**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

JUL 2 7 2021

TAMMY H. DOWNS, CLERK
By: *Ktrips*
_____
DEP CLERK

### IN THE UNITED STATES DISTRICT COURT FOR THE
### EASTERN DISTRICT OF ARKANSAS
### CENTRAL DIVISION

**DR. LENSEY SCOTT**                                                    **PLAINTIFF**

**V.**                                                   CASE NO. 4:21-cv-670-BSM

**CONWAY REGIONAL MEDICAL CENTER, INC.;**                       **DEFENDANTS**
**JACK STEPHENS HEART INSTITUTE, LLC; and**
**ST. VINCENT INFIRMARY MEDICAL CENTER**

### NOTICE OF REMOVAL

Pursuant to 28 U.S.C. §§ 1331, 1441, and 1446, Defendants St. Vincent Infirmary Medical

Center ("**St. Vincent**") and Jack Stephens Heart Institute, LLC ("**JSHI**") hereby remove this action

from the 20th Judicial Circuit Court, Division 1, Faulkner County, Arkansas to the United States

District Court for the Eastern District of Arkansas, Central Division. Federal jurisdiction is proper

on the basis of federal question jurisdiction under 28 U.S.C. § 1331. In support of this Notice of

Removal, St. Vincent and JSHI state as follows.

This case assigned to District Judge Miller
and to Magistrate Judge Kearney

### State Court Action

1.      On April 13, 2021, Plaintiff Lensey Scott ("Plaintiff") filed a Complaint against

Defendant Conway Regional Medical Center, Inc. ("**Conway Regional**") in the 20th Judicial

Circuit Court, Division 1, Faulkner County, Arkansas, Case No. 23CV-21-404.

2.      On June 9, 2021, Plaintiff filed an Amended Complaint adding St. Vincent and

JSHI as Defendants in addition to Conway Regional.

3.      Plaintiff served St. Vincent and JSHI on June 29, 2021 with a Summons and the

Amended Complaint (the "**Petition**"). Copies of the Summons, Petition, Civil Cover Sheet, and

Exhibits, as well as the remainder of the State Court file, are attached hereto as **Exhibit A**. No

78921330.1

other process, pleadings, or orders have been served on St. Vincent or JSHI. *See* 28 U.S.C. § 1446(a).

## **Grounds for Removal**

4.     Plaintiff makes claims under, alleges that St. Vincent and JSHI violated, and alleges that St. Vincent and JSHI are liable for racial discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e et seq. ("**Title VII**"), 42 U.S.C. § 1981 et seq. ("**Section 1981**"), and the Arkansas Civil Rights Act, AR Code § 16-123-107 et seq. ("**ACRA**"). *See* Petition, ¶¶1, 40-72.

5.     Racial discrimination claims made under Section 1981 and Title VII "aris[e] under" the laws of the United States, as they are federal laws. *See Arbaugh v. Y&H Corp.*, 546 U.S. 500, 500 (2006) (noting that Title VII "fit[s] within the Judicial Code's grant of subject-matter jurisdiction to federal courts over actions 'arising under' federal law" and that Title VII's own jurisdictional provision, 42 US.C. § 2000e-5(f)(3), also "empowers federal courts to adjudicate civil actions" brought under Title VII).

6.     Claims not within the federal courts' original jurisdiction, such as Plaintiff's ACRA claim may still be heard in federal court, so long as the court has supplemental jurisdiction over the claim. *See* 28 U.S.C. § 1367(a).

7.     Supplemental jurisdiction exists where, as here, federal-law and state-law claims "derive from a common nucleus of operative fact." *S. Council of Indus. Workers v. Ford*, 83 F.3d 966, 969 (8th Cir. 1996) (quoting *Kan. Pub. Emps. Ret. Sys. v. Reimer & Koger Assocs., Inc.* 77 F.3d 1063, 1067 (8th Cir. 1996)).

8.     Thus, this Court has original federal question jurisdiction and supplemental jurisdiction over the entire subject action pursuant to 28 U.S.C. §§ 1331 and 1367(a), respectively.

**Timeliness of Removal**

9.      This Notice of Removal is being filed within thirty (30) days of service on defendants St. Vincent and JSHI on June 29, 2021, which was St. Vincent's and JSHI's first receipt of the Summons and Complaint through any means of purported service. Thus, this removal is timely pursuant to 28 U.S.C. § 1446(b) and Rule 6(a) of the Federal Rules of Civil Procedure. *See Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344 (1999) (thirty-day deadline to remove commences upon service of the summons and complaint).

**Joinder**

10.      All three defendants – i.e., Conway Regional, St. Vincent, and JSHI consent to this removal. St. Vincent and JSHI have filed the removal while Conway Regional, which was earlier-served, has consented to the removal. *See* 28 U.S.C. § 1446(b)(2)(C)("If defendants are served at different times, and a later-served defendant files a notice of removal, any earlier-served defendant may consent to the removal even though that earlier-served defendant did not previously initiate or consent to removal."). *See also* Conway Regional's Notice of Consent to Removal, attached hereto as **Exhibit B**.

**Venue**

11.      Venue lies in the United States District Court for the Eastern District of Arkansas, Central Division, pursuant to 28 U.S.C. §§ 1441 and 83(a)(1). This action originally was brought in the 20th Judicial Circuit Court, Faulkner County, Arkansas, which is located within the Eastern District of Arkansas, Central Division. Therefore, venue is proper because it is the "district and division embracing the place where such action is pending." 28 U.S.C. § 1441(a).

**Notice of Removal**

12.     Notice of this removal will promptly be filed with the 20th Judicial Circuit Court, Faulkner County, Arkansas and served upon all parties.

WHEREFORE, Defendants St. Vincent Infirmary Medical Center and Jack Stephens Heart Institute, LLC, through counsel, remove this matter from the 20th Judicial Circuit Court, Division 1, Faulkner County, Arkansas to this United States District Court, Eastern District of Arkansas, Central Division.

Dated:  July 27, 2021.

Respectfully submitted,

Cynthia W. Kolb (#2000156)
ckolb@cgwg.com
**Cross, Gunter, Witherspoon**
  **& Galchus, P.C.**
500 President Clinton Avenue, Suite 200
Little Rock, Arkansas 72201
Telephone: (501) 371-9999
Facsimile: (501) 371-0035


*Counsel for St. Vincent Infirmary Medical Center and Jack Stephens Heart Institute, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on the 27th day of July, 2021, I transmitted the foregoing via Electronic

Mail and U.S. Mail, postage prepaid to the following:

Dylan J. Botteicher
Cox, Sterling, McClure & Vandiver, PLLC
8712 Counts Massie Rd.
North Little Rock, AR 72113
djbotteicher@csmfirm.com

Gabriel D. Mallard
Taylor S. Pray
Mallard Gardner, PllC
1422 Scott Street
Little Rock, AR 72202
gabriel.mallard@mallardgardner.com
taylor.pray@mallardgardner.com

*Counsel for Plaintiff Lensey Scott*

*Counsel for Conway Regional Medical Center*

Cynthia W. Kolb

# EXHIBIT A

https://caseinfo.arcourts.gov/cconnect/PROD/public/ck_public_qry_doct.cp_dktrpt_frames?back
to=P&case_id=23CV-21-404&begin_date=&end_date=

**Report Selection Criteria**

**Case ID:**          23CV-21-404

**Citation No:**

**Docket Start Date:**

**Docket Ending Date:**

**Case Description**

**Case ID:**   23CV-21-404 - DR LENSEY SCOTT V CONWAY REGIONAL MEDICAL
CENTER -*NON-TRIAL*

**Filing
Date:**        Tuesday , April 13th, 2021

**Court:**     23 - FAULKNER

**Location:**  CI - CIRCUIT

**Type:**      EM - EMPLOYMENT DISCRIMINATION

**Status:**    OPEN - CASE OPEN

**Docket Entries**

| Filing Date | Description | Name | Monetary |
|---|---|---|---|
| 04/13/2021 03:20 PM | AOC COVERSHEET CIVIL | BOTTEICHER, JAMES | DYLAN |

**Entry:**   *none.*

78964308.1

**Images**       No Images

| 04/13/2021<br>03:20 PM | COMPLAINT/PETITION FILED $ | BOTTEICHER,<br>JAMES | DYLAN |

**Entry:**      *none.*

**Images**      WEB

| 04/13/2021<br>03:20 PM | SUMMONS FEE 21-6-402 $ | BOTTEICHER,<br>JAMES | DYLAN |

**Entry:**      *none.*

**Images**      No Images

| 04/13/2021<br>03:20 PM | SUMMONS ISSUED | BOTTEICHER,<br>JAMES | DYLAN |

**Entry:**      CONWAY REGIONAL MEDICAL CENTER INC

**Images**      WEB

| 04/13/2021<br>03:20 PM | MOF ORIGINAL | BOTTEICHER,<br>JAMES | DYLAN |

**Entry:**      *none.*

**Images**      No Images

78964308.1

04/13/2021   PAYMENT RECEIVED
03:34 PM

**Entry:**      A Payment of $167.50 was made on receipt 23CI19675.

**Images**    No Images

05/03/2021   SUMMONS SERVED                    BOTTEICHER,      DYLAN
12:34 PM                                        JAMES

**Entry:**      *none.*

**Images**    WEB

05/27/2021   MOTION DISMISS
01:44 PM

**Entry:**      *none.*

**Images**    WEB

05/27/2021   EFILING        NOTICE      OF   MALLARD,      GABRIEL
01:44 PM   APPEARANCE                         DOUGLAS

**Entry:**      *none.*

**Images**    No Images

3

| 05/27/2021 01:52 PM | BRIEF IN SUPPORT | MALLARD, DOUGLAS | GABRIEL |

**Entry:**   Motion to Dismiss

**Images**   <u>WEB</u>

| 06/09/2021 12:11 PM | AMENDED COMPLAINT | BOTTEICHER, JAMES | DYLAN |

**Entry:**   *none.*

**Images**   <u>WEB</u>

| 06/09/2021 12:31 PM | SUMMONS FEE 21-6-402 $ | BOTTEICHER, JAMES | DYLAN |

**Entry:**   *none.*

**Images**   No Images

| 06/09/2021 12:31 PM | SUMMONS ISSUED | BOTTEICHER, JAMES | DYLAN |

**Entry:**   CT CORPORATION SYSTEM

**Images**   <u>WEB</u>

| 06/09/2021 12:46 PM | PAYMENT RECEIVED |

4

78964308.1

**Entry:**    A Payment of $2.50 was made on receipt 23CI20269.

**Images**    No Images

06/10/2021   RESPONSE TO MOTION FILED        BOTTEICHER,       DYLAN
11:27 AM                                     JAMES

**Entry:**    PLAINTIFF'S   RESPONSE   TO   DEFENDANT   CONWAY   REGIONAL
              MEDICAL CENTER, INC.'S MOTION TO DISMISS

**Images**    WEB

06/29/2021   MOTION DISMISS                  MALLARD,         GABRIEL
03:00 PM                                     DOUGLAS

**Entry:**    *none.*

**Images**    WEB

06/29/2021   BRIEF IN SUPPORT               MALLARD,         GABRIEL
03:03 PM                                     DOUGLAS

**Entry:**    Motion to Dismiss Amended Complaint

**Images**    WEB

07/08/2021   RETURN OF SERVICE              BOTTEICHER,       DYLAN
12:09 PM                                     JAMES

**Entry:**    Return of Service of Jack Stephens Heart Institute

78964308.1

**Images**      <u>WEB</u>

07/08/2021   RETURN OF SERVICE                BOTTEICHER,      DYLAN
12:09 PM                                       JAMES

**Entry:**     Return of Service of St. Vincent Infirmary Medical Center

**Images**     <u>WEB</u>

07/12/2021   RESPONSE TO MOTION FILED        BOTTEICHER,      DYLAN
02:26 PM                                       JAMES

**Entry:**     PLAINTIFF'S   RESPONSE   TO   DEFENDANT   CONWAY   REGIONAL
              MEDICAL CENTER, INC.'S MOTION TO DISMISS

**Images**     <u>WEB</u>

07/16/2021   RESPONSE/REPLY
04:15 PM

**Entry:**     Defendant CRMC's Reply in Support of Motion to Dismiss

**Images**     <u>WEB</u>

07/16/2021   EFILING        NOTICE        OF  PRAY, TAYLOR SLOVER
04:15 PM     APPEARANCE

**Entry:**     *none.*

6

**Images**      No Images

07/19/2021     SUMMONS FEE 21-6-402 $          BOTTEICHER,      DYLAN
10:48 AM                                       JAMES

**Entry:**      *none.*

**Images**      No Images

07/19/2021     SUMMONS ISSUED                  BOTTEICHER,      DYLAN
10:48 AM                                       JAMES

**Entry:**      JACK STEPHENS HEART INSTITUTE LLC

**Images**      WEB

07/19/2021     SUMMONS FEE 21-6-402 $          BOTTEICHER,      DYLAN
10:48 AM                                       JAMES

**Entry:**      *none.*

**Images**      No Images

07/19/2021     SUMMONS ISSUED                  BOTTEICHER,      DYLAN
10:48 AM                                       JAMES

**Entry:**      ST VINCENT INFIRMARY MEDICAL CENTER

**Images**      WEB

78964308.1

07/19/2021   PAYMENT RECEIVED
10:53 AM

**Entry:**         A Payment of $5.00 was made on receipt 23CI20666.

**Images**      No Images

78964308.1

ELECTRONICALLY FILED
Faulkner County Circuit Court
Crystal Taylor, Circuit Clerk
2021-Apr-13  15:20:45
23CV-21-404
C20D01 : 12 Pages

## IN THE CIRCUIT COURT OF FAULKNER COUNTY, ARKANSAS
### CIVIL DIVISION

**DR. LENSEY SCOTT**                                            **PLAINTIFF**

**VS.**                          **CASE NO. _____**

**CONWAY REGIONAL MEDICAL**
**CENTER, INC.**                                               **DEFENDANT**

### COMPLAINT

COMES NOW the Plaintiff, Dr. Lensey Scott (hereinafter "Plaintiff" or "Dr. Scott"), by and through counsel, Cox, Sterling, McClure & Vandiver, PLLC, and for his Complaint against Defendant, Conway Regional Medical Center, Inc. (hereinafter the "Conway Regional"), hereby states and alleges as follows:

### INTRODUCTION

This is an action to redress discrimination based on race in violation of Title VII of the Civil Rights Act of 1964, as amended (hereinafter "Title VII"), to redress discrimination in violation of the Arkansas Civil Rights Act of 1993 (the "ACRA"), Ark. Code Ann. §16-123-101, *et seq.,* and to redress discrimination based on race in violation of 42 U.S.C. § 1981, to award full back pay and benefits, front pay, liquidated, compensatory, and punitive damages, and all other benefits of Dr. Scott's employment to which he would have been entitled had he not been the victim of discrimination based on his race.

### PARTIES, JURISDICTION, AND VENUE

1.      Jurisdiction of this Court is invoked under both the Arkansas Civil Rights Act of 1993, Ark. Code Ann. §§ 16-123-101 *et seq*., and 42 U.S.C. § 1981.

2.      Venue is proper in this Court.

3.      Dr. Scott is a resident of Faulkner County, Arkansas and worked as an employee for Conway Regional in Faulkner County, Arkansas.

4.      Upon information and belief, and at all times relevant to this complaint, Conway Regional, is an Arkansas limited liability company that does business in Faulkner County, Arkansas.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

5.      Under 42 U.S.C. § 1981, there is no requirement to exhaustion of administrative remedies. *Cheyney State College Faculty v. Hufstedler*, 703 F.2d 732, 737 (3d Cir. 1983).

6.      Exhaustion of remedies not required under Arkansas Civil Rights Act ("ACRA") because the statute does not provide that administrative procedures will be exclusive, and according to the Supreme Court of the United States, "The most common application of the exhaustion doctrine is in cases where the relevant statute provides that certain administrative procedures shall be exclusive." *McKart v. U.S.*, 395 U.S. 185, 193 (1969).  The ACRA provides that any party in violation of the Act will be liable in a circuit court for damages. Ark. Code Ann. § 16-123-105(a).

7.      On or about January 5, 2021, Dr. Scott filed a Charge of Discrimination against Conway Regional with the Little Rock Office of the Equal Employment Opportunity Commission (the "EEOC"), Charge No. 493-2021-00533. A copy of the EEOC charge of discrimination has been attached hereto as Exhibit "A" and is incorporated by reference herein.

8.      By notice dated January 14, 2021, Dr. Scott was notified by the EEOC of his right to file a civil action against the District. A copy of the right-to-sue letter has been attached hereto as Exhibit "B" and is incorporated by reference herein.

9.      This lawsuit has been timely filed within 90 days of Dr. Scott's receipt of the EEOC's right-to-sue notice.

## GENERAL FACTUAL ALLEGATIONS

10.     Plaintiff restates and incorporates herein by reference the preceding paragraphs of his Complaint as if fully set forth herein word for word.

11.     Plaintiff was employed as a cardiologist and his employer was Conway Regional.

12.     Conway Regional at all times had control of the terms and conditions of Dr. Scott's employment.

13.     During his employment, Dr. Scott was subjected to continual harassment by his superiors are Conway Regional.

14.     The harassment existed in many forms. Dr. Scott was regularly not paid the full amount for services rendered for work performed even though white physicians were consistently paid the full amount for the same services. Dr. Scott submitted unbilled hospital charges, but Conway Regional refused to reimburse Dr. Scott. Conway Regional always reimbursed white physicians who submitted similar charges.

15.     Matt Troup, the President and CEO of Conway Regional, repeatedly reported Dr. Scott for bogus unprofessional behavior allegations in an attempt to humiliate Dr. Scott, to have his licensing impacted, and to force him to resign.

16.     Dr. Scott consistently complained that he was unable to be assigned cases in the evening when white physicians regularly were assigned cases. Despite Dr. Scott's complaints, Conway Regional still refused to allow him to provide services in the evening.

17.     Dr. Scott was cursed and screamed at by a white Conway Regional employee during one of the conversations regarding his inability to do cases, and when he complained about

3

this behavior, Conway Regional punished Dr. Scott for reporting the issue rather than disciplining the egregious behavior done by the white employee. Conway Regional never punished its white physicians when similar incidents occurred.

18.     Dr. Scott complained about this behavior, and in retaliation for his complaint Conway Regional falsely reported Dr. Scott for having behavioral issues and informed him that he would have to have an evaluation done on his mental health in Kansas immediately. Conway Regional informed Dr. Scott that he would lose his privileges at Conway Regional if he did not comply. When Dr. Scott explained that he was uncomfortable travelling and leaving his family during the racial unrest at the time and the pandemic, Conway Regional still required Dr. Scott to travel to Kansas immediately.

19.     One of the many false complaints regarding Dr. Scott involved an inappropriate heart catheter. The EKG for the patient was reviewed by four cardiologists, all who agreed that a procedure should not have been done. Conway Regional directed one of its cardiologists to perform the operation in order to discredit Dr. Scott so that it could report him for failing to provide care to a patient.

20.     Dr. Scott was not the only minority physician who complained about the discrimination he was facing. Dr. Deepali Nivas Tukaye made similar complaints and faced retaliation as well.

21.     Dr. Tukaye complained about white employees screaming and cursing at her, and none of the white employees ever faced discipline for their actions.

22.     Conway Regional ultimately informed Dr. Scott and Dr. Tukaye that it would not be renewing their contracts to provide services. Conway Regional renewed the contracts of all white cardiologists.

23.     There were no African-Americans in management positions in Conway Regional throughout Dr. Scott's employment.

24.     Conway Regional never took steps to curb the behavior against Dr. Scott despite his reporting of the unwanted harassment and overall hostile work environment. This caused Dr. Scott to suffer mental distress.

25.     None of this offensive and unwanted actions were directed to white employees at Conway Regional.

26.     Dr. Scott exhausted all possible remedies to try to improve his work situation. When his efforts proved fruitless, and when Conway Regional informed Dr. Scott that it would not be renewing his contract to provide services, Dr. Scott resigned to seek other employment.

27.     Conway Regional engaged in policies and practices which willfully, intentionally, and unlawfully discriminated against Dr. Scott on the basis of his race. These practices and policies include, but are not limited to, tolerating the continual barrage racist actions toward Dr. Scott and persistently refusing to take any action regarding that barrage.

28.     Dr. Scott's constructive discharge was the result of a practice to ignore complaints of harassment and offensive behavior and to protect white management employees from the consequences of their improper and unwanted remarks and actions.

29.     As a result of Conway Regional's conduct, Dr. Scott suffered damages.

### CAUSE OF ACTION
### VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964

30.     Dr. Scott restates and incorporates herein by reference the preceding paragraphs of his Complaint as if fully set forth herein word for word.

31.     Dr. Scott was a dedicated and exemplary employee during his service at Conway Regional.

5

32.     Dr. Scott was subjected to unwanted and offensive harassment, about which he complained, and about which nothing was done until the conditions of his employment became so intolerable that he was forced to resign.

33.     Conway Regional was tolerant of the unwanted harassment in spite of the fact that Conway Regional knew about the harassment and failed to take action.

34.     This harassing and discriminatory behavior was sufficiently severe and pervasive to unreasonably interfere with Dr. Scott's physical health and work performance.

35.     As a result of Conway Regional's failure to protect Dr. Scott from harassment and discrimination, he suffered humiliation, emotion distress, and physical pain.

36.     Conway Regional failed to take any reasonable or necessary steps to eliminate discrimination from its workplace or to prevent it from occurring in the future and, as a result, Dr. Scott was constructively discharged.

37.      Dr. Scott has incurred damages due to Conway Regional's actions.

### CAUSE OF ACTION
### VIOLATION OF 42 U.S.C. § 1981

38.     Dr. Scott restates and incorporates herein by reference the preceding paragraphs of his Complaint as if fully set forth herein word for word.

39.     Dr. Scott was a dedicated and exemplary employee during his service at Conway Regional.

40.     Dr. Scott was subjected to unwanted and offensive harassment, about which he complained, and about which nothing was done until the conditions of his employment became so intolerable that he was forced to resign.

41.     Conway Regional was tolerant of the unwanted harassment in spite of the fact that Conway Regional knew about the harassment and failed to take action.

6

42.     This harassing and discriminatory behavior was sufficiently severe and pervasive to unreasonably interfere with Dr. Scott's physical health and work performance.

43.     As a result of Conway Regional's failure to protect Dr. Scott from harassment and discrimination, he suffered humiliation, emotion distress, and physical pain.

44.     Conway Regional failed to take any reasonable or necessary steps to eliminate discrimination from its workplace or to prevent it from occurring in the future and, as a result, Dr. Scott was constructively discharged.

45.     Dr. Scott has incurred damages due to Conway Regional's actions.

## CAUSE OF ACTION
## VIOLATION OF THE ARKANSAS CIVIL RIGHTS ACT OF 1993

46.     Dr. Scott restates and incorporates herein by reference the preceding paragraphs of his Complaint as if fully set forth herein word for word.

47.     Dr. Scott was a dedicated and exemplary employee during his service at Conway Regional.

48.     Dr. Scott was subjected to unwanted and offensive harassment, about which he complained, and about which nothing was done until the conditions of his employment became so intolerable that he was forced to resign.

49.     Conway Regional was tolerant of the unwanted harassment in spite of the fact that Conway Regional knew about the harassment and failed to take action.

50.     This harassing and discriminatory behavior was sufficiently severe and pervasive to unreasonably interfere with Dr. Scott's physical health and work performance.

51.     As a result of Conway Regional's failure to protect Dr. Scott from harassment and discrimination, he suffered humiliation, emotion distress, and physical pain.

52.     Conway Regional failed to take any reasonable or necessary steps to eliminate discrimination from its workplace or to prevent it from occurring in the future and, as a result, Dr. Scott was constructively discharged.

53.     Dr. Scott has incurred damages due to Conway Regional's actions.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff seeks judgment against the Defendant for all just and proper relief including:

(A) Plaintiff seeks a jury trial on all issues so triable;

(B) Plaintiff seeks compensatory damages including lost wages, past and future lost income, physical pain, emotional distress, humiliation, and past and future medical expenses. As to lost wages, Plaintiff seeks an order awarding Plaintiff back pay, pre-judgment interest, fringe benefits, and any other appropriate relief necessary to make Plaintiff whole and compensate HIM for the civil rights violations described above;

(C) Award Plaintiff front pay, fringe benefits, and other compensation; and

(D) Award Plaintiff the costs of this action, including reasonable attorney's fees, and such other legal and equitable relief as this Court deems just and proper.

Respectfully Submitted,

By:    _/s/ Dylan Botteicher_
          Dylan J. Botteicher (ABN 201710)
          COX, STERLING, MCCLURE &
          VANDIVER, PLLC
          8712 Counts Massie Rd.
          North Little Rock, AR 72113
          T: (501) 954-8073
          F: (501) 954-7856
          E: djbotteicher@csmfirm.com
          ATTORNEY FOR THE PLAINTIFF



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

**CHARGE OF DISCRIMINATION**

EEOC Form 5A (7/2016)

| | |
|---|---|
| **Personal Information** | Name (First, Middle, Last): Lensey C. Scott<br><br>Street Address: 1815 Centennial Club Drive<br><br>City: Conway    State: AR    Zip Code: 72034<br><br>Telephone Number: 850-284-9010    ☐ Home  ☐ Work  ☑ Cell |
| **Information about the company or organization you believe discriminated against you.** | Organization Name: Conway Regional Medical Center<br><br>Street Address: 2302 College Ave.<br><br>City: Conway    State: AR    Zip Code: 72034<br><br>Your job title or the title of the job for which you applied: Physician |
| **Why you believe you were discriminated against?** | Race ☒          Color ☐          Religion ☐          National Origin ☐<br>Sex ☐          Disability ☐          Age ☐          Genetic Information ☐<br>          Retaliation ☒          Other ☐ |
| **What happened to you that you believe was discriminatory?** | Date(s) Discrimination Took Place: Earliest _July 2020_          Latest _September 2020_<br><br>My employer treated me, an African American, differently than my white colleagues. I was terminated after I complained about this behavior. |
| **Signature and Verification** | I understand this charge will be filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.<br><br>I understand by signing below that I am filing a charge of employment discrimination with the EEOC. I understand that the EEOC is required by law to give a copy of the charge, which includes my name, to the organization named above. I also understand that the EEOC can only investigate charges of job discrimination based on race, color, religion, sex, national origin, disability, age, genetic information, or based on retaliation for filing a charge of employment discrimination, helping in someone else's complaint about job discrimination, or complaining to the employer about job discrimination.<br><br>I declare under penalty of perjury that the above is true and correct.<br><br>Signature: _Lensey Scott_          Date: _1/4/2021_ |

EXHIBIT A

EEOC Form 161 (11/2020)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## DISMISSAL AND NOTICE OF RIGHTS

| To: **Lensey Scott**<br>**1815 Centennial Club Drive**<br>**Conway, AR 72034** | From: **Little Rock Area Office**<br>**820 Louisiana**<br>**Suite 200**<br>**Little Rock, AR 72201** |
|---|---|

|  | ☐ | *On behalf of person(s) aggrieved whose identity is*<br>*CONFIDENTIAL (29 CFR §1601.7(a))* | |
|---|---|---|---|

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| **493-2021-00533** | **Lynda F. Fier,**<br>**Enforcement Supervisor** | **(501) 324-5468** |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

☐  The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

☐  Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

☐  The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

☐  Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

☐  The EEOC issues the following determination: The EEOC will not proceed further with its investigation, and makes no determination about whether further investigation would establish violations of the statute. This does not mean the claims have no merit. This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge.

☐  The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

☒  Other *(briefly state)*   **No employee/employer relationship**

### - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed <u>WITHIN 90 DAYS</u> of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred <u>more than 2 years (3 years)</u> before you file suit may not be collectible.**

On behalf of the Commission

_W_____    January 14, 2021

Enclosures(s)

**William A. Cash, Jr.,**
**Area Office Director**

*(Date Issued)*

cc:   **CONWAY REGIONAL MEDICAL CENTER**
**Attn:  Richard Tyler**
**2302 College Avenue**
**Conway, AR 72034**

**Dylan Botteicher**
**COX, STERLING, MCCLURE & VANDIVER, PLLC**
**8712 Counts Massie Road**
**North Little Rock, AR 72113**

EXHIBIT B

Enclosure with EEOC
Form 161 (11/2020)

## INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court under Federal law.*
*If you also plan to claim violations of State law, please be aware that time limits and other*
*provisions of State law may be shorter or more limited than those described below.)*

**PRIVATE SUIT RIGHTS   --   Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA), the Genetic Information Nondiscrimination Act (GINA), or the Age Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge **within 90 days** of the date you *receive* this Notice. Therefore, you should **keep a record of this date**. Once this 90-day period is over, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and its envelope or record of receipt, and tell him or her the date you received it. Furthermore, in order to avoid any question that you did not act in a timely manner, it is prudent that your suit be filed **within 90 days of the date this Notice was** *issued* to you (as indicated where the Notice is signed) or the date of the postmark or record of receipt, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. (Usually, the appropriate State court is the general civil trial court.) Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. Filing this Notice is not enough. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Your suit may include any matter alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters alleged in the charge. Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some cases can be brought where relevant employment records are kept, where the employment would have been, or where the respondent has its main office. If you have simple questions, you usually can get answers from the office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint or make legal strategy decisions for you.

**PRIVATE SUIT RIGHTS   --   Equal Pay Act (EPA):**

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back pay due for violations that occurred **more than 2 years (3 years)** before you file suit may not be collectible. For example, if you were underpaid under the EPA for work performed from 7/1/08 to 12/1/08, you should file suit before 7/1/10 – *not* 12/1/10 -- in order to recover unpaid wages due for July 2008. This time limit for filing an EPA suit is separate from the 90-day filing period under Title VII, the ADA, GINA or the ADEA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA or the ADEA, in addition to suing on the EPA claim, suit must be filed within 90 days of this Notice and within the 2- or 3-year EPA back pay recovery period.

**ATTORNEY REPRESENTATION   --   Title VII, the ADA or GINA:**

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction in your case may, in limited circumstances, assist you in obtaining a lawyer. Requests for such assistance must be made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your efforts to retain an attorney). Requests should be made well before the end of the 90-day period mentioned above, because such requests do not relieve you of the requirement to bring suit within 90 days.

**ATTORNEY REFERRAL AND EEOC ASSISTANCE   --   All Statutes:**

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any questions about your legal rights, including advice on which U.S. District Court can hear your case. If you need to inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide your charge number (as shown on your Notice). While EEOC destroys charge files after a certain time, all charge files are kept for at least 6 months after our last action on the case. Therefore, if you file suit and want to review the charge file, **please make your review request within 6 months** of this Notice. (Before filing suit, any request should be made within the next 90 days.)

*IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.*

EXHIBIT B

**IN THE CIRCUIT COURT OF FAULKNER COUNTY, ARKANSAS**
**20TH CIRCUIT DIVISION 1**

DR LENSEY SCOTT V CONWAY REGIONAL MEDICAL CENTER

23CV-21-404

**SUMMONS**

**THE STATE OF ARKANSAS TO DEFENDANT:**

CONWAY REGIONAL MEDICAL CENTER, INC.
2302 College Ave
2302 College Ave
Conway, AR  72034

A lawsuit has been filed against you. The relief demanded is stated in the attached complaint.  Within 30 days after service of this summons on you (not counting the day you received it) - or 60 days if you are incarcerated in any jail, penitentiary, or other correctional facility in Arkansas - you must file with the clerk of this court a written answer to the complaint or a motion under Rule 12 of the Arkansas Rules of Civil Procedure.

The answer or motion must also be served on the plaintiff or plaintiff's attorney, whose name and address are:

Dylan J. Botteicher
8712 Counts Massie Road
North Little Rock, AR  72113

If you fail to respond within the applicable time period, judgment by default may be entered against you for the relief demanded in the complaint.

Additional notices:
•Notice of Right to Consent to Disposition of Case by a State District Court Judge

CLERK OF COURT

Address of Clerks Office

CRYSTAL TAYLOR, CIRCUIT CLERK
CIRCUIT COURT OF FAULKNER COUNTY
724 LOCUST STREET
CONWAY, AR  72034



N Eastham, DC

Date: 04/13/2021

## NOTICE OF RIGHT TO CONSENT
## TO DISPOSITION OF CASE BY A STATE DISTRICT COURT JUDGE

In accordance with Administrative Order Number 18, you are hereby notified that upon the consent of all the parties in a case, a State District Court Judge may be authorized to conduct all proceedings, including trial of the case and entry of a final judgment. Copies of appropriate consent forms are available from the Circuit Clerk.

You should be aware that your decision to consent or not to consent to the disposition of your case before a State District Court Judge is entirely voluntary, and by consenting to the reference of this matter to a State District Court Judge, the parties waive their right to a jury trial, and any appeal in the case shall be taken directly to the Arkansas Supreme Court or Court of Appeals as authorized by law.

You should communicate your consent by completing the Form -- CONSENT TO PROCEED BEFORE A STATE DISTRICT COURT JUDGE -- and return to the Circuit Clerk.

Circuit Clerk
Date: 04/13/2021

No. 23CV-21-404 This summons is for CONWAY REGIONAL MEDICAL CENTER, INC. (name of Defendant).

PROOF OF SERVICE

❏ On _____ [date] I personally delivered the summons and complaint to the individual at _____ [place]; or

❏ After making my purpose to deliver the summons and complaint clear, on _____ [date] I left the summons and complaint in the close proximity of the defendant by _____ [describe how the summons and complaint was left] after he/she refused to receive it when I offered it to him/her; or

❏ On _____ [date] I left the summons and complaint with _____, a member of the defendant's family at least 18 years of age, at _____ [address], a place where the defendant resides; or

❏ On _____ [date] I delivered the summons and complaint to _____ [name of individual], an agent authorized by appointment or by law to receive service of summons on behalf of _____ [name of defendant]; or

❏ On _____ [date] at _____ [address], where the defendant maintains and office or other fixed location for the conduct of business, during normal working hours I left the summons and complaint with _____

[name and job description]; or

❏ I am the plaintiff or an attorney of record for the plaintiff in this lawsuit, and I served the summons and complaint on the defendant by certified mail, return receipt requested, restricted delivery, as shown by the attached signed return receipt.

❏ I am the plaintiff or an attorney of record for the plaintiff in this lawsuit, and I mailed a copy of the summons and complaint by first-class mail to the defendant together with two copies of a notice and acknowledgment and received the attached notice and acknowledgment form within twenty days after the date of mailing.

❏ Other [specify]:
_____

❏ I was unable to execute service because:
_____
_____

My fee is $ _____.

**To be completed if service is by a sheriff or deputy sheriff:**

Date: _____          SHERIFF OF _____ COUNTY, ARKANSAS

By: _____
[Signature of server]


_____
[Printed name, title, and badge number]

**To be completed if service is by a person other than a sheriff or deputy sheriff:**

Date: _____     By: _____
[Signature of server]


_____
[Printed name]

Address: _____

_____

Phone: _____

Subscribed and sworn to before me this date: _____


_____
Notary Public

My commission expires: _____

Additional information regarding service or attempted service:

_____

_____

ELECTRONICALLY FILED
Faulkner County Circuit Court
Crystal Taylor, Circuit Clerk
2021-May-03 12:34:17
23CV-21-404
C20D01 : 4 Pages

**IN THE CIRCUIT COURT OF FAULKNER COUNTY, ARKANSAS
20TH CIRCUIT DIVISION 1**

DR LENSEY SCOTT V CONWAY REGIONAL MEDICAL CENTER

23CV-21-404

**SUMMONS**

**THE STATE OF ARKANSAS TO DEFENDANT:**

CONWAY REGIONAL MEDICAL CENTER, INC.
2302 College Ave
2302 College Ave
Conway, AR  72034

A lawsuit has been filed against you. The relief demanded is stated in the attached complaint.  Within 30 days after service of this summons on you (not counting the day you received it) - or 60 days if you are incarcerated in any jail, penitentiary, or other correctional facility in Arkansas - you must file with the clerk of this court a written answer to the complaint or a motion under Rule 12 of the Arkansas Rules of Civil Procedure.

The answer or motion must also be served on the plaintiff or plaintiff's attorney, whose name and address are:

Dylan J. Botteicher
8712 Counts Massie Road
North Little Rock, AR  72113

If you fail to respond within the applicable time period, judgment by default may be entered against you for the relief demanded in the complaint.

Additional notices:
•Notice of Right to Consent to Disposition of Case by a State District Court Judge

CLERK OF COURT

Address of Clerks Office

CRYSTAL TAYLOR, CIRCUIT CLERK
CIRCUIT COURT OF FAULKNER COUNTY
724 LOCUST STREET
CONWAY, AR  72034



N Eastham, DC

Date: 04/13/2021

## NOTICE OF RIGHT TO CONSENT
## TO DISPOSITION OF CASE BY A STATE DISTRICT COURT JUDGE

In accordance with Administrative Order Number 18, you are hereby notified that upon the consent of all the parties in a case, a State District Court Judge may be authorized to conduct all proceedings, including trial of the case and entry of a final judgment. Copies of appropriate consent forms are available from the Circuit Clerk.

You should be aware that your decision to consent or not to consent to the disposition of your case before a State District Court Judge is entirely voluntary, and by consenting to the reference of this matter to a State District Court Judge, the parties waive their right to a jury trial, and any appeal in the case shall be taken directly to the Arkansas Supreme Court or Court of Appeals as authorized by law.

You should communicate your consent by completing the Form -- CONSENT TO PROCEED BEFORE A STATE DISTRICT COURT JUDGE -- and return to the Circuit Clerk.

Circuit Clerk
Date: 04/13/2021

No. 23CV-21-404 This summons is for CONWAY REGIONAL MEDICAL CENTER, INC. (name of Defendant).

PROOF OF SERVICE

❑ On _____ [date] I personally delivered the summons and complaint to the individual at _____ [place]; or

❑ After making my purpose to deliver the summons and complaint clear, on _____ [date] I left the summons and complaint in the close proximity of the defendant by _____ _____ [describe how the summons and complaint was left] after he/she refused to receive it when I offered it to him/her; or

❑ On _____ [date] I left the summons and complaint with _____, a member of the defendant's family at least 18 years of age, at _____ [address], a place where the defendant resides; or

☒ On 4-27-2021 at 2:20 PM [date] I delivered the summons and complaint to Matthew E. Troup [name of individual], an agent authorized by appointment or by law to receive service of summons on behalf of Conway Regional Medical Center [name of defendant]; or

❑ On _____ [date] at _____ [address], where the defendant maintains and office or other fixed location for the conduct of business, during normal working hours I left the summons and complaint with _____

[name and job description]; or

❑ I am the plaintiff or an attorney of record for the plaintiff in this lawsuit, and I served the summons and complaint on the defendant by certified mail, return receipt requested, restricted delivery, as shown by the attached signed return receipt.

❑ I am the plaintiff or an attorney of record for the plaintiff in this lawsuit, and I mailed a copy of the summons and complaint by first-class mail to the defendant together with two copies of a notice and acknowledgment and received the attached notice and acknowledgment form within twenty days after the date of mailing.

❑ Other [specify]:
_____

❑ I was unable to execute service because:
_____
_____

My fee is $ _____.

**To be completed if service is by a sheriff or deputy sheriff:**

Date: _____          SHERIFF OF _____ COUNTY, ARKANSAS

By: _____
[Signature of server]

_____
[Printed name, title, and badge number]

**To be completed if service is by a person other than a sheriff or deputy sheriff:**

Date: 4-27-2021     By: _____
[Signature of server]

*John A. Burns, Jr*
[Printed name]

Address: *1519 Ellen Court*
*Little Rock, AR  72212*

Phone: *501-960-7414*

Subscribed and sworn to before me this date: *4-27-2021*

_____
Notary Public

My commission expires: *2-9-2028*

```
JAME B PIERCE
NOTARY PUBLIC
PULASKI COUNTY, ARKANSAS
COMM. EXP. 2-9-2028
COMMISSION NO. 12703273
```

Additional information regarding service or attempted service:

_____

_____

ELECTRONICALLY FILED
Faulkner County Circuit Court
Crystal Taylor, Circuit Clerk
2021-May-27  13:44:12
23CV-21-404
C20D01 : 3 Pages

**IN THE CIRCUIT COURT OF FAULKNER COUNTY, ARKANSAS**
**CIVIL DIVISION**

**DR. LENSEY SCOTT**                                                                    **PLAINTIFF**

**VS.**                          **CASE NO. 23CV-21-404**

**CONWAY REGIONAL MEDICAL**
**CENTER, INC.**                                                                        **DEFENDANT**

## MOTION TO DISMISS

Defendant Conway Regional Medical Center, Inc. (CRMC), by and through its attorneys, Mallard Gardner PLLC, and for its Motion to Dismiss the Complaint of Dr. Lensey Scott (Plaintiff), states as follows:

1.       Plaintiff filed his Complaint against CRMC in the above-referenced matter on or about April 13, 2021, alleging causes of action for Violation of Title VII of the Civil Rights Act of 1964, Violation of 42 U.S.C. § 1981, Violation of the Arkansas Civil Rights Act of 1993 arising from Plaintiff's alleged employment with CRMC.

2.       For the reasons fully explained in the contemporaneously filed Brief in Support of the Motion to Dismiss, incorporated herein by reference, Plaintiff has not asserted facts sufficient to support the elements of the claims he has brought.

3.       CRMC seeks dismissal pursuant to Ark. R. Civ. P. 12(b)(6), as the Complaint fails to state facts upon which relief can be granted.

WHEREFORE, for the reasons stated herein and the accompanying brief in support, Defendant CRMC moves for an Order dismissing Plaintiff's Complaint with prejudice, for its attorney's fees and costs incurred in connection with this motion, and for all other relief to which it may be entitled.

Respectfully submitted,

**MALLARD GARDNER, PLLC**
1422 Scott Street
Little Rock, AR 72202
T:      (501)850-8501
F:      (844)778-1750
E:      gabriel.mallard@mallardgardner.com;
        taylor.pray@mallardgardner.com


/s/ Gabriel D. Mallard
Gabriel Mallard (2005130)
Taylor Pray (2020127)
*Attorneys for Conway Regional Medical Center, Inc.*

## CERTIFICATE OF SERVICE

I, Gabriel D. Mallard, do hereby certify that on this 27th day of May, 2021 a copy of the foregoing pleading was served upon the named individuals through electronic filing pursuant to Administrative Order No. 21:

Dylan J. Botteicher
COX, STERLING, MCCLURE &
VANDIVER, PLLC
8712 Counts Massie Rd.
North Little Rock, AR 72113
T: (501) 954-8073
F: (501) 954-7856
E: djbotteicher@csmfirm.com


  /s/ Gabriel D. Mallard_____

Gabriel D. Mallard

ELECTRONICALLY FILED
Faulkner County Circuit Court
Crystal Taylor, Circuit Clerk
2021-May-27  13:52:34
23CV-21-404
C20D01 : 12 Pages

## IN THE CIRCUIT COURT OF FAULKNER COUNTY, ARKANSAS
## CIVIL DIVISION

**DR. LENSEY SCOTT**                                              **PLAINTIFF**

**VS.**                          **CASE NO. 23CV-21-404**

**CONWAY REGIONAL MEDICAL**
**CENTER, INC.**                                              **DEFENDANT**

### BRIEF IN SUPPORT OF MOTION TO DISMISS

COMES NOW Defendant Conway Regional Medical Center, Inc. ("CRMC"), by and through its attorneys, Mallard Gardner PLLC, and for its Brief in Support of its Motion to Dismiss the Plaintiff's Complaint, states as follows:

### INTRODUCTION

Plaintiff has filed claims of discrimination against CRMC under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 1981 ("§1981"), and the Arkansas Civil Rights Act of 1993 ("ACRA"). Plaintiff's Complaint relies almost entirely on Plaintiff's assertion that he was an employee of CRMC.  The Equal Employment Opportunity Commission ("EEOC") investigated this matter and determined that no employer/ employee relationship existed between Plaintiff and CRMC.  As Plaintiff was not an employee of CRMC and the Complaint lacks factual allegations demonstrating disparate treatment of Plaintiff as compared to similarly situated white individuals, this matter is ripe for dismissal pursuant to Ark. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted.

### STANDARD OF REVIEW

Arkansas is a fact pleading state.  *Faulkner v. Ark. Children's Hosp.,* 347 Ark. 941, 69 S.W.3d 393 (2002); see also *Ark. Dep't of Envtl. Quality v. Brighton Corp.,* 352

1

Ark. 396, 403, 102 S.W.3d 458, 463 (2003). The Arkansas Rules of Civil Procedure require that a complaint contain a "statement in ordinary and concise language of facts showing that the pleader is entitled to relief[.]". Ark. R. Civ. P. 8(a). "Our rules require fact pleading, and a complaint must state facts, not mere conclusions, in order to entitle the pleader to relief." *Faulkner*, 347 Ark. at 951, 69 S.W.3d at 399. In this vein, plaintiffs may not rely on mere conclusions to support claims. *Hollingsworth v. First National Bank & Trust Co. of Rogers,* 311 Ark. 637, 846 S.W.2d 176 (1993). Rather plaintiffs must set forth the facts sufficient to support each element of the cause of action.

A complaint that does not satisfy the Rule 8 pleading standard is subject to dismissal under Ark. R. Civ. P. 12(b)(6). *Wiseman v. Batchelor,* 315 Ark. 85, 864 S.W.2d 248, (1993). In determining whether to grant a motion to dismiss, the trial court only looks to the four corners of the complaint. *Thomas v. Pierce,* 87 Ark. App. 26, 28, 184 S.W.3d 489, 490 (2004). If the complaint either "(1) fail[s] to state general facts upon which relief could be granted, or (2) fail[s] to include specific facts pertaining to the elements of one of its claims after accepting all facts contained in the complaint as true and in the light most favorable to the nonmoving party," then the complaint must be dismissed. *Id.* "[A]ll reasonable inferences must be resolved in favor of the complaint and the pleadings are to be liberally construed." *Brighton,* 352 Ark. at 403, 102 S.W.3d at 462.

## ARGUMENT

### A.    Plaintiff is not an employee of CRMC and fails to set forth facts to establish a claim for a violation of Title VII.

On January 4, 2021, Plaintiff filed a Charge of Discrimination with the EEOC alleging racial discrimination and retaliation.  See Complaint, Ex. A.  Specifically, the Charge of Discrimination alleges that "[m]y employer treated me, an African American, differently, than my white colleagues.  I was terminated after I complained about this behavior."  *Id*.  There are no other allegations against CRMC in the Charge of Discrimination other than that statement.  On January 14, 2021, the EEOC closed the file as there was no employee/employer relationship between Plaintiff and CRMC.  See Complaint, Ex. B.  As Title VII is only applicable to employment matters, and Plaintiff was not an employee of CRMC, Plaintiff's cause of action for violation of Title VII should be dismissed with prejudice.

Title VII covers only employees.  *Glascock v. Linn Cnty, Emergency Med., PC,* 698 F.3d 695, 698 (8th Cir. 2012); *Alexander v. Avera St. Luke's Hosp.,* 868 F.3d 756, 761 (8th Cir. 2014).  Title VII defines "employee" as "an individual employed by an employer."  42 U.S.C. §2000e(f).  The pertinent part of Title VII states that "it shall be an unlawful employment practice for an employer...to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. §2000e-2(a)(1).  A central tenant of a Title VII claim is the existence of an employee and employer relationship.  It does not apply in the absence of such relationship.

3

In order for Plaintiff to demonstrate a prima facie case of termination due to race, Plaintiff is required to show: (1) that he belongs to a protected group, (2) that he was qualified as an employee, (3) that he was subjected to an adverse employment action, and (4) that the adverse action occurred under circumstances giving rise to an inference of discrimination. *Tatum v. City of Berkeley,* 408 F.3d 543, 551 (8th Cir. 2005); see also *Wheeler v. Aventis Pharms.,* 360 F.3d 853, 857 (8th Cir. 2004).  Failure to establish even one element of a prima facie case defeats a Title VII discrimination claim. *Tatum,* 408 F.3d at 550-51.

Here, the statements made in the Complaint and those contained in the Exhibits attached to the Complaint directly conflict with one another.  On January 4, 2021, Plaintiff filed a Charge of Discrimination against CRMC with the EEOC.  See Complaint, Ex. A.  Within ten days, the EEOC completed its investigation and issued Plaintiff a notice of dismissal, which clearly states that the EEOC closed the file on Plaintiff's charge because there was "no employee/employer relationship."  See Complaint, Ex. B.[1] As indicated by the EEOC, no "adverse employment action" could occur because there was no employee/employer relationship.  As the EEOC has already determined that Plaintiff was not an employee of CRMC, Plaintiff will not be able to make a prima facie case that CRMC violated Title VII.

Even if Plaintiff were considered an employee of CRMC, Plaintiff failed to raise a claim of a hostile work environment before the EEOC.  Title VII establishes certain

---

[1] Plaintiff is well aware that he was not an employee of CRMC and has, in fact, brought a separate EEOC Charge of Discrimination against his actual employer.  Plaintiff will be unable to produce any facts or evidence indicating that he was an employee of CRMC; however, for purposes of this Motion to Dismiss, CRMC is limiting its arguments to the four corners of the Complaint and attached Exhibits.

4

procedural prerequisites that a plaintiff must satisfy before filing an action in court. Under Title VII, a plaintiff must "file a charge of discrimination within 180 days' after the alleged unlawful employment practice occurred'" and must "give notice to the employer of the circumstances of 'the alleged unlawful employment practice.'" *Richter v. Advance Auto Parts, Inc.*, 686 F.3d 847, 851 (8th Cir. 2012). The Eighth Circuit addressed this very issue in *Williams v. Little Rock Municipal Water Works*, 21 F.3d 218, 223 (8th Cir. 1994), where the plaintiff filed an EEOC charge alleging retaliation, but in her complaint also brought a race discrimination claim. The Eighth Circuit disallowed this type of bootstrapping and stated: "Allowing a complaint to encompass allegations outside the ambit of the predicate EEOC charge would circumscribe the EEOC's investigatory role, as well as deprive the charged party of notice of the charge, as surely as would an initial failure to file a timely EEOC charge." *Id.* (quoting *Babrocky v. Jewel Food Co. & Retail Meatcutters*,  773 F.2d 857, 863 (7th Cir. 1985)). "The claims of employment discrimination in the complaint may be as broad as the scope of the EEOC investigation which reasonably could be expected to result from the administrative charge." *Kirklin v. Joshen Paper & Packaging of Arkansas Co.*, 2018 WL 6625766, at *4 (8th Cir. Dec 19, 2018).

Here, the allegation before the EEOC was narrow. Plaintiff alleges he was treated different than unidentified white colleagues and that he was terminated after complaining. "Although an EEOC complaint need not specifically articulate the precise claim, it must nevertheless be sufficient to give the employer notice of the subject matter of the charge and identify generally the basis for a claim." *Fair v. Norris,* 480 F.3d 865, 867, n. 2 (8th Cir. 2007). Plaintiff's allegation was limited to an alleged "termination"

and did not address a hostile work environment.  Thus, to the extent that Plaintiff is

bringing a Title VII claim for a hostile work environment, Plaintiff failed to exhaust his

administrative remedies on his claim that CRMC created and/or fostered a hostile work

environment.  *See Nat'l R.R. Passenger Corp v. Morgan,* 536 U.S. 101, 114, 122 S.Ct.

2061, 153 L.Ed.2d 106 (2002) (explaining that discrete acts such as failure to hire are

"easy to identify," and noting that "[e]ach incident of [alleged] discrimination…

constitutes a separate actionable 'unlawful employment practice'").

As Plaintiff was not an employee of CRMC and failed to properly exhaust his

administrative remedies through the EEOC, Plaintiff's cause of action related to Title

VII should be dismissed with prejudice.

### B.   Plaintiff fails to establish the threshold requirement of 42 U.S.C. §1981 that but, for his race he suffered the loss of a legally protected right.

To prevail on a §1981 claim, a plaintiff must show: (1) membership in a protected

class, (2) discriminatory intent on the part of the defendant, (3) engagement in a

protected activity, and (4) interference with that activity by the defendant.  *Combs v.*

*The Cordish Companies, Inc.,* 862 F.3d 671, 681 (8th Cir, 2017) (quoting *Gregory v.*

*Dillard's Inc.,* 565 F.3d 464, 473 (8th Cir. 2009).  More specifically, to prevail on a §1981

claim, "a plaintiff must initially plead and ultimately prove that, but for race, [he] would

not have suffered the loss of a legally protected right."  *Comcast Corp. v. Nat'l Ass'n of*

*African Am.-Owned Media,* 140 S. Ct. 1009, 1019 (2020).

42 U.S.C. §1981 states:

(A)   All persons within the jurisdiction of the United States shall have the same right
in every state and territory to make and enforce contracts, to sue and be parties, give
evidence, to the full and equal benefit of all laws and proceedings for the security of

persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, exactions of every kind and to no other.

(B)    For purposes of this section, the term "make and enforce contracts" includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.

(C)    The rights protected by this section are protected against impairment by non-governmental discrimination and impairment under color of law.

*Id.*

Plaintiff's Complaint is replete with legal conclusions and short of actual factual allegations.  As an example, Plaintiff concludes that "Dr. Scott was regularly not paid the full amount for services rendered for work performed even though white physicians were consistently paid the full amount for the same services."[2]  Complaint, ¶14.  It further alleges that "Dr. Scott consistently complained that he was unable to be assigned cases in the evening when white physicians regularly were assigned cases."  Complaint, ¶16.  Dr. Scott further alleges that "Conway Regional ultimately informed Dr. Scott and Dr Tukaye that it would not be renewing their contracts to provide services.  Conway Regional renewed the contracts of all white cardiologists."[3]  Complaint, ¶22.

While courts accept *factual* allegations as true at the Motion to Dismiss stage—with only *reasonable* inferences drawn in Plaintiff's favor—the Complaint, at a minimum, "must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Id.* (citing *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) (quoting *Bell*

---

[2] CRMC categorically denies this allegation and affirmatively states that Plaintiff was at no time an employee of CRMC.  See Complaint, Exhibit B.

[3] It should be noted that no contract exists between Conway Regional and Plaintiff.  To the extent that one exists, Plaintiff has failed to meet the requirements of Ark. R. Civ. P. 10(d) that requires "a copy of any written instrument or document upon which a claim or defense is based shall be attached as an exhibit to the pleading...".

*Atl. Corp. v. Twombly*, 550 U.S. 544, 569 (2007)). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id*. In other words, Rule 8's pleading standard "demands more than an unadorned, the defendant-unlawfully-harmed-me accusation." *Id*.

The Eighth Circuit has addressed the issue of conclusory assertions in discrimination cases. In *Ward v. Arkansas Dep't of Finance and Admin.,* the plaintiff alleged that Defendants engaged in "unlawful employment practices involv[ing] subjecting [her] to termination and disparaging treatment different than her co-workers in the form of creating falsified documents in order to terminate the plaintiff and replace her with a male employee." *Ward v. Arkansas Dep't of Finance and Admin.,* No. 1:19-cv-1062, 2020 WL 403138, at *3 (W.D. Arkansas, July 16, 2020). The Plaintiff in *Ward* also made the general statement that "[t]he unlawful practices include...disparate treatment because of her gender as a female as reflected by the [sic] replacing her with a less qualified male co-worker." *Id*. The Court found these conclusory allegations unsupported as the plaintiff did not identify any comparators and did not allege facts showing that any similarly situated employees were treated differently. *Id*. This continues a long line of cases where the courts have found that plaintiff's complaints do not state a plausible discrimination claim where they contain only general allegations that other unidentified white employees were given different treatment. *Hager v. Ark. Dep't of Health,* 735 F.3d 1009 (8th Cir. 2013); *Dixon v. Ark. Dep't of Huma Servs.*, No. 4:14-cv-00295 JLH, 2014, WL 5093833, at *2 (Dixon's complaint, which generally concludes that his white co-workers were treated differently than he was, fails to "allege

8

facts such as names, positions or job duties, to support these conclusions"); *Weaver v. Hobbs,* No. 2:13-cv-00048 SWW, 2013, WL 6634005, at *2 (E.D.Ark. Dec 17, 2013) ("Weaver...does not identify alleged comparable employees by name, position, or job duty, does not identify the circumstances under which they were disciplined differently, does not describe the time frame within which the events occurred, and does not anew the decision makers involved.")

Plaintiff fails to identify any actual comparators in claiming disparate treatment between himself and white physicians.  Plaintiff must show that he and potential comparators were "similarly situated in all relevant respects." *Bone v. G4S Youth, Servs., LLC,* 686 F.3d 948, 956 (8th Cir. 2012).  The comparators "used for comparison must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct without any mitigating or distinguishing circumstances." *Wierman v. Casey's Gen. Stores,* 638 F.3d 984, 995 (8th Cir. 2011) (quoting *Cherry v. Ritenour Sch. Dist.,* 361 F.3d 474, 479 (8th Cir. 2004)).

To survive a motion to dismiss, a §1981 complaint must do more than "allege facts plausibly showing that race was a 'motivating factor' in the defendant's decision", rather, the complaint must contain "'sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face' under the but-for causation standard." *Comcast,* 140 S. Ct. at 1014.  A §1981 plaintiff first must show that he was deprived of a protected right and then establish causation.  *Id.* at 1018.  Plaintiff fails to meet this threshold.  The Complaint's general allegations of racial discrimination are conclusory, threadbare and unsupported.  As Plaintiff fails to meet the pleading requirements for a

9

§1981 claim, the cause of action against CRMC for violation of §1981 should be dismissed with prejudice.

**C.    Plaintiff fails to state facts to support his claim of a violation of the Arkansas Civil Rights Act of 1993.**

Under Ark. Code Ann. §16-123-107(a)(1), all otherwise qualified persons have the right to be "free from discrimination because of race, religion, national origin, gender, or the presence of any sensory, mental, or physical disability." This extends to the "right to obtain and hold employment without discrimination." *Id.* Further, Section (c)(1)(A) lays out a cause of action for any employee who is injured by their employer for acts of employment discrimination. Ark. Code Ann. § 16-123-107(c)(1)(A).

Claims under ACRA are analyzed under the same criteria as the Title VII claims. *See Henderson v. Simmons Foods, Inc.,* 217 F.3d 612, 615 n.3 (8th Cir. 2000). Thus, a failure to establish even one element of a *prima facie* case under Title VII is fatal to a claim under ACRA. See *Tatum v. City of Berkeley,* 408 F.3d 543, 550-51 (8th Cir. 2005). For the reasons Plaintiff's claims under Title VII fail, so does his claims under ACRA.

WHEREFORE, Defendant, Conway Regional Medical Center, Inc. prays that the Court grant its Motion Dismiss and dismiss Plaintiff's Complaint with prejudice and award costs and attorneys' fees, as well as all other just and property relief to which Defendant may show itself entitled.

Respectfully submitted,

**MALLARD GARDNER, PLLC**
1422 Scott Street
Little Rock, AR 72202
T:      (501)850-8501
F:      (844)778-1750
E:      gabriel.mallard@mallardgardner.com;
        taylor.pray@mallardgardner.com


/s/ Gabriel D. Mallard
Gabriel Mallard (2005130)
Taylor Pray (2020127)
*Attorneys for Conway Regional Medical Center, Inc.*

## CERTIFICATE OF SERVICE

I, Gabriel D. Mallard, do hereby certify that on this 27th day of May, 2021 a copy of the foregoing pleading was served upon the named individuals through electronic filing pursuant to Administrative Order No. 21:

Dylan J. Botteicher
COX, STERLING, MCCLURE &
VANDIVER, PLLC
8712 Counts Massie Rd.
North Little Rock, AR 72113
T: (501) 954-8073
F: (501) 954-7856
E: djbotteicher@csmfirm.com


/s/ Gabriel D. Mallard_____

Gabriel D. Mallard

ELECTRONICALLY FILED
Faulkner County Circuit Court
Crystal Taylor, Circuit Clerk
2021-Jun-09  12:11:50
23CV-21-404
C20D01 : 61 Pages

## IN THE CIRCUIT COURT OF FAULKNER COUNTY, ARKANSAS
## CIVIL DIVISION

**DR. LENSEY SCOTT**                                                          **PLAINTIFF**

**VS.**                              **CASE NO. 23CV-21-404**

**CONWAY REGIONAL MEDICAL**
**CENTER, INC.; JACK STEPHENS HEART**
**INSTITUTE, LLC; and ST. VINCENT**
**INFIRMARY MEDICAL CENTER**                                    **DEFENDANTS**

### AMENDED COMPLAINT

COMES NOW the Plaintiff, Dr. Lensey Scott (hereinafter "Plaintiff" or "Dr. Scott"), by

and through counsel, Cox, Sterling, McClure & Vandiver, PLLC, and for his Amended Complaint

against Defendants, Conway Regional Medical Center, Inc. ("Conway Regional"), Jack Stephens

Heart Institute, LLC ("Jack Stephens"), and St. Vincent Infirmary Medical Center ("St. Vincent"),

hereby states and alleges as follows:

### INTRODUCTION

This is an action to redress discrimination based on race in violation of Title VII of the

Civil Rights Act of 1964, as amended (hereinafter "Title VII"), to redress discrimination in

violation of the Arkansas Civil Rights Act of 1993 (the "ACRA"), Ark. Code Ann. §16-123-101,

*et seq.,* and to redress discrimination based on race in violation of 42 U.S.C. § 1981, to award full

back pay and benefits, front pay, liquidated, compensatory, and punitive damages, and all other

benefits of Dr. Scott's employment to which he would have been entitled had he not been the

victim of discrimination based on his race.

### PARTIES, JURISDICTION, AND VENUE

1.      Jurisdiction of this Court is invoked under both the Arkansas Civil Rights Act of

1993, Ark. Code Ann. §§ 16-123-101 *et seq.*, and 42 U.S.C. § 1981.

2.      Venue is proper in this Court.

3.      Dr. Scott is a resident of Faulkner County, Arkansas and worked as an employee for Conway Regional, Jack Stephens, and St. Vincent in Faulkner County, Arkansas.

4.      Upon information and belief, and at all times relevant to this complaint, Conway Regional, is an Arkansas corporation that does business in Faulkner County, Arkansas. Upon information and belief, St. Vincent manages Conway Regional and has control over the Conway Regional executive team.

5.      Upon information and belief, and at all times relevant to this complaint, Jack Stephens, is an Arkansas limited liability company that does business in Faulkner County, Arkansas. Upon information and belief, Jack Stephens is owned by its parent company, St. Vincent. Jack Stephens entered into a contract with Dr. Scott to work for Conway Regional and St. Vincent.

6.      Upon information and belief, and at all times relevant to this complaint, St. Vincent, is an Arkansas corporation that does business in Faulkner County, Arkansas. Upon information and belief, St. Vincent is the parent company of Jack Stephens and has control over Conway Regional operations.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

7.      Under 42 U.S.C. § 1981, there is no requirement to exhaustion of administrative remedies. *Cheyney State College Faculty v. Hufstedler*, 703 F.2d 732, 737 (3d Cir. 1983).

8.      Exhaustion of remedies not required under Arkansas Civil Rights Act ("ACRA") because the statute does not provide that administrative procedures will be exclusive, and according to the Supreme Court of the United States, "The most common application of the exhaustion doctrine is in cases where the relevant statute provides that certain administrative

2

procedures shall be exclusive." *McKart v. U.S.*, 395 U.S. 185, 193 (1969). The ACRA provides that any party in violation of the Act will be liable in a circuit court for damages. Ark. Code Ann. § 16-123-105(a).

9.      On or about January 5, 2021, Dr. Scott filed a Charge of Discrimination against Conway Regional with the Little Rock Office of the Equal Employment Opportunity Commission (the "EEOC"), Charge No. 493-2021-00533. A copy of the EEOC charge of discrimination has been attached hereto as Exhibit "A" and is incorporated by reference herein.

10.     By notice dated January 14, 2021, Dr. Scott was notified by the EEOC of his right to file a civil action against the Conway Regional. A copy of the right-to-sue letter has been attached hereto as Exhibit "B" and is incorporated by reference herein.

11.     On or about January 5, 2021, Dr. Scott filed a Charge of Discrimination against Conway Regional with the Little Rock Office of the Equal Employment Opportunity Commission (the "EEOC"), Charge No. 493-2021-00532. A copy of the EEOC charge of discrimination has been attached hereto as Exhibit "C" and is incorporated by reference herein.

12.     By notice dated January 14, 2021, Dr. Scott was notified by the EEOC of his right to file a civil action against the St. Vincent. A copy of the right-to-sue letter has been attached hereto as Exhibit "D" and is incorporated by reference herein.

13.     This lawsuit has been timely filed within 90 days of Dr. Scott's receipt of the EEOC's right-to-sue notices.

## GENERAL FACTUAL ALLEGATIONS

14.     Plaintiff restates and incorporates herein by reference the preceding paragraphs of his Amended Complaint as if fully set forth herein word for word.

3

15.     Plaintiff signed an employment agreement with Jack Stephens, but Plaintiff worked for all Defendants at the direction of Defendants' management and executives. Plaintiff's employment agreement is attached hereto as Exhibit "E" and is incorporated by reference herein.

16.     Defendants at all times had control of the terms and conditions of Dr. Scott's employment.

17.     During his employment, Dr. Scott was subjected to continual harassment by his superiors employed by Defendants because of his race.

18.     The harassment existed in many forms. Dr. Scott was regularly not paid the full amount for services rendered for work performed even though white cardiologists, such as Dr. Donald Steely and Dr. Landon Humphrey, were consistently paid the full amount for the same services. Dr. Steely and Dr. Humphrey were similarly situated to Dr. Scott in all relevant respects. They were all subjected to the same standards and were engaged in the same work. Dr. Scott submitted unbilled hospital charges, but Defendants refused to reimburse Dr. Scott. Defendants always reimbursed white cardiologists, such as Dr. Steely and Dr. Humphrey, who submitted similar charges. These actions would not have occurred but for Dr. Scott's race.

19.     Matt Troup, the President and CEO of Conway Regional and an employee of St. Vincent, repeatedly reported Dr. Scott for bogus unprofessional behavior allegations in an attempt to humiliate Dr. Scott, to have his licensing impacted, and to force him to resign. These actions were undertaken due to Dr. Scott's race.

20.     Matt Troup actively inserted himself in the clinical decision-making process. He attempted to stop Dr. Scott from an appropriate patient transfer because the patient was being transferred to a "competing" hospital. Mr. Troup took these actions because Dr. Scott complained about the treatment he received due to the color of his skin.

4

21.     Dr. Scott consistently complained that he was unable to be assigned cases in the evening when white physicians, such as Dr. Steely and Dr. Humphrey, regularly were assigned cases. Despite Dr. Scott's complaints, Defendants still refused to allow him to provide services in the evening because of his race and because of his engagement in protected activity.

22.     Mr. Troup punished Dr. Scott for complaining about the racist behavior by requiring Dr. Scott to work extra call days without receiving additional pay.

23.     Dr. Scott was cursed and screamed at by a white employee of Defendants during one of the conversations regarding his inability to do cases, and when he complained about this behavior, Defendants punished Dr. Scott for reporting the issue rather than disciplining the egregious behavior done by the white employee. Defendants never punished their white physicians, such as Dr. Steely or Dr. Humphrey, when similar incidents occurred. Dr. Scott was treated differently because of his race and because of his complaints regarding the discrimination.

24.     Dr. Scott complained about this behavior, and in retaliation for his complaint, Defendants falsely reported Dr. Scott for having behavioral issues and informed him that he would have to have an evaluation done on his mental health in Kansas immediately. Defendants informed Dr. Scott that he would lose his privileges at Conway Regional and St. Vincent if he did not comply. Dr. Scott explained that he was uncomfortable travelling and leaving his family during the racial unrest and pandemic in the early Summer of 2020, but Defendants still required Dr. Scott to travel to Kansas immediately.

25.     Dr. Landon Humphrey, a white cardiologist, had repeatedly engaged in offensive behavior toward another minority cardiologist, Dr. Tukaye. Defendants did not reprimand Dr. Humphrey at all. Dr. Scott was punished when he complained about being the victim of offensive

behavior. Dr. Humphrey was treated more favorably than Dr. Scott because he was white and because Dr. Humphrey had not previously complained about race discrimination.

26.     One of the many false complaints regarding Dr. Scott involved an inappropriate heart catheter. The EKG for the patient was reviewed by four cardiologists, all who agreed that a procedure should not have been done. Defendants directed one of their cardiologists to perform the operation in order to discredit Dr. Scott so that it could report him for failing to provide care to a patient.

27.     Mr. Troup and Dr. Donald Steely conspired to stop Dr. Bernard Gojer, a minority physician, from obtaining staff privileges at Conway Regional because of Dr. Gojer's race. Dr. Scott objected to this discrimination, and Dr. Steely informed Dr. Scott that Dr. Steely would make Dr. Scott's life miserable if Dr. Scott did not vote to change Conway Regional bylaws to stop Dr. Gojer from obtaining staff privileges. Dr. Scott faced more retaliation after complaining about the illegal behavior directed toward Dr. Gojer.

28.     Dr. Scott was not the only minority physician who complained about the discrimination he was facing. Dr. Deepali Nivas Tukaye made similar complaints and faced retaliation as well.

29.     Dr. Scott created a new "vein program" to offer to patients. Defendants refused to allow Dr. Scott to initiate the vein program and instead gave the equipment to Dr. Landon Humphrey, a white cardiologist. This resulted in a loss of income to Dr. Scott. The refusal to allow Dr. Scott to initiate the vein program was caused by his race.

30.     Group leaders, Dr. Randy Jordan and Ms. Marcia Atkinson, both told Dr. Scott that they were not in a position to intervene in Conway Regional matters. Dr. Scott had been told that

group leadership participated in making decisions at Conway Regional and Dr. Scott regularly witnessed Dr. Jordan and Ms. Atkinson having control over Conway Regional matters.

31.     Dr. Tukaye complained about white employees screaming and cursing at her, and none of the white employees ever faced discipline for their actions.

32.     Defendants ultimately informed Dr. Scott and Dr. Tukaye that they would not be renewing their contracts to provide services. Defendants renewed the contracts of all white cardiologists.

33.     There were no African-Americans in management positions for Defendants throughout Dr. Scott's employment.

34.     Defendants never took steps to curb the behavior against Dr. Scott despite his reporting of the unwanted harassment and overall hostile work environment. This caused Dr. Scott to suffer mental distress.

35.     None of this offensive and unwanted actions were directed to white employees at Defendants.

36.     Dr. Scott exhausted all possible remedies to try to improve his work situation. When his efforts proved fruitless, and when Defendants informed Dr. Scott that they would not be renewing his contract to provide services, Dr. Scott resigned to seek other employment.

37.     Defendants engaged in policies and practices which willfully, intentionally, and unlawfully discriminated against Dr. Scott on the basis of his race. These practices and policies include, but are not limited to, tolerating the continual barrage racist actions toward Dr. Scott and persistently refusing to take any action regarding that barrage.

7

38.     Dr. Scott's constructive discharge was the result of a practice to ignore complaints of harassment and offensive behavior and to protect white management employees from the consequences of their improper and unwanted remarks and actions.

39.     As a result of Defendants' conduct, Dr. Scott suffered damages.

**CAUSE OF ACTION**
**VIOLATION OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964**

40.     Dr. Scott restates and incorporates herein by reference the preceding paragraphs of his Amended Complaint as if fully set forth herein word for word.

41.     Dr. Scott was a dedicated and exemplary employee during his service for Conway Regional, Jack Stephens, and St. Vincent.

42.     Dr. Scott was subjected to unwanted and offensive harassment, about which he complained, and about which nothing was done until the conditions of his employment became so intolerable that he was forced to resign.

43.     Defendants were tolerant of the unwanted harassment in spite of the fact that Defendants knew about the harassment and failed to take action.

44.     This harassing and discriminatory behavior was sufficiently severe and pervasive to unreasonably interfere with Dr. Scott's physical health and work performance.

45.     As a result of Defendants' failure to protect Dr. Scott from harassment and discrimination, he suffered humiliation, emotional distress, and physical pain.

46.     Dr. Scott engaged in an activity protected under federal law when he complained to Defendants about unlawful practices engaged in by Mr. Troup, Dr. Steely, and other members of Defendants' management and executive teams.

47.     Defendants' stated reasons for their decision to not renew Dr. Scott's contract were pretext to hide their race discrimination and retaliation.

8

48.     Defendants subjected Dr. Scott to adverse employment actions, including withholding pay and failing to renew the employment contract, in retaliation for Dr. Scott's participation in protected activity.

49.     Defendants failed to take any reasonable or necessary steps to eliminate discrimination from their workplace or to prevent it from occurring in the future and, as a result, Dr. Scott was constructively discharged.

50.     Dr. Scott has incurred damages due to Defendants' actions.

## CAUSE OF ACTION
## VIOLATION OF 42 U.S.C. § 1981

51.     Dr. Scott restates and incorporates herein by reference the preceding paragraphs of his Amended Complaint as if fully set forth herein word for word.

52.     Dr. Scott was a dedicated and exemplary employee during his service for Conway Regional, Jack Stephens, and St. Vincent.

53.     Dr. Scott was subjected to unwanted and offensive harassment, about which he complained, and about which nothing was done until the conditions of his employment became so intolerable that he was forced to resign.

54.     Defendants were tolerant of the unwanted harassment in spite of the fact that Defendants knew about the harassment and failed to take action.

55.     This harassing and discriminatory behavior was sufficiently severe and pervasive to unreasonably interfere with Dr. Scott's physical health and work performance.

56.     As a result of Defendants' failure to protect Dr. Scott from harassment and discrimination, he suffered humiliation, emotional distress, and physical pain.

9

57.     Dr. Scott engaged in an activity protected under federal law when he complained to Defendants about unlawful practices engaged in by Mr. Troup, Dr. Steely, and other members of Defendants' management and executive teams.

58.     Defendants' stated reasons for their decision to not renew Dr. Scott's contract were pretext to hide their race discrimination and retaliation.

59.     Defendants subjected Dr. Scott to adverse employment actions, including withholding pay and failing to renew the employment contract, in retaliation for Dr. Scott's participation in protected activity.

60.     Defendants failed to take any reasonable or necessary steps to eliminate discrimination from their workplace or to prevent it from occurring in the future and, as a result, Dr. Scott was constructively discharged.

61.     Dr. Scott has incurred damages due to Defendants' actions.

### CAUSE OF ACTION
### VIOLATION OF THE ARKANSAS CIVIL RIGHTS ACT OF 1993

62.     Dr. Scott restates and incorporates herein by reference the preceding paragraphs of his Amended Complaint as if fully set forth herein word for word.

63.     Dr. Scott was a dedicated and exemplary employee during his service for Conway Regional, Jack Stephens, and St. Vincent.

64.     Dr. Scott was subjected to unwanted and offensive harassment, about which he complained, and about which nothing was done until the conditions of his employment became so intolerable that he was forced to resign.

65.     Defendants were tolerant of the unwanted harassment in spite of the fact that Defendants knew about the harassment and failed to take action.

66.     This harassing and discriminatory behavior was sufficiently severe and pervasive to unreasonably interfere with Dr. Scott's physical health and work performance.

67.     As a result of Defendants' failure to protect Dr. Scott from harassment and discrimination, he suffered humiliation, emotional distress, and physical pain.

68.     Dr. Scott engaged in an activity protected under federal law when he complained to Defendants about unlawful practices engaged in by Mr. Troup, Dr. Steely, and other members of Defendants' management and executive teams.

69.     Defendants' stated reasons for their decision to not renew Dr. Scott's contract were pretext to hide their race discrimination and retaliation.

70.     Defendants subjected Dr. Scott to adverse employment actions, including withholding pay and failing to renew the employment contract, in retaliation for Dr. Scott's participation in protected activity.

71.     Defendants failed to take any reasonable or necessary steps to eliminate discrimination from their workplace or to prevent it from occurring in the future and, as a result, Dr. Scott was constructively discharged.

72.      Dr. Scott has incurred damages due to Defendants' actions.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff seeks judgment against the Defendants for all just and proper relief including:

(A) Plaintiff seeks a jury trial on all issues so triable;

(B) Plaintiff seeks compensatory damages including lost wages, past and future lost income, physical pain, emotional distress, humiliation, and past and future medical expenses. As to lost wages, Plaintiff seeks an order awarding Plaintiff

11

back pay, pre-judgment interest, fringe benefits, and any other appropriate relief necessary to make Plaintiff whole and compensate him for the civil rights violations described above;

(C) Award Plaintiff front pay, fringe benefits, and other compensation; and

(D) Award Plaintiff the costs of this action, including reasonable attorney's fees, and such other legal and equitable relief as this Court deems just and proper.

Respectfully Submitted,

By: /s/ Dylan Botteicher
Dylan J. Botteicher (ABN 201710)
COX, STERLING, MCCLURE &
VANDIVER, PLLC
8712 Counts Massie Rd.
North Little Rock, AR 72113
T: (501) 954-8073
F: (501) 954-7856
E: djbotteicher@csmfirm.com
ATTORNEY FOR THE PLAINTIFF

**CERTIFICATE OF SERVICE**

I certify that on June 9, 2021, a true and correct copy of the above response was forwarded to the counsel via eFLEX at:

Gabriel Mallard
Taylor Pray
1422 Scott Street
Little Rock, AR 72202

By: /s/ Dylan J. Botteicher
Dylan J. Botteicher (ABN 2017170)

12



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

**CHARGE OF DISCRIMINATION**

EEOC Form 5A (7/2016)

| Personal Information | Name (First, Middle, Last): Lensey C. Scott |
|---|---|
| | Street Address: 1815 Centennial Club Drive |
| | City: Conway          State: AR          Zip Code: 72034 |
| | Telephone Number: 850-284-9010          ☐ Home  ☐ Work  ☑ Cell |

| Information about the company or organization you believe discriminated against you. | Organization Name: Conway Regional Medical Center |
|---|---|
| | Street Address: 2302 College Ave. |
| | City: Conway          State: AR          Zip Code: 72034 |
| | Your job title or the title of the job for which you applied: Physician |

**Why you believe you were discriminated against?**

| | | | |
|---|---|---|---|
| Race ☒ | Color ☐ | Religion ☐ | National Origin ☐ |
| Sex ☐ | Disability ☐ | Age ☐ | Genetic Information ☐ |
| | Retaliation ☒ | Other ☐ | |

Date(s) Discrimination Took Place:  Earliest  July 2020          Latest  September 2020

**What happened to you that you believe was discriminatory?**

My employer treated me, an African American, differently than my white colleagues. I was terminated after I complained about this behavior.

**Signature and Verification**

I understand this charge will be filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

I understand by signing below that I am filing a charge of employment discrimination with the EEOC. I understand that the EEOC is required by law to give a copy of the charge, which includes my name, to the organization named above. I also understand that the EEOC can only investigate charges of job discrimination based on race, color, religion, sex, national origin, disability, age, genetic information, or based on retaliation for filing a charge of employment discrimination, helping in someone else's complaint about job discrimination, or complaining to the employer about job discrimination.

I declare under penalty of perjury that the above is true and correct.

Signature: _Lensey Scott_          Date: 1/4/2021

EEOC Form 161 (11/2020)

## U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

## DISMISSAL AND NOTICE OF RIGHTS

| To: **Lensey Scott**<br>**1815 Centennial Club Drive**<br>**Conway, AR 72034** | From: **Little Rock Area Office**<br>**820 Louisiana**<br>**Suite 200**<br>**Little Rock, AR 72201** |
|---|---|

| | ☐ | *On behalf of person(s) aggrieved whose identity is*<br>*CONFIDENTIAL (29 CFR §1601.7(a))* | |
|---|---|---|---|

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| **493-2021-00533** | **Lynda F. Fier,**<br>**Enforcement Supervisor** | **(501) 324-5468** |

### THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:

☐  The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

☐  Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

☐  The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

☐  Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

☐  The EEOC issues the following determination: The EEOC will not proceed further with its investigation, and makes no determination about whether further investigation would establish violations of the statute. This does not mean the claims have no merit. This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge.

☐  The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

☒  Other *(briefly state)*   **No employee/employer relationship**

### - NOTICE OF SUIT RIGHTS -
*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.**

On behalf of the Commission

_____     January 14, 2021

Enclosures(s)                     **William A. Cash, Jr.,**          *(Date Issued)*
                                   **Area Office Director**

cc:   **CONWAY REGIONAL MEDICAL CENTER**
      **Attn:  Richard Tyler**            **Dylan Botteicher**
      **2302 College Avenue**            **COX, STERLING, MCCLURE & VANDIVER, PLLC**
      **Conway, AR 72034**               **8712 Counts Massie Road**
                                          **North Little Rock, AR 72113**

EXHIBIT B

Enclosure with EEOC
Form 161 (11/2020)

## INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court <u>under Federal law</u>.*
*If you also plan to sue claiming violations of State law, please be aware that time limits and other*
*provisions of State law may be shorter or more limited than those described below.)*

**PRIVATE SUIT RIGHTS   --   Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA), the Genetic Information Nondiscrimination Act (GINA), or the Age Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge **within 90 days of the date you *receive* this Notice**.  Therefore, you should **keep a record of this date**.  Once this 90-day period is over, your right to sue based on the charge referred to in this Notice will be lost.  If you intend to consult an attorney, you should do so promptly.  Give your attorney a copy of this Notice, and its envelope, and tell him or her the date you received it.  Furthermore, in order to avoid any question that you did not act in a timely manner, it is prudent that your suit be filed **within 90 days of the date this Notice was *issued* to you** (as indicated where the Notice is signed) or the date of the postmark or record of receipt, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction.  (Usually, the appropriate State court is the general civil trial court.)  Whether you file in Federal or State court is a matter for you to decide after talking to your attorney.  Filing this Notice is not enough.  You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief.  Your suit may include any matter alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters alleged in the charge.  Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some cases can be brought where relevant employment records are kept, where the employment would have been, or where the respondent has its main office.  If you have simple questions, you usually can get answers from the office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint or make legal strategy decisions for you.

**PRIVATE SUIT RIGHTS   --   Equal Pay Act (EPA):**

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back pay due for violations that occurred **more than 2 years (3 years)** before you file suit may not be collectible.  For example, if you were underpaid under the EPA for work performed from 7/1/08 to 12/1/08, you should file suit *before 7/1/10 – not* 12/1/10 -- in order to recover unpaid wages due for July 2008.  This time limit for filing an EPA suit is separate from the 90-day filing period under Title VII, the ADA, GINA or the ADEA referred to above.  Therefore, if you also plan to sue under Title VII, the ADA, GINA or the ADEA, in addition to suing on the EPA claim, suit must be filed within 90 days of this Notice <u>and</u> within the 2- or 3-year EPA back pay recovery period.

**ATTORNEY REPRESENTATION   --   Title VII, the ADA or GINA:**

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction in your case may, in limited circumstances, assist you in obtaining a lawyer.  Requests for such assistance must be made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your efforts to retain an attorney).  Requests should be made well before the end of the 90-day period mentioned above, because such requests do <u>not</u> relieve you of the requirement to bring suit within 90 days.

**ATTORNEY REFERRAL AND EEOC ASSISTANCE   --   All Statutes:**

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any questions about your legal rights, including advice on which U.S. District Court can hear your case.  If you need to inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide your charge number (as shown on your Notice).  While EEOC destroys charge files after a certain time, all charge files are kept for at least 6 months after our last action on the case.  Therefore, if you file suit and want to review the charge file, **please make your review request <u>within 6 months</u> of this Notice**.  (Before filing suit, any request should be made within the next 90 days.)

*IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.*

EXHIBIT B



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

**CHARGE OF DISCRIMINATION**

EEOC Form 5A (7/2016)

| | |
|---|---|
| **Personal Information** | Name (First, Middle, Last): Lensey C. Scott<br><br>Street Address: 1815 Centennial Club Drive<br><br>City: Conway      State: Arkansas      Zip Code: 72034<br><br>Telephone Number: 850-284-9010      ☐ Home  ☐ Work  ☑ Cell |
| **Information about the company or organization you believe discriminated against you.** | Organization Name: CHI St. Vincent<br><br>Street Address: 2 St. Vincent Circle<br><br>City: Little Rock      State: AR      Zip Code: 72205<br><br>Your job title or the title of the job for which you applied: Physician |
| **Why you believe you were discriminated against?** | Race ⊠      Color ☐      Religion ☐      National Origin ☐<br>Sex ☐      Disability ☐      Age ☐      Genetic Information ☐<br>      Retaliation ⊠      Other ☐ |
| **What happened to you that you believe was discriminatory?** | Date(s) Discrimination Took Place:  Earliest July 2020      Latest September 2020<br><br>My employer treated me, an African American, differently than my White colleagues. I was terminated after I complained about this behavior. |
| **Signature and Verification** | I understand this charge will be filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or telephone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.<br><br>I understand by signing below that I am filing a charge of employment discrimination with the EEOC. I understand that the EEOC is required by law to give a copy of the charge, which includes my name, to the organization named above.  I also understand that the EEOC can only investigate charges of job discrimination based on race, color, religion, sex, national origin, disability, age, genetic information, or based on retaliation for filing a charge of employment discrimination, helping in someone else's complaint about job discrimination, or complaining to the employer about job discrimination.<br><br>**I declare under penalty of perjury that the above is true and correct.**<br><br>Signature: _____      Date: _____ |

EXHIBIT C

**PRIVACY ACT STATEMENT:** Under the Privacy Act of 1974, Pub. Law 93-579, authority to request personal data and its uses are:

**1. FORM NUMBER/TITLE/DATE.** EEOC Form 5A, Charge of Discrimination (July 2016).

**2. AUTHORITY.** 42 U.S.C. 2000e-5(b), 29 U.S.C. 211, 29 U.S.C. 626, 42 U.S.C. 12117**,** 42 U.S.C. 2000ff-6.

**3. PRINCIPAL PURPOSES.** The purposes of a charge, taken on this form or otherwise reduced to writing (whether later recorded on this form or not) are, as applicable under the EEOC anti-discrimination statutes (EEOC statutes), to preserve private suit rights under the EEOC statutes, to invoke the EEOC's jurisdiction and, where dual-filing or referral arrangements exist, to begin state or local proceedings.

**4. ROUTINE USES.** This form is used to provide facts that may establish the existence of matters covered by the EEOC statutes (and as applicable, other federal, state or local laws). Information given will be used by staff to guide its mediation and investigation efforts and, as applicable, to determine, conciliate and litigate claims of unlawful discrimination. This form may be presented to or disclosed to other federal, state or local agencies as appropriate or necessary in carrying out EEOC's functions. A copy of this charge will ordinarily be sent to the respondent organization against which the charge is made.

**5. WHETHER DISCLOSURE IS MANDATORY; EFFECT OF NOT GIVING INFORMATION.** Charges must be reduced to writing and should identify the charging party and respondent and the actions or policies complained of. Without a written charge, EEOC will ordinarily not act on the complaint. Charges under Title VII, ADA or GINA must be sworn to or affirmed (either by using this form or by presenting a notarized statement or unsworn declaration under penalty of perjury); charges under the ADEA should ordinarily be signed. Charges may be clarified or amplified later by amendment. It is not mandatory that this form be used to make a charge.

### NOTICE OF RIGHT TO REQUEST SUBSTANTIAL WEIGHT REVIEW

Charges filed at a state or local Fair Employment Practices Agency (FEPA) that dual-files charges with EEOC will ordinarily be handled first by the FEPA. Some charges filed at EEOC may also be first handled by a FEPA under worksharing agreements. You will be told which agency will handle your charge. When the FEPA is the first to handle the charge, it will notify you of its final resolution of the matter. Then, if you wish EEOC to give Substantial Weight Review to the FEPA's final findings, you must ask us in writing to do so within 15 days of your receipt of its findings. Otherwise, we will ordinarily adopt the FEPA's finding and close our file on the charge.

### NOTICE OF NON-RETALIATION REQUIREMENTS

Please **notify** EEOC or the state or local agency where you filed your charge **if retaliation is taken against you or others** who oppose discrimination or cooperate in any investigation or lawsuit concerning this charge. Under Section 704(a) of Title VII, Section 4(d) of the ADEA, Section 503(a) of the ADA and Section 207(f) of GINA, it is unlawful for an *employer* to discriminate against present or former employees or job applicants, for an *employment agency* to discriminate against anyone, or for a *union* to discriminate against its members or membership applicants, because they have opposed any practice made unlawful by the statutes, or because they have made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the laws. The Equal Pay Act has similar provisions and Section 503(b) of the ADA prohibits coercion, intimidation, threats or interference with anyone for exercising or enjoying, or aiding or encouraging others in their exercise or enjoyment of, rights under the Act.

Issued July 2016.

EXHIBIT C

EEOC Form 161 (11/2020)

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

# DISMISSAL AND NOTICE OF RIGHTS

To: **Lensey Scott**
**1815 Centennial Club Drive**
**Conway, AR 72034**

From: **Little Rock Area Office**
**820 Louisiana**
**Suite 200**
**Little Rock, AR 72201**

☐ *On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| **493-2021-00532** | **Johnny L. Glover, Investigator** | **(501) 324-6475** |

**THE EEOC IS CLOSING ITS FILE ON THIS CHARGE FOR THE FOLLOWING REASON:**

☐ The facts alleged in the charge fail to state a claim under any of the statutes enforced by the EEOC.

☐ Your allegations did not involve a disability as defined by the Americans With Disabilities Act.

☐ The Respondent employs less than the required number of employees or is not otherwise covered by the statutes.

☐ Your charge was not timely filed with EEOC; in other words, you waited too long after the date(s) of the alleged discrimination to file your charge

☒ The EEOC issues the following determination: The EEOC will not proceed further with its investigation, and makes no determination about whether further investigation would establish violations of the statute. This does not mean the claims have no merit. This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge.

☐ The EEOC has adopted the findings of the state or local fair employment practices agency that investigated this charge.

☐ Other *(briefly state)*

## - NOTICE OF SUIT RIGHTS -

*(See the additional information attached to this form.)*

**Title VII, the Americans with Disabilities Act, the Genetic Information Nondiscrimination Act, or the Age Discrimination in Employment Act:** This will be the only notice of dismissal and of your right to sue that we will send you. You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court. Your lawsuit **must be filed WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost. (The time limit for filing suit based on a claim under state law may be different.)

**Equal Pay Act (EPA):** EPA suits must be filed in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment. This means that **backpay due for any violations that occurred more than 2 years (3 years) before you file suit may not be collectible.**

On behalf of the Commission

**William A. Cash, Jr.,**
**Area Office Director**

May 13, 2021
*(Date Issued)*

Enclosures(s)

cc:

**Michelle Foreman**
**HR Manager**
**CHI St Vincent**
**2 St Vincent Cir**
**Little Rock, AR 72205**

**Kelly J. Muensterman**
**Polsinelli PC**
**100 S 4TH STe 1000**
**Saint Louis, MO 63102**

**Dylan Botteicher**
**COX, STERLING, MCCLURE & VANDIVER, PLLC**
**8712 Counts Massie Road**
**North Little Rock, AR 72113**

EXHIBIT D

Enclosure with EEOC
Form 161 (11/2020)

## INFORMATION RELATED TO FILING SUIT
## UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court under Federal law.*
*If you also plan to sue claiming violations of State law, please be aware that time limits and other*
*provisions of State law may be shorter or more limited than those described below.)*

PRIVATE SUIT RIGHTS   --   **Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA), the Genetic Information Nondiscrimination Act (GINA), or the Age Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge **within 90 days** of the date you *receive* this Notice. Therefore, you should **keep a record of this date**. Once this 90-day period is over, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and its envelope or record of receipt, and tell him or her the date you received it. Furthermore, in order to avoid any question that you did not act in a timely manner, it is prudent that your suit be filed **within 90 days of the date this Notice was** *issued* to you (as indicated where the Notice is signed) or the date of the postmark or record of receipt, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. (Usually, the appropriate State court is the general civil trial court.) Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. Filing this Notice is not enough. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Your suit may include any matter alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters alleged in the charge. Generally, suits are brought in the State where the alleged unlawful practice occurred, but in some cases can be brought where relevant employment records are kept, where the employment would have been, or where the respondent has its main office. If you have simple questions, you usually can get answers from the office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint or make legal strategy decisions for you.

PRIVATE SUIT RIGHTS   --   **Equal Pay Act (EPA):**

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back pay due for violations that occurred **more than 2 years (3 years)** before you file suit may not be collectible. For example, if you were underpaid under the EPA for work performed from 7/1/08 to 12/1/08, you should file suit before 7/1/10 – *not* 12/1/10 -- in order to recover unpaid wages due for July 2008. This time limit for filing an EPA suit is separate from the 90-day filing period under Title VII, the ADA, GINA or the ADEA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA or the ADEA, in addition to suing on the EPA claim, suit must be filed within 90 days of this Notice **and** within the 2- or 3-year EPA back pay recovery period.

ATTORNEY REPRESENTATION   --   **Title VII, the ADA or GINA:**

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction in your case may, in limited circumstances, assist you in obtaining a lawyer. Requests for such assistance must be made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your efforts to retain an attorney). Requests should be made well before the end of the 90-day period mentioned above, because such requests do not relieve you of the requirement to bring suit within 90 days.

ATTORNEY REFERRAL AND EEOC ASSISTANCE   --   **All Statutes:**

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any questions about your legal rights, including advice on which U.S. District Court can hear your case. If you need to inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide your charge number (as shown on your Notice). While EEOC destroys charge files after a certain time, all charge files are kept for at least 6 months after our last action on the case. Therefore, if you file suit and want to review the charge file, **please make your review request within 6 months of this Notice.** (Before filing suit, any request should be made within the next 90 days.)

*IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.*

EXHIBIT D

## PHYSICIAN EMPLOYMENT AGREEMENT
## FOR CARDIOLOGY SERVICES

THIS PHYSICIAN EMPLOYMENT AGREEMENT ("Agreement") is made and entered into effective as of the _16th_ day of _September_ 2016 ("Effective Date") by and between Jack Stephens Heart Institute, LLC, an Arkansas limited liability company ("Employer"), and Lensey Scott, M.D. an individual ("Physician").

### RECITALS

A.    Employer, in furtherance of its charitable mission and with the intention of providing a community benefit, operates a cardiovascular clinic for the provision of professional medical services in order to improve the availability of quality clinical services to the residents served by Employer's clinic(s).

B.    St. Vincent Infirmary Medical Center d/b/a St. Vincent Health System ("SVHS"), as the sole corporate member of Employer, operates inpatient and outpatient clinics, and provides a variety of services through the SVHS cardiovascular service line, comprised of all SVHS inpatient, outpatient/ambulatory, cardiovascular surgery, diagnostic, rehabilitation and cardiovascular care services (the "Service Line").

C.    Employer may provide certain administrative, business, clinical management or professional services to one or more health care facilities (each a "Hospital") in connection with the operation, medical direction, clinical services, or management of the Hospital's cardiovascular service line pursuant to a written agreement (each a "Services Agreement").

D.    The Service Line includes certain ambulatory clinic facilities which were operated prior to January 1, 2012 by Heart Clinic Arkansas, PA, as physician-owned ambulatory clinical facilities, but which clinical facilities are now operated by SVHS as provider-based clinics and/or as SVHS-owned clinics that are not provider-based, the management of which may be governed by a Services Agreement.

E.    Physician has the knowledge, experience, and desire to provide professional medical services to patients, and to assist Employer in the provision of certain services pursuant this Agreement, and agrees to render such services in accordance with Employer's policies, rules, regulations, and protocols, subject to the terms and conditions of this Agreement and otherwise as provided herein.

In consideration of the mutual covenants contained in this Agreement and other good and valuable consideration, the parties, intending to be legally bound, agree as follows:

### AGREEMENT

***Section 1.***    ***Employment.***  Employer employs Physician as, and in the specific capacity of, a medical doctor engaged in the practice of medicine, specializing in Interventional Cardiology ("Specialty"), and to perform such duties associated with Employer's clinical care operations. Physician accepts such employment upon the terms and conditions set forth in this Agreement. Physician's employment under this Agreement shall commence on the 1st day of October, 2016 (the "Start Date").

-1-

**Section 2.**       *Physician's Duties & Responsibilities.*

2.1     Services; Loyalty.  At the direction of Employer, Physician shall provide the services and perform the duties set forth on the attached Exhibit A, and shall perform such other duties as reasonably assigned by Employer from time to time that are commensurate with the professional medical services normally and customarily performed by a physician specializing in the Specialty.  The Cardiovascular Chief Medical Officer ("CMO") will have the power to direct Physician in furtherance of Employer's performance under a Services Agreement, including in connection with the achievement of the Performance Incentive, defined below.  During the Term of this Agreement (as defined in Section 7.1), except with Employer's prior written consent, Physician shall: (i) render professional medical services to patients solely and exclusively on behalf of Employer; (ii) devote his or her best efforts to perform diligently the practice of medicine in the Specialty; and (iii) not accept employment with any other employer or engage in other professional activities for profit, except that the ownership of publicly-traded equity interests of any entity will not be deemed a violation of this provision; provided, however, that Physician may from time to time engage in outside professional activities such as speaking, consulting, teaching, serving as an expert witness, writing books and articles, and similar activities that do not impose upon Physician's full-time obligations to the Employer or require the use of Employer resources; and, provided, further, that Employer approves such outside professional activities in advance, with such approval not to be unreasonably withheld by Employer.  Physician may retain all honoraria and fees for such permitted outside activities, unless otherwise agreed by the parties.

2.2     Abide by Employer's Policies, Etc.  Physician shall be subject to and shall abide by all policies, rules, regulations, and protocols established by Employer that are applicable to Physician.  Nothing in any of Employer's policies, rules, regulations, protocols, or employee handbook, if any, shall be construed to create an employment contract for a specific time or to create any rights in favor of Physician that are contrary to the provisions of this Agreement.

2.3     Maintain Licensure & Certification.  As of the Start Date and throughout the Term of this Agreement, Physician shall (i) maintain  a currently valid and unlimited license to practice medicine in Arkansas; (ii) maintain a currently valid and unlimited Drug Enforcement Administration ("DEA") Registration Number and applicable state permit; (iii) meet the applicable eligibility criteria for full participation in the Medicare and Medicaid programs; and (iv) be or remain board eligible or board certified in the Specialty in accordance with the time period(s) established in the medical staff bylaws of SVHS and/or other Facilities (as defined below), if any.  Physician shall provide Employer with a copy of Physician's Arkansas medical license, DEA Registration, and applicable state permit prior to the Start Date and upon request thereafter.  Physician shall deliver immediately to Employer, upon receipt, a copy of any final decision or pending or threatened administrative or judicial action adverse to Physician's (v) license to practice medicine in Arkansas or any other state, (vi) DEA Registration, (vii) Medicare/Medicaid participation status or provider number(s), or (viii) participation in any federally-funded healthcare program, including without limitation, the Medicare and Medicaid programs.  Physician agrees that Employer may access any data bank or other source of information in order to verify Physician's compliance with these requirements.

2.4     Maintain Third-Party Payor Status.  Physician shall procure, maintain, and be subject to contracting provider status in such health maintenance organizations, preferred provider organizations, and other third party payors, including Medicare and Medicaid, as deemed necessary by Employer; provided, however, that Physician shall not enter into or renew such contracting status unless Employer authorizes such participation in writing.  Physician shall assist Employer in satisfying the requirements of third party payors by, for example, participation in utilization review, peer review, and quality assurance programs.

Physician, at his cost and upon reasonable advance notice to Employer, may review any such third-party payor contracts.

2.5     Maintain Medical Staff Membership.  As of the Start Date Physician shall have, and throughout the Term of this Agreement Physician shall maintain, unrestricted and active medical staff membership with appropriate clinical privileges at Conway Regional Medical Center, Baptist Health Medical Center – Conway, and shall also maintain membership on the medical staff of other hospitals mutually agreed upon by Physician and Employer (collectively, the "Facilities"), provided, however, that Physician may maintain his or her medical staff membership and clinical privileges at other area facilities where Physician, as of the Start Date, is a medical staff member.  Physician may also participate in any accountable care organizations and similar organizations with any facilities at which Physician has privileges, subject to prior written approval of the Employer board of managers.  Physician shall immediately notify Employer of any of the following which occur with regard to the medical staff membership and/or clinical privileges required under this Section or with regard to medical staff membership and/or clinical privileges held at other health care institutions: (i) initiation of an investigation for potential corrective action; (ii) a summary or precautionary suspension; (iii) a recommendation for or final imposition of any adverse professional action; (iv) any focused professional practice evaluation or external review of Physician's care whether imposed as corrective action or as part of the peer review and quality assurance process; (v) medical staff or health care institution evaluation of the Physician's conduct pursuant to the relevant policies on physician behavior or physician health; and (vi) Physician's involvement in a sentinel or adverse event subject to a root cause analysis or equivalent review.  Physician agrees that Employer and SVHS may have access to any information relevant to such actions and Physician agrees to execute any consents and/or releases necessary for access or communication between Employer or SVHS and the relevant health care institution regarding any such actions.

2.6     Exercise Independent Medical Judgment.  Physician shall at all times exercise independent medical judgment and control over all his professional activities and services.  Nothing in this Agreement shall be construed to give Employer any authority over Physician's medical judgment or to direct the means or methods by which Physician practices medicine.

2.7     Maintain Professional Skills.  Physician shall at all times maintain professional competence and skill commensurate with prevailing standards of medical practice in Physician's Specialty, and shall attend and participate in continuing education courses designed to maintain and enhance such skills in accordance with policies adopted by Employer from time to time.  Employer shall provide Physician up to five (5) working days to attend Continuing Medical Education ("CME") courses applicable to Physician's Specialty and reimburse Physician up to Five Thousand Dollars ($5,000) per Contract Year ("CME Amount") which may accrue up to but not to exceed Ten Thousand Dollars ($10,000).  In addition, Employer will allow Physician up to One Thousand Dollars ($1,000) per Contact Year ("Subscription Amount") for professional dues, professional memberships, and professional subscriptions in support of Physician's Specialty; provided, however, that Physician may, in Physician's discretion, ask Employer apply any or all of the Subscription Amount to the CME Amount for CME and CME-related expenses.

2.8     Medical Records.  Physician shall maintain, in accordance with Employer's policies, to the extent applicable, a standard medical record for each patient treated by Physician pursuant to this Agreement, containing such information and preserved for such time period as may be required by Employer, SVHS, or by law.  Physician agrees to use such electronic medical record system ("EHR") as SVHS determines and makes available for Physician's use, and shall comply with all applicable standards and requirements of the EHR, including, but not limited to, completion of dictation and charts within applicable time periods required by law, regulation, or otherwise established by SVHS and its Affiliates for their Employed Physicians.  The parties agree that the EHR will consist of the Gateway Electronic Medical Management System (GEMMS) EHR, and the treatment of the EHR and medical records shall be in

EXHIBIT E

accordance with Employer's current policies and procedures, copies of which have been provided to Physician. Employer or SVHS shall have custody of and shall be the sole owner of all medical records concerning all patients treated pursuant to this Agreement.  Upon the expiration or termination of this Agreement, subject to the requirements of applicable law, Physician shall be entitled to obtain copies of the following:

    (a)    Records of patients who have requested in writing that Physician assume responsibility for their continuing medical care;

    (b)    Records of patients that are necessary or desirable to enable Physician to complete a course of medical treatment for patients that are currently under Physician's care; and

    (c)    Records necessary or desirable to enable Physician to defend any malpractice action or other claim against Physician.

For purposes of this Agreement, an "Affiliate" of Employer shall be any entity which controls, is controlled by, or is under common control with Employer, as the case may be.

    2.9    Conflicts of Interest. As required under Employer's or SVHS's conflict of interest policies, Physician agrees to promptly report any conflict of interest or potential conflict of interest Physician may have with Employer, SVHS, or any Affiliate, and/or the existence of any influence adversely affecting Physician's decision-making process pertaining to the performance of Physician's duties as set forth herein. Such report shall be made to Employer's Chief Executive Officer, or their respective designees, and Physician shall cooperate as requested by Employer in providing full information concerning such conflict, potential conflict, and/or adverse influence.

    2.10    Services Under Services Agreements.  If so required by Employer from time to time, Physician will assist Employer in connection with the performance of management, administrative, professional or other services required to be performed by Employer under the Services Agreement(s), if any, as described on Exhibit B attached hereto.

***Section 3.***    ***Employer's Duties and Responsibilities.***  The duties and responsibilities of Employer are:

    3.1    Facilities and Support.  Employer shall furnish Physician with physician office space, administrative assistance, appropriate examination and treatment facilities, supplies, and such additional and auxiliary services as shall be suitable to Physician's position and adequate for the proper performance of Physician's duties and responsibilities under this Agreement.

    3.2    Respect Medical Judgment.  Employer shall at all times respect Physician's independent medical judgment and control over Physician's professional medical services.  At no time shall Employer knowingly issue to Physician any direction or impose any requirement that would require Physician to violate the standards for the professional and ethical practice of medicine.

    3.3    Compensation and Benefits.  In consideration of Physician's performance of his duties as required by this Agreement, Employer shall pay Physician the compensation set forth in the attached Exhibit C *(Total Compensation)*. Employer will provide the benefits consistent with Employer's benefit policy, as amended from time to time, and is available to Physician upon request. All compensation is subject to all applicable city, state, federal, and other withholding taxes.  Employer reserves the right to change the benefits in accordance with such policies and procedures as are applicable to Employer, when such changes are (i) generally applicable to all physicians employed by Employer, or (ii) when such changes are consistent with benefit changes applied to other similarly situated clinical or executive employees of

SVHS or its Affiliates, or (iii) when required by law or regulation. Physician understands that Physician, Employer, and its Affiliates are each subject to a number of laws and regulations affecting the compensation and incentives that may be paid under this Agreement. Physician further understands that these laws and regulations and interpretations thereof are subject to change. Physician agrees that notwithstanding anything to the contrary in this Agreement, its exhibits and schedules, or any Employer policy, rule, regulation, or protocol, Employer shall not be obligated to pay and Physician shall not accept any compensation or incentive payment if such payment would violate any applicable law or regulation or result in a financial relationship that does not meet an exception to the Stark Law.

3.4     Reporting. Employer shall provide Physician with monthly, year-to-date, and end-of-year financial and accounting reports relating to services performed by Physician pursuant to this Agreement, including, without limitation, gross billings, wRVUs, net collections, accounts receivable by patients and payors, adjustments, and write-offs.

3.5     Certain Expenses. In accordance with Employer's policy, Employer shall pay all medical staff application and reapplication fees for staff privileges at facilities to which Physician renders professional medical services. Employer shall pay all reasonable ordinary and necessary business expenses incurred by Physician on Employer's behalf, but subject to prior written approval of the Employer and consistent with Employer policies.

3.6     Management Services. Employer will direct Physician and other physicians employed by Employer, in connection with the performance of various services in furtherance of Management/ Professional Services related to a Services Agreement.

**Section 4.     Insurance.**

4.1     Physician's Eligibility & Coverage Limits. During the Term of this Agreement, the Employer shall provide Physician, at Employer's expense, with professional liability insurance. Physician shall at all times during the Term of this Agreement be and remain insurable for professional liability (malpractice) coverage, at rates reasonably equivalent to those available with respect to other physician employees of Employer (or otherwise as reasonably determined by Employer), allowing for normal rate differentials among specialties; with such policy limits and subject to such deductibles and retentions as Employer, in its sole discretion, determines to be reasonable and prudent for the protection of Employer and Physician, but not less than as specified in the attached Exhibit E. Notwithstanding the foregoing, in addition to the professional liability coverage limits specified in Section 1.4 of the attached Exhibit E, Employer shall provide, at its sole cost and expense, necessary appropriate excess coverage sufficient to pay any settlements, damages, or judgments against Physician that are in excess of the coverage limits described in Exhibit E, with respect to Physician's professional medical services rendered hereunder, subject, however, to the applicable terms, conditions, and limits of such excess insurance coverage.

4.2     Prior Acts Coverage. Physician shall, at his or her own cost and expense, provide, purchase or otherwise acquire professional liability "prior acts" insurance coverage to cover all of Physician's professional services rendered prior to Physician's employment with Employer. Physician shall, prior to the Start Date or upon request, provide Employer with a Certificate of Insurance evidencing such coverage.

4.3     Physician's Responsibility for Additional Coverage. In the event Employer, in its sole discretion, authorizes Physician to engage in professional or other services outside the scope of Physician's employment under this Agreement, Physician shall, at Physician's own cost and expense, purchase or otherwise acquire professional liability insurance coverage in amounts acceptable to Employer to cover all professional services rendered outside the scope of Physician's employment, and shall furnish Employer with a Certificate of Insurance and the declaration page of such policies evidencing such coverage.

EXHIBIT E

4.4     <u>Tail Coverage</u>. In the event this Agreement is terminated or not renewed, Employer shall purchase or otherwise acquire professional liability ("tail") insurance coverage to cover all of Physician's professional services rendered during the Term of this Agreement. Physician shall deliver promptly to Employer, upon receipt, a copy of any notice of claim against Physician involving Physician's liability insurance or any adverse action, change or modification to the terms and conditions of Physician's insurance coverage. Physician shall cooperate in filling out applications or other documents to obtain insurance.

**Section 5.**     ***Physician's Representations & Warranties.***    Physician represents and warrants to Employer that, as of the Effective Date of this Agreement:

5.1     <u>No Misrepresentations</u>. All statements made by Physician in any employment application or application for clinical privileges delivered to Employer are true and correct; and

5.2.     <u>Competing Interests</u>. Physician does not have any financial or other business relationships or ownership interests that involve the provision of health care items or services and that are competitive with or adverse to the business of Employer or any of its Affiliates (as hereinafter defined), except for those previously disclosed to Employer in writing and approved by SVHS; and

5.3     <u>No Violation</u>. Physician is not subject to or bound by any noncompetition or other restrictive covenant that would be violated or contravened by Physician's execution of this Agreement or that would impede or interfere with the performance of Physician's duties and responsibilities under this Agreement.

**Section 6.**     ***Billing.*** Employer shall perform all billing of patients and payors and shall pay all costs incident to billing and collections with respect to professional medical services rendered by Physician under this Agreement regardless of where such services are rendered. All fees or other income from any source attributable to the professional medical services rendered by Physician in the course of Physician's employment by Employer and related activities shall be the sole property of Employer, unless otherwise approved pursuant to Section 2.1 above, and Physician assigns the same to Employer.

**Section 7.**     ***Term and Termination.***

7.1     <u>Term</u>. Subject to earlier termination as set forth in this Agreement, the term of this Agreement shall commence on the Start Date and continue through June 30, 2021 (the "Initial Term"). The parties agree to renegotiate an extension of the Initial Term prior June 30, 2020 with compensation consistent with fair market value. The inability of the parties to agree in writing, prior to the expiration of the Initial Term, on the terms of compensation for periods subsequent to the Initial Term, shall result in termination of this Agreement upon expiration of the Initial Term. The Initial Term and any extension term hereunder are collectively referred to as the "Term."

7.2     <u>Immediate Termination by Employer for Cause</u>. Employer may at its option terminate this Agreement immediately for cause upon the occurrence of any of the following:

(a)     Suspension, curtailment, or revocation of Physician's DEA Registration or Physician's license to practice medicine in any state, including Arkansas, regardless of the pendency of any appeal of such suspension, curtailment, or revocation;

(b)     Termination, limitation, suspension (including summary suspension), or non-renewal by Physician (to avoid sanctions) of Physician's medical staff membership or clinical privileges at any hospital, including termination, for any reason, of Physician's medical

-6-

staff membership or clinical privileges at SVHS, other than termination, limitation, suspension or non-renewal of Physician's medical staff membership or clinical privileges at a hospital other than SVHS that is without cause or that is not related to quality of care provided by Physician, as reasonably determined by Employer;

(c) Expulsion, suspension, or other final disciplinary action against Physician by a professional medical organization as a result of professional misconduct, or resignation by Physician from any professional medical organization under threat of disciplinary action for professional misconduct;

(d) Physician's failure or inability to qualify or continue eligibility for professional liability insurance covering those elements of Physician's employment set forth in this Agreement, including Exhibit A;

(e) Imposition of any sanctions, including exclusion, suspension, or other limitation, relating to Physician's participation in any federally-funded health care program, including, without limitation, the Medicare and Medicaid programs;

(f) Physician's death;

(g) Physician's indictment for or conviction of a crime which relates to the practice of medicine; Physician's conviction of any felony; or Physician's conviction of a misdemeanor involving an act considered a violation of the standards of moral conduct;

(h) Physician is the subject of an allegation of healthcare fraud, abuse, or similar activities that are criminally or civilly proscribed and which Employer deems to be credible after an internal investigation including in connection with reviews of medical necessity;

(i) Physician enters into a consent decree or other judicial order or administrative settlement with respect to fraud, abuse or similar activities that are criminally or civilly proscribed;

(j) Physician jeopardizes the health and/or safety of any patient(s) due to gross inattention or willful neglect of Physician's duties;

(k) Physician's drug or alcohol abuse or the provision of medical services while under the influence of alcoholic beverages or illegal drugs;

(l) Breach by Physician of medical ethics, as defined in the "Arkansas Medical Practices Acts and Regulations" by the Arkansas State Medical Board at http://www.armedicalboard.org/index.asp;

(m) Physician's failure to comply with the Directives or the *CHI Standards of Conduct* (both as defined in the attached Exhibit E);

(n) Physician becomes "permanently disabled" (as defined in applicable policies and/or benefit plan documents and in accordance with the Americans with Disabilities Act), effective as of the date determined pursuant to the Employer policies and/or benefit plan; or

(o) Failure by Physician to comply with any other material term and/or condition of this Agreement, and such failure to comply continues for twenty (20) days after Employer gives Physician written notice specifying such failure (or, in the case of a failure that is not

-7-

EXHIBIT E

reasonably capable of being cured within such twenty (20) days period, if Physician fails to commence a cure within such twenty (20) day period or fails to diligently pursue such cure to completion thereafter), or if the same or similar failure is repeated by Physician at any time during the Term of this Agreement after a twenty (20) day notice has been given by Employer, then Employer may terminate this Agreement by giving Physician written notice of such termination, with the termination effective as of the date such notice is delivered.

7.3    Termination Without Cause.  Notwithstanding any other provision of this Agreement to the contrary, this Agreement may be terminated without cause as described in Section 1.15 of the attached Exhibit E.

7.4    Termination by Physician.  If Employer defaults in the performance of any of its obligations under this Agreement and such default or breach continues for twenty (20) days after Physician gives written notice specifying such default (or, in the case of a default that is not reasonably capable of being cured within such twenty (20) day period, if Employer or SVHS, as applicable, fails to commence a cure within such twenty (20) day period or fails to diligently pursue such cure to completion thereafter), or if the same or similar default or breach is repeated by Employer or SVHS at any time during the Term of this Agreement after a twenty (20) day notice has been given by Physician, then Physician may terminate this Agreement by giving Employer written notice of termination, with the termination effective as of the date such notice is delivered.

7.5    Other Termination by Physician.  In the event Employer conducts a compensation review for reasonableness pursuant to Section 9 of Exhibit C, and such review results in a reduction of Physician's compensation hereunder, Physician may make an election within ninety (90) days of such reduction to terminate this Agreement, with such termination becoming effective one hundred eighty (180) days after Physician's notice to Employer.

7.6    Omitted.

7.7    Physician's Cooperation Upon Termination.

(a)    In the event of the termination of this Agreement, Physician shall cooperate with Employer to assure the orderly transfer of patients treated by Physician during the course of employment to other physicians employed by Employer.  Subject to restrictions, if any, under applicable state law, (i) Physician's cooperation shall include, without limitation, taking all steps necessary or convenient to enable Employer to effect an orderly transfer of charts, records and information pertaining to patients that have been treated by Physician during Physician's Term of employment, and (ii) Physician shall coordinate with Employer in the sending by Employer of a notice to all patients for whom Physician performed services pursuant to this Agreement, signed by Physician, informing them: (y) that Physician is no longer employed by Employer; and (z) the name of the successor physician or physicians who will be available to provide services to such patients.

(b)    In the event of the termination or expiration of this Agreement for any reason, Physician shall reasonably cooperate with Employer: (i) to complete all administrative tasks necessary for Employer to seek reimbursement for care rendered during Physician's Term of employment; and (ii) in the defense of any claims (including litigation) arising out of the performance by Physician of his duties during the Term of this Agreement and Employer agrees to reimburse Physician for reasonable travel and other related expenses, not to include hourly fees, related to such assistance.

-8-

**Section 8.     *Recordkeeping.*** If and to the extent required by 42 U.S.C. § 1395x(v)(1)(I), until the expiration of four (4) years after the termination of the Agreement, Physician shall make available, upon written request by the Secretary of the Department of Health and Human Services (the "Secretary"), or upon request by the Comptroller General of the United States General Accounting Office (the "Comptroller General"), or any of their duly authorized representatives, a copy of this Agreement and such books, documents, and records as are necessary to certify the nature and extent of the costs of the services provided by Physician under the Agreement. Physician further agrees that, in the event he carries out any of his duties under the Agreement through a subcontract with a related organization with a value or cost of Ten Thousand Dollars ($10,000) or more over a twelve (12) month period, such subcontract shall contain a provision requiring the related organization to make available until the expiration of four (4) years after the furnishing of such services pursuant to such subcontract upon written request to the Secretary, or upon request to the Comptroller General, or any of their duly authorized representatives, a copy of such subcontract and such books, documents, and records of such organization as are necessary to verify the nature and extent of such costs. The provisions of this Section shall survive the expiration or termination of this Agreement for any reason.

**Section 9.     *Counterparts.*** This Agreement may be executed in any number of counterparts, each of which shall be deemed to be an original, and all of which together shall constitute one and the same instrument.

**Section 10.     *Notices.*** All notices required or permitted by this Agreement shall be in writing and shall be deemed to have been duly given upon personal delivery; or twenty-four (24) hours following deposit for overnight delivery with a bonded courier holding itself out to the public as providing such service, or following transmission by email or electronic facsimile, if subsequently mailed as provided herein; or forty-eight (48) hours following deposit in the U.S. Mail, registered or certified mail, postage prepaid, and in any case addressed as follows, or to such other addresses as the parties may designate from time to time:

|  |  |
|---|---|
| If to Physician: | Lensey Scott, M.D.<br>525 Western Ave., Suite 304<br>Conway, AR 72034 |
| If to Employer: | Jack Stephens Heart Institute<br>c/o President<br>#2 St. Vincent Circle<br>Little Rock, Arkansas 72205<br>Facsimile:  (501) 552-4271 |

**Section 11.     *Waiver.*** Failure by either party to insist upon strict compliance with any of the terms, covenants, or conditions of this Agreement shall not be deemed a continuing waiver of such term, covenant, or condition, nor shall any waiver or relinquishment of any right or power at any time be deemed a waiver or relinquishment of the same or any other right or power, whether or not similar.

**Section 12.     *Entire Agreement; Amendment.*** All exhibits referenced in this Agreement are incorporated herein by this reference. This Agreement (including any attached exhibits) contains the entire agreement between the parties concerning the subject matter of this Agreement, and supersedes all other and prior terms, covenants, representations, and agreements, whether oral or written.

**Section 13.     *General Interpretation; Ambiguities.*** Ambiguities, if any, in this Agreement shall be reasonably construed in accordance with all relevant circumstances including, without limitation, prevailing practices in the industry of the parties in the place where the contract is to be performed and shall not be

-9-

EXHIBIT E

construed against either party, irrespective of which party may be deemed to have authored the ambiguous provision.

**Section 14.** ***Coordination of Care.*** In order to promote the delivery of quality, coordinated, efficient, cost-effective care for patients of Employer, Physician agrees to utilize services available from the SVHS or its Affiliates except when (i) the use of a different provider is required by the terms of a patient's enrollment or participation in an insurance or other health care plan or as required by law, (ii) Physician determines that the use of SVHS or an Affiliate to provide such services is not in the best medical interests of the patient, (iii) the patient or his or her referring physician on their own initiative requests to use a different provider, (iv) SVHS-affiliated providers do not offer the needed services, or (v) medical emergency requires otherwise. Physician shall endeavor to regularly communicate with Employer regarding the basis for referrals of patients to a non-SVHS Affiliate provider for such services.

**Section 15.** ***Setoff.*** Upon expiration or termination of this Agreement for any reason, Physician authorizes Employer, at its sole discretion, upon written notice to Physician and to the extent permissible by applicable state and federal laws, to setoff any liability owed to Physician by Employer, including compensation hereunder, against any obligation owed by Physician to Employer or its Affiliates. Physician agrees to complete any documentation that may be requested by Employer related to such setoff.

**Section 16.** ***Non-Competition and Non-Solicitation.*** Employer or its Affiliates will provide, and Physician will use, confidential business information, trade secrets, patient information and other valuable information belonging to Employer or an Affiliate. The non-competition and non-solicitation provisions set forth in the attached <u>Exhibit D</u> are intended to protect the integrity of Employer and its Affiliates, the practices of the physicians who remain with Employer and its Affiliates, and the value of practices acquired by Employer and its Affiliates.

**Section 17.** ***Equitable Relief.*** The parties acknowledge and agree that, since a remedy at law for any breach or attempted breach of the provisions <u>Exhibit D</u> or Section 16 *(Non-Competition and Non-Solicitation)* shall be inadequate, Employer shall be entitled to injunctive and other equitable relief, including specific performance, in case of any such breach or attempted breach, in addition to such other remedies as may exist at law. The parties waive any requirement for the securing or posting of any bond in connection with the obtaining of any such injunctive or other equitable relief. The parties consent to exclusive jurisdiction and venue in the state and federal courts sitting in Little Rock, Pulaski County, Arkansas, and waive any objection to the jurisdiction of, or the venue of any action instituted in, such courts.

**Section 18.** ***Further Assurances.*** The parties shall execute and deliver such other documents and perform such further acts as shall be reasonably necessary or convenient to carry out and effectuate all the terms and conditions of this Agreement.

**Section 19.** ***Assignment.*** This Agreement is personal to each of the parties and no rights or duties may be assigned or delegated by either party without the prior written consent of the other; <u>provided, however,</u> that Employer may assign its rights and delegate its duties to any Affiliate or successor in interest of Employer.

**Section 21.** ***Successors.*** This Agreement shall be binding upon and inure to the benefit of the parties to this Agreement and their respective heirs, administrators, executors, successors and permitted assigns.

**Section 22.** ***Captions.*** The captions contained in this Agreement are not a part of this Agreement, are only for the convenience of the parties and do not in any way modify or amplify any of the terms, covenants, or conditions of this Agreement.

-10-

EXHIBIT E

**Section 23.**     *Expenses.*   Unless otherwise expressly provided in this Agreement, each party to this Agreement shall bear sole responsibility for all expenses incurred by such party in connection with this Agreement, including legal fees, whether or not the transactions contemplated by this Agreement are consummated.

**Section 24.**     *Arbitration.*   Any dispute regarding (i) any aspect of this Agreement, (ii) any act which allegedly has or may violate any provision of this Agreement, or (iii) any dispute related to the employment relationship between the parties or the termination of that relationship shall be submitted to binding arbitration in Little Rock, Arkansas before a mutually acceptable arbitrator, as the exclusive remedy for such claim or dispute.   The arbitration shall be in accordance with the American Health Lawyers Association Alternative Dispute Resolution Service Rules of Procedure for Arbitration (AHLA Arbitration Procedures) to the extent such procedures are not in conflict with this Agreement.  Disputes subject to arbitration include, but are not limited to, all employment-related claims arising under state or federal statutes, common-law torts, and contract claims.  Employment disputes not subject to arbitration include injunctive and equitable relief actions under Section 17 of this Agreement, as well as workers' compensation claims, unemployment compensation claims, and other employment-related claims that parties are not legally permitted to voluntarily arbitrate.  The party seeking arbitration shall send written notice to the other party setting forth the nature of the dispute, the dollar amount involved, if any, and the remedies sought. Unless the parties agree otherwise, the arbitrator must be an attorney licensed in Arkansas with experience in employment law, health care law, and contract matters, and will be selected pursuant to the AHLA Arbitration Procedures.  For statutory claims, relief, costs and attorney's fees may be awarded as provided by law.  For other claims, the prevailing party shall be entitled to reasonable attorney's fees, costs, and necessary disbursements, in addition to any other relief to which that party may be entitled under applicable laws.  Any arbitration award may be enforced under the Federal Arbitration Act or the Arkansas Uniform Arbitration Act, but the parties agree that the sole and exclusive jurisdiction and venue for any such enforcement action shall be the state and federal courts sitting in Little Rock / Pulaski County / Arkansas, and the parties consent to and waive any objection to the jurisdiction of, or the venue of any action instituted in, such courts.

**Section 25.**     *Compliance With Laws.*   Physician and Employer shall each comply with all applicable laws and regulations and performing their respective obligations under this Agreement.  If any provision of this Agreement shall reasonably be determined by either party to violate any applicable law or regulation, then the parties shall promptly and in good faith amend this Agreement (to the extent feasible) as may be necessary or advisable to comply with such law or regulation.  Any such amendment of this Agreement shall, to the extent practical, preserve to each party the economic and other benefits accorded such party in the original Agreement.  If a mutually acceptable amendment cannot be agreed upon, the provisions of Section 1.5 of Exhibit E shall apply.

*[Signature Page Follows]*

-11-

EXHIBIT E

IN WITNESS WHEREOF, the parties have executed and delivered this Agreement as of the date first written above.

**EMPLOYER:**                                    **PHYSICIAN:**

**Jack Stephens Heart Institute, LLC**

By:  St. Vincent Infirmary Medical Center,
     its sole member

By: _____              _____ M. D.
Chad S. Aduddell, President & Chief          Lensey Scott, M.D.
Executive Officer

-12-

AR0169 Physician Employment Agreement_Interventionalist_JSHI (Scott 16) v10 dcn

EXHIBIT E

**EXHIBIT A**
*Physician's Duties*

1) <u>In connection with Physician's clinical services,</u> Physician shall:

    a) Treat patients according to, and perform such clinical procedures as are consistent with, Physician's licensure, clinical Specialty and privileges, practice and training;

    b) Keep and maintain (or cause to be kept and maintained) appropriate records (including, without limitation, patient charts) on a timely basis relating to all professional medical services rendered by Physician. Timely basis shall constitute a fourteen (14) day period from the time when the professional medical service(s) was rendered. Employer management shall conduct or cause to be conducted chart audits to ensure that Physician is adhering to the terms and conditions regarding appropriate record maintenance. The cost of such audit shall be borne by Employer;

    c) Prepare and maintain all reports, claims, and correspondence necessary or appropriate to the performance of professional services;

    d) Attend professional conventions, post-graduate seminars, and/or continuing medical education programs to maintain and enhance Physician's professional skills, and participate in professional societies on a reasonable basis, at the Employer's expense, and subject to prior approval pursuant to applicable procedures of Employer;

    e) Promote the professional practice of Physician and of Employer at the Employer's expense;

    f) Provide coverage at facilities at which Physician practices when other physician employees of Employer are unavailable due to vacations, holidays, illness, or attendance at professional activities;

    g) Cooperate with Employer and/or SVHS in the event of a claim, threatened claim, or litigation involving Employer and/or SVHS;

    h) Supervise nurses and other personnel in accordance with Employer's policies, procedures, and applicable laws;

    i) Participate in medical staff activities of the Facilities, as applicable, in accordance with the requirements imposed by the Medical Staff Bylaws;

    j) Accept Physician's proportionate share of after-hours call coverage within Employer's practice, unless Physician is excluded by Employer or SVHS policy from such call coverage;

    k) Attend to patients in hospitals and other facilities in which Physician has privileges whenever they are admitted for care in such facilities or secure appropriate coverage for patient care through the St. Vincent Hospitalist program; provided, however, that Employer and SVHS will use their best efforts to ensure that hospitalist physicians who practice at the SVHS collaborate with Physician to confine their inpatient service to an appropriate scope of practice;

    l) Treatment of indigent and charity care patients, including patients covered by Medicaid and other state health programs, provided that Physician shall receive full wRVU credit for all professional services provided hereunder;

<div align="center">A-1</div>

<div align="center">EXHIBIT E</div>

m) In furtherance of Employer's stated goal of including physician representation on Employer's Board of Managers and committees of the board, to the extent consistent with the tax-exempt status of SVHS and Employer, participate on the Board of Managers and/or other committees thereof to the extent requested to do so; and

n) Cooperate and participate with Employer in the recruitment of other physicians and medical personnel.

2) <u>In connection with Physician's performance of Management/Professional Services,</u> Physician shall, consistent with Employer's governance, decision-making, and other processes described in this Agreement and Employer's Operating Agreement, assist Employer in the performance of Management/Professional Services pursuant to a Services Agreement, as such duties may be assigned by Employer to Physician from time to time.

A-2

EXHIBIT E

**EXHIBIT B**
*Services Agreements*

1.      Employer may enter into one or more agreements for the performance of management, administrative, professional or other services that are performed by Employed Physicians (each, a "Services Agreement").   Physician acknowledges that Physician may not participate in all or any Services Agreements.

2.      Services to be provided and the compensation payable to Employer under each Services Agreement in which Physician may participate and how such compensation will be distributed among the participating physicians under the IDP will be set forth in a separate services exhibit (each, a "Services Exhibit") which shall be sequentially numbered as Exhibit B-1, B-2, etc. and attached to this Exhibit B without further action by Physician.

3.      The approval of Employer's Board of Managers will be required for (a) any new Services Agreement, (b) the designation of which Employed Physicians may participate in a Services Agreement, (c) any new Service Exhibit, (d) any modifications to Services Agreements or Services Exhibit, and (e) termination of a Services Agreement by Employer.  A new Services Exhibit (or any changes to an existing Services Agreement) will become effective on the date approved by Employer's Board of Managers without separate amendment to this Agreement.

4.      A copy of each Services Exhibit for a Services Agreement in which Physician may participate will be provided to Physician within ten (10) days after approval by the Board of Managers.  In addition, a copy of any Services Agreement in which Physician may participate will be provided to Physician within ten (10) days upon request by Physician.

5.      In the event of a conflict between the terms of this Agreement or a Services Exhibit, the terms of the Agreement shall control.

6.      Physician's rights and duties under a Services Agreement or Services Exhibit, including participation in and compensation, will always be subject to the terms of the Services Agreement, including without limitation physician participation criteria and termination provisions therein. Physician's participation under a Services Exhibit will terminate upon the earlier of the termination of this Agreement or as provided under the applicable Services Agreement.

B-1

EXHIBIT E

**EXHIBIT B-1**

*Services Exhibit*
SVHS Cardiology Service Line Services Agreement

This Services Exhibit sets forth compensation, duties, and other provisions applicable to Physician's services under the Services Agreement described below. The Board of Managers of Employer approved the terms of this Services Exhibit on July 1, 2016. This Services Exhibit becomes effective on July 1, 2016. Any capitalized terms not defined herein will have the meaning set forth in Physician's Employment Agreement (the "Employment Agreement") or the Services Agreement, as applicable.

Physician acknowledges that Physician has limited participation under this Services Agreement. Therefore, payment to Physician for services under this Services Agreement is limited to the hourly rate of $237 as set forth in 6(d) below for actual hours of service provided to Hospital and as appropriately documented in a Time Record. Physician acknowledges and agrees that Incentive Management Fees as described herein are not available to Physician.

1. **Services Agreement.** As used herein, the "Services Agreement" means the Cardiology Service Line Services Agreement between Employer and St. Vincent Infirmary Medical Center d/b/a St. Vincent Health System ("Hospital"), effective January 1, 2012, as amended.

2. **Term.** The term of the Services Agreement has been extended and continues through June 30, 2021 and is subject to renewal or early termination as provided therein.

3. **Participating Physicians.** All Employed Physicians who satisfy the eligibility requirements described below or set forth in the Services Agreement, other than New Physician Employees and the Employed Physicians providing services to Conway Regional Health System or its affiliate, or as otherwise designated by Employer's Vice President/Administrator and the CMO, are eligible to participate in the provision of services under the Services Agreement.

In order to provide Management Services on behalf of Employer under the Services Agreement, an Employed Physician shall be required to be and remain employed by Employer, a party to and in continuous compliance with Physician's employment agreement with Employer, and agree to comply with the provisions of the Services Agreement and the policies and procedures established by Hospital, Employer and the JOC that are applicable to Employed Physicians in connection with the operation of the Service Line. If at any time an Employed Physician fails to meet the criteria set forth above, such Employed Physician shall be immediately removed from the provision of any Management Services. The Employed Physicians who are eligible to participate under the Services Agreement will be referred to herein as "Participating Physicians."

4. **Management and Administrative Services.** Employer, through the Participating Physicians, shall provide management and administrative services to Hospital in connection with the operation, medical direction and management of the Hospital cardiovascular service line, comprised of all Hospital inpatient, outpatient/ambulatory, cardiovascular surgery, diagnostic,

B-1-1

EXHIBIT E

rehabilitation and cardiovascular care services (the "Service Line") ("Management Services"). The Management Services to be performed by Employer and which may be engaged in by each Participating Physician, available upon request from Employer. In the event of an amendment to the Services Agreement, this Services Exhibit, including its schedules, will be automatically amended without separate action by the parties to remain consistent with the Services Agreement. All references to JSHI on Schedule 1 shall mean Employer and all references to SVHS on Schedule 1 shall mean Hospital.

     5.    **Quality Improvement Initiatives**.   Employer, through the Participating Physicians, shall also provide services designed to enhance the quality of care delivered through the Service Line (collectively, the "Performance Improvement Initiatives"), available upon request from Employer. The Performance Improvement Incentives will be updated annually or as otherwise permitted by the Services Agreement.

     6.    **Payment for Management Services.**

     (a)    In General. Employer will receive an aggregate base fee ("Base Management Fee") for the performance of the Management Services under the Services Agreement. To provide for stability of cash flow, Employer will have allocated to it, an equal amount of the aggregate Base Management Fee per month by Hospital for Employer's performance of Management Services, with such amount subject to quarterly and annual reconciliations as set forth in the Services Agreement. Employer will, in-turn, allocate a portion of the aggregate Base Management Fee received by Employer to the IDP to compensate the Participating Physicians for their performance of Management Services (with other portions of the aggregate Base Management Fee received by Employer allocated to pay the compensation for the services of CMO and medical director services performed by cardiovascular surgical physician employees of Employer in accordance with the Services Agreement). The Hospital will evaluate Employer's performance under the Services Agreement. The Employer's Board of Managers will retain ultimate responsibility for Employer's performance under the Services Agreement.

     (b)    Allocation of Cardiology Portion of Base Management Fee Allocated to IDP. The portion of the aggregate payment earned by Employer for Management Services that are performed by the cardiology Participating Physicians will be allocated to the IDP, and subsequently distributed to cardiology Participating Physicians. The portion of the Base Management Fee earned by Employer for Management Services that are performed by the cardiology Participating Physicians during 2016 which will be made available to be earned and paid into the IDP (assuming full performance under the Services Agreement) is set at Nine Hundred Thousand Dollars ($900,000), and the portion of the Base Management Fee earned by Employer that will be used to compensate the CMO during 2016 will equal Three Hundred Thousand Dollars ($300,000). The aggregate Base Management Fee earned by Employer for Management Services that are performed by the cardiology Participating Physicians from and after January 1, 2017 will be determined based on an external valuation and based on the fair market value of the Management Services, with such aggregate Base Management Fee to be allocated and used as provided herein and in the Services Agreement (to include allocating a portion of the aggregate Base Management Fee received by Employer to the IDP, allocating a portion to pay the compensation for the services of CMO, and allocating a portion to pay medical director services performed by cardiovascular surgical physician employees of Employer in accordance with the Services Agreement).

(c)     Time and Management Duties and Task Records.  Except as otherwise provided in the Services Agreement, each Participating Physicians providing Management Services must complete detailed "Time Records" substantially in the form designated by Hospital, with each such Time Record to include, without limitation, a description of the Management Services, management tasks and duties engaged in during each time period in which Participating Physicians perform reported Management Services.  Each Participating Physician will be required to submit to Employer, and Employer will submit to Hospital, the original Time Records and a summary of all time records listing the total number of hours devoted to individual management duties and tasks within the Management Services, and a description of the management duties and tasks described on Schedule 1 that were engaged in and/or accomplished.  Participating Physicians shall submit the Time Records to Employer for each month during the term of this Agreement by the fifth (5th) day of the following month. The timely and accurate submission of such Time Records demonstrating the performance of the Management Services, duties and tasks described and in accordance with the Services Agreement is a condition precedent to Hospital's payment of the Base Management Fee to Employer for Management Services, and there will be no allocation of funds for time incurred which is not supported by appropriately completed Time Records.

(d)     Minimum Hours Requirement.  Participating Physicians will continue to be required to provide, in the aggregate, a minimum of 3,797.5 hours of Management Services during 2016 (with such amounts calculated based on a total portion of the Base Management Fee allocated for cardiology Participating Physician Management Services, using the fair market value hourly rate as of the Effective Date of $237.00 per hour (calculated by dividing $900,000 by $237 per hour)).  The fair market value hourly rate for subsequent periods will be determined based on an external valuation, with such fair market value hourly rate used to determine the minimum number of hours of Management Services to be provided by the cardiology Participating Physicians for such year by dividing the total portion of the Base Management Fee available to be earned from the performance of Management Services by cardiology Participating Physicians, by the then applicable fair market value hourly rate.

Employer and Participating Physicians may report on the Time Sheets, actual hours of service (and fractions thereof) in which the Participating Physician performs bona fide Management and Administrative Services under the Employment Agreement and the Services Agreement, to include, without limitation, time the Participating Physicians devotes to Employer Board of Managers, JOC, Council and other committee meetings, and other time the Participating Physicians spend in connection with the performance of other duties and tasks that are within the scope of the Management Services.  The Parties understand and agree that the performance of such Management Services during a particular year will most likely require time in excess of the total minimum hours requirement referenced above, but that neither Employer nor the Participating Physicians will receive separate payment for time reported on the Time Sheets during any year which is in excess of the minimum hours requirement.  Physician understands and agrees that the full completion and submission of Time Sheets is a necessary requirement to assist Hospital and Employer in validating and documenting Employer's performance of the Management Services under the Services Agreement, and agrees to comply with this requirement.

---

B-1-3

(e)    Reconciliation. Base Management Fee payments by Employer into the IDP will be subject to quarterly and annual reconciliation and adjustment based on performance (demonstrated by time and the performance of the duties and tasks under the Services Agreement by the Participating Physicians), and the amount advanced may be reduced based upon inadequate performance. The quarterly and annual reconciliations will be performed within thirty (30) days following the end of each quarter or year during the term of the Services Agreement. For purposes of quarterly reconciliations, no adjustment to the portion of the Base Management Fee received by Employer which is advanced to the IDP for the performance of Management Services by the Participating Physicians will be made unless the aggregate hours reported by such Participating Physicians during the subject quarter or year-to-date period are substantially less (defined as 10%) than the portion of the minimum hours requirement applicable to the measurement period (e.g., if a minimum of 4,000 hours are required to be performed by Participating Physicians during the year and the first quarter is being measured, an adjustment to the portion of the Base Management Fee advanced to the IDP will only be made if less than 900 hours are reported on the Time Sheets of the Participating Physicians during the subject quarter). In the event that a reconciliation determines that an overpayment has been made (including an allocation to the IDP which is in excess of the amount earned), then the amount of overpayment shall be deducted pro-rata from the next three (3) subsequent payments or allocations. In the event that the Services Agreement terminates and an overpayment has been made which has not been recouped as of the termination date, then Employer shall repay the overpayment to Hospital within ten (10) days of notice of same, and recoup the amount of the overpayment from Physician and other Participating Physicians.

(f)    Distributions of Base Management Fee to Participating Physicians. Each Participating Physician is eligible to receive a portion of payments allocated by Employer to the IDP for the performance of Management Services equal to the total amount of the compensation allocated to the IDP from the performance of Management Services, multiplied by a fraction, the numerator of which is the total number of documented hours (and fractions thereof) time spent by that Participating Physician performing Management Services during the applicable year, and the denominator of which is the total time spent by all Participating Physicians performing Management Services during the applicable year.

Physician must comply with all documentation and other requirements, including those relating to Time Records, described in this Services Exhibit and the Employment Agreement to document the types of Management Services, management duties and tasks, performed by the Participating Physicians and the time spent performing such activities. For purposes of administering this provision, Employer will allocate a portion of the total portion of compensation allocated by Employer to the IDP on a monthly basis for the payment of Management Services based on an estimate of each Participating Physician's actual hours of Management services, subject to annual reconciliation based on actual hours spent during the respective year.

### 7.    Incentive Management Fees Based on Performance Improvement Initiatives.

(a)    In General. In addition to the items of Base Management Fee compensation set forth above, Employer shall be eligible to earn an "Incentive Management Fee" for the achievement of Performance Improvement Initiatives under the Services Agreement, pursuant to the terms of the Services Agreement. The Incentive Management Fee will be paid based on

B-1-4

performance in relation to the Performance Improvement Initiatives. Incentive Management Fee measures will be assessed and reported periodically and awards determined and paid on the schedule set forth in the Services Agreement and on <u>Schedule 2</u>, as applicable to the respective measure.

(b)    <u>Allocation of Cardiology Portion of Incentive Management Fee to IDP</u>.   The portion of the aggregate payment earned by Employer as an Incentive Management Fee based on the performance by Employer's cardiology Participating Physicians will be allocated to the IDP, and subsequently distributed to the cardiology Participating Physicians in accordance with the IDP. For 2016, the portion of the aggregate Incentive Management Fee earned by Employer the performance by Employer's cardiology Participating Physicians which will be made available to be earned and paid into the IDP (assuming full performance under the Services Agreement), is Six Hundred Thousand Dollars ($600,000). The aggregate Incentive Management Fee to be made available to be earned and paid into the IDP for each of the subsequent Contract Years will be determined based on an external valuation, with such aggregate fee to be allocated and used as provided herein (to include allocating a portion of the aggregate Incentive Management Fee received by Employer to the IDP, and to pay compensation for services performed by cardiovascular surgical physician employees of Employer in accordance with the Services Agreement).

(c)    <u>Distributions of Incentive Management Fee to Participating Physicians</u>.

The portion of the aggregate payment earned by Employer as an Incentive Management Fee based on the performance by Participating Physicians will be subsequently distributed to the Participating Physicians in accordance with this Services Exhibit; provided, however, that in order to be eligible for any portion of the Incentive Management Fee, Physician shall have no medical record deficiencies which have been outstanding for more than sixty (60) days post-discharge (inpatient) or from the date of service (outpatient), unless an exception has been made by Hospital's Chief Medical Officer for a immaterial deficiency or a deficiency which is reasonably deemed to not be the fault of Physician.

Each Participating Physician shall be eligible for a share of the Incentive Management Fee. Each Participating Physician's share of such Incentive Management Fee shall be equal to the total Incentive Management Fees received by Employer under the Services Agreement, divided by the total number of Participating Physicians actively involved in providing services on behalf of Employer that contributed in some way to achieving the Performance Improvement Initiatives, determined pursuant to the Services Agreement.

8.    <u>Updates to Base Management Fee and Incentive Management Fee</u>.   The compensation payable for services performed under the Services Agreement may be subject to annual updates, fair market value requirements, and other terms of the Services Agreement. The maximum available to be paid under the Services Agreement in the form of a Base Management Fee, and the aggregate amount available for payment in the form of the Incentive Management Fee, in each case beginning on January 1, 2017, will be updated annually. In connection with each such update, the minimum number of hours of Management Services required to be performed by cardiology Participating Physicians based on the then current fair market value hourly rate as determined by the external valuation, and the specific Performance Improvement Initiatives, associated award measures and amounts will be updated for the next year. In the event that such update results in a reduction of the fair market value hourly rate for cardiology services or

the maximum annual amount available to be paid under the Services Agreement in the form of a Base Management Fee of more than five percent (5%) as compared to the rate in the then current year, then the Participating Physicians may hold a vote and the affirmative vote of no less than seventy-five percent (75%) of the Participating Physicians will be an "Unwind Trigger," as defined in Section 11.4(A) of the Asset Purchase and Lease Agreement dated as of the Effective Date by and among Hospital, Heart Clinic Arkansas, P.A., Cardia Properties, LLC and the shareholders of Heart Clinic Arkansas, P.A.

9.      <u>Miscellaneous.</u>  Although this Exhibit B-1 is a part of Physician's Agreement with Employer and describes certain rights and obligations between Physician and Employer with respect to the performance of the Services Agreement, Physician is not a third-party beneficiary to the Services Agreement nor is Physician entitled to enforce any rights under the Services Agreement. This Services Exhibit does not alter or convey any rights, limitations, or obligations as between Hospital and Employer under the Services Agreement.

<div align="center">B-1-6</div>

<div align="center">EXHIBIT E</div>

**EXHIBIT B-3**

*Services Exhibit*
CRMC Professional Services Agreement

This Services Exhibit sets forth compensation, duties, and other provisions applicable to Physician's services under the Services Agreement described below. The Board of Managers of Employer approved the terms of this Services Exhibit. This Services Exhibit becomes effective on the Start Date. Any capitalized terms not defined herein will have the meaning set forth in Physician's Employment Agreement (the "Employment Agreement") or the Services Agreement, as applicable.

1. **Services Agreement.** As used herein, the "Services Agreement" means the Independent Contractor Professional Services Agreement between Employer and Conway Regional Medical Center, an Arkansas nonprofit corporation, ("CRMS") ("Hospital"), effective August 1, 2016.

2. **Term.** The term of the Services Agreement has been extended and continues through August 31, 2020, and is subject to renewal or early termination as provided therein.

3. **Participating Physicians.** The Employed Physicians who satisfy the eligibility requirements described below or set forth in the Services Agreement and who are designated by Employer's Vice President/Administrator are eligible to participate in the provision of services under the Services Agreement.

In order to provide professional medical and other services (the "Professional Services") on behalf of Employer under the Services Agreement, an Employed Physician shall be required to be and remain employed by Employer, a party to and in continuous compliance with Physician's employment agreement with Employer, and agree to comply with the provisions of the Services Agreement and the policies and procedures established by Hospital, Employer and the JOC that are applicable to Employed Physicians in connection with the operation of the Service Line. If at any time an Employed Physician fails to meet the criteria set forth above, such Employed Physician shall be immediately removed from the provision of any Professional Services. The Employed Physicians who are eligible to participate under the Services Agreement will be referred to herein as "Participating Physicians."

4. **Professional Services; Other Services.**

(a) Employer, through the Participating Physicians, shall provide professional medical and related services to Hospital. The Professional Services to be performed by Employer and which may be engaged in by each Participating Physicians, shall consist of the duties and activities described in the Services Agreement and as required by Employer. In the event of an amendment to the Services Agreement, this Services Exhibit will be automatically amended without separate action by the parties to remain consistent with the Services Agreement.

C-1

EXHIBIT E

5.   **Payment for Professional Services.**

(a)    In General.   Employer will receive Production-Based Payment, Group Costs, Supervision Payment, and Lecture Payment for the performance of the Professional Services and related services under the Services Agreement.

(b)    Attributed wRVUs.   For services provided under the Services Agreement, the wRVUs performed by the Participating Physicians under the Services Agreement will be allocated to the respective Participating Physician's wRVU productivity for purposes of calculating Base Compensation payable to the Participating Physician.

Physician must comply with all documentation and other requirements, including those described in this Services Exhibit and the Employment Agreement to document the types of Professional Services and other services performed by the Participating Physicians.

6.   **Updates to Compensation.**   The compensation payable for services performed under the Services Agreement may be subject to annual updates, fair market value requirements, and other terms of the Services Agreement.  The maximum available to be paid under the Services Agreement as compensation may be updated annually, as necessary.

7.   **Miscellaneous.**   Although this Exhibit B-3 is a part of Physician's Employment Agreement with Employer and describes certain rights and obligations between Physician and Employer with respect to the performance of the Services Agreement, Physician is not a third-party beneficiary to the Services Agreement nor is Physician entitled to enforce any rights under the Services Agreement. This Services Exhibit does not alter or convey any rights, limitations, or obligations as between Hospital and Employer under the Services Agreement.

**EXHIBIT C**
*Compensation*

**Section 1.      Defined Terms.**  Capitalized terms used in this <u>Exhibit C</u> shall have the meanings set forth below, or elsewhere in this <u>Exhibit C</u> or the Agreement.

"Board" shall mean Employer's Board of Managers.

"Contract Year" shall mean each full or partial year that ends on June 30, such that Physician's Contract Year corresponds to those of all other Employed Physicians.  Any amounts due to Physician during a partial Contract Year shall be prorated.

"Conversion Factor" shall mean $57.50.

"Employed Physicians" means all physicians in the Specialty who are employees of Employer, including New Physician Employees.  Upon the termination of employment of Physician for any reason, Physician will cease to be an Employed Physician for purposes hereof.

"IDP" shall mean that certain "internal distribution plan" which is attached as <u>Exhibit C-1</u>, as may be amended from time to time as provided in Section 8 below, which sets forth the methodology under which amounts allocated to the IDP will be distributed among the Employed Physicians as compensation for their services during each Contract Year.

"Management/Professional Services" shall mean the various services provided by Employer in connection with one or more Services Agreements as described on a Services Exhibit.

"New Physician Employees" shall mean those Employed Physicians in the Specialty of Employer who (i) are assigned by Employer to staff clinical facilities, work in conjunction and share a practice with the other Employed Physicians, (ii) have been approved by Employer's Board of Managers and become an employee of Employer after the Start Date, and (iii) have not yet completed their first full year of employment by Employer as an Employed Physician.

"Non-Physician Individual" shall mean those nurse practitioners and/or physician assistant providers who are licensed in the State of Arkansas, enrolled and eligible to bill for professional services under the Medicare, Medicaid, and other Federal Health Care Programs, and who are assigned by Employer to work in conjunction and share a practice with the Employed Physicians (other than New Physician Employees) during each respective Contract Year.  In addition, Non-Physician Individual includes any unlicensed individual (e.g., scribe) that has been assigned to an Employed Physician (other than a New Physician Employees).

"Non-Physician Direct Expenses" shall mean the actual direct expenses which are incurred by Employer for the payment of compensation, benefits, and other specific expenses (e.g., licensure, continuing education allowance, etc.) for the Non-Physician Individual who are assigned by Employer to work in conjunction and share a practice with the Employed Physicians based on their assigned time commitment during each Contract Year.

"Outreach and Training Credit" shall mean four and 75/100 (4.75) *wRVUs* per hour for Outreach and Training Services performed by Physician, or other amount agreed upon by Employer (with the approval of Employer's Vice President/Administrator and the CMO) for the provision of such services.

C-3

"Outreach and Training Services" shall mean time spent in developing outreach clinics at Employer's request and attending training seminars, sessions, and/or events to enhance and/or increase the level of services provided by Physician through Employer. Outreach and Training Services shall include approved travel time associated with developing outreach clinics and attending training seminars, sessions and/or the events described above. All Outreach and Training Services, including without limitation, the nature, length, and parameters around travel time shall be approved in advance by the Board of Employer.

"Pass Through Amounts" shall mean any of the following amounts received by Employer during a given Contract Year:

        (i)      Amounts which are attributed to Physician's performance of activities and services required to obtain physician-specific incentive payments from Medicare, Medicaid or other payors for e-prescribing, payments made under the Physician Quality Reporting System, Electronic Health Record "meaningful use" incentives and any other physician-specific incentive payments as designated by Employer (with the approval of the Board);

        (ii)      Amounts received by Employer for investigator or other research services performed by SVHS or Employer under research study or similar agreements administered by Employer under which Physician serves as the investigator (collectively "JSHI Research Agreements"), net of direct costs incurred by Employer in performing the duties and obligations of Employer under all such Research Agreement(s) or otherwise in connection with the operations of the research department;

        (iii)      Amounts received by Employer for investigator or other research services that are attributable directly to Physician's personally-performed services under research study or similar agreements not administered by Employer (collectively "CIRI Research Agreements");

        (iv)      Amounts payable for EKG reads personally performed by Physician which are performed at and paid for by hospitals or facilities other than SVHS or SVHS affiliates; and

        (v)      Any additional payments for services which are outside of Physician's duties under this Agreement which are approved in advance by Employer and following the completion of any third party valuation or other review deemed necessary by Employer.

"Quarterly IDP Allocation Reconciliation" shall mean a reconciliation to be completed following the completion of each three-month period during a Contract Year during the Term, which compares the aggregate amount of compensation earned by the Employed Physicians during such period in question to the total amount actually allocated by Employer to, and paid by, the IDP during the respective period.

*"wRVUs"* shall mean the work relative value units (CMS RBRVS method) for professional services. Employer will use the applicable year CMS RBRVS values to calculate *wRVU* values, except as provided herein. New procedures with *wRVU* assignments will be valued at the value assigned during the first year of use by CMS. The *wRVU* value of procedures without *wRVUs* assigned by CMS will be calculated as set forth in the MGMA Physician Compensation and Production Survey by dividing the total gross charges for the unvalued procedures, by the Employer's known average charge per wRVU for all procedures which are listed and valued, with

C-4

such calculated value to be used until a value is assigned by CMS, after which the CMS-assigned value will be used. In the event any procedure is subsequently bundled involving a single, combined payment for hospital and physician professional services, then the initial *wRVU* value for such procedure as determined hereunder will continue to apply. Physician will receive *wRVU* credit for purposes of this Agreement for all professional services of Physician which are performed for Employer using Medicare assigned wRVU values, to specifically include EKG interpretations performed for SVHS and its Affiliates (but excluding EKG reads personally performed by Physician which are performed at and paid for by hospitals or facilities other than SVHS or an Affiliate, which constitute "Pass Through Amounts" as defined above).

### Section 2.  Compensation Paid Directly to Physician

During each Contract Year of the Term, Employer will pay the following amounts directly to Physician (rather than allocating such amounts to the IDP), subject to withholds, deductions, expenses, or other provisions of this Agreement:

(a)      Physician is a New Physician Employee. From the Start Date through September 30, 2017, Physician shall be paid a base salary equal to Five Hundred Seventy-Five Thousand Dollars ($575,000) ("Base Salary") plus Incentive Compensation. For purposes of this Agreement, the term "Incentive Compensation" means, during the Initial Term, Physician's actual wRVUs in excess of 2,500 per calendar quarter, multiplied by $57.50. Incentive Compensation, if any, shall be reconciled at the end of each calendar quarter. Beginning October 1, 2017 Physician will be paid a "Draw" as described in Section B(i) of Exhibit C-1.

(b)      Student Loan Repayment Stipend. Provided that (i) Physician is and remains employed by Employer; (ii) Physicians is and remains in compliance with all of his or her obligations hereunder; and (iii) Physician has any outstanding student loans related to Physician's medical education and training, then upon completion of each Contract Year of this Agreement, Employer shall provide a "student loan repayment stipend" to Physician in the amount of Twenty Thousand Dollars ($20,000), not to exceed One Hundred Thousand Dollars ($100,000). Employer will pay such student loan repayment stipend to Physician upon proof that Physician paid at least $20,000 toward student loans in a given Contract Year. Amounts provided to Physician hereunder shall be treated as income to Physician for tax purposes to the extent required by law.

### Section 3.  Compensation Allocated to IDP

During each Contract Year of the Term, Employer will allocate the following amounts to be distributed through the IDP, which aggregate amount shall be used to pay annual compensation to Physician and all other Employed Physicians, subject to withholds, deductions, expenses, or other provisions of this Agreement:

(a)      Base Compensation in an amount equal to the total number of wRVUs attributable to the professional medical services of each Employed Physician (other than a New Physician Employee) and each assigned Non-Physician Individual multiplied by the applicable Conversion Factor, and subtracting from the result thereof the Non-Physician Direct Expense. Notwithstanding the foregoing, upon a Reduction Event (as defined below) with respect to any Employed Physician (other than a New Physician Employee), the Base Compensation allocated to the IDP for the Employed Physician subject to Reduction Event during any six (6) month period during the Term shall not be less than seventy percent (70%) of the Employed Physician's Base Compensation during the immediately preceding six (6) full months prior to the Reduction Event. A "Reduction Event" means an event or decision that is outside the control or influence of the Employed Physicians that causes a "material decrease" in an Employed Physician's *wRVU*

C-5

production.  "Material decrease" shall mean a reduction in an Employed Physician's *wRVU* production of thirty percent (30%) or greater within a six (6) month period.  For illustrative purposes, a Reduction Event includes, without limitation, the following examples:  (i) cessation of the provision of cardiology services CHI St. Vincent North hospital; (ii) Employer discontinues a managed care agreement with a payor that represents a significant portion of Employer's payor mix; and (iii) other significant events that are outside the control or influence of the Employed Physicians that reduces an Employed Physician's *wRVU* production. Base Compensation will be estimated based on a running (annualized) total of wRVUs throughout each Contract Year and subject to the Quarterly IDP Allocation Reconciliation;

(b)  Payments (including for performance of Management/Professional Services and incentive payments) earned by Employer under all Services Agreements and which (if earned) will be allocated to participating Employed Physicians under the IDP in accordance with the applicable Services Exhibit;

(c)  Pass Through Amounts;

(d)  Outreach and Training Credits earned by Employed Physicians; and

(e)  Other forms of compensation allocated to the IDP as described in this Compensation Plan.

**Section 4. *Payment of Physician's Compensation; Quarterly IDP Reconciliation.***

(a)  Payment of Physician's Compensation.  All compensation paid to Physician in accordance with the Employer's normal payroll policies and practices and, for compensation allocated to the IDP, shall be allocated and distributed among Employed Physicians in accordance with the IDP.

(b)  Quarterly IDP Allocation Reconciliation.  Within thirty (30) days of the end of each three (3) month period during a Contract Year, Employer shall perform a reconciliation of the amounts properly allocated to the IDP during such three (3) month period.  Employer agrees to pay to Physician any amounts due to Physician within fifteen (15) days following the completion of the calculation. In the event Physician has been paid compensation in excess of that provided for, or is delinquent on the repayment of any debt to Employer, Physician hereby authorizes Employer to deduct any overpayment or debt pro rata from the next payments, if any, due to Physician during the following three (3) months, and following such three (3) month period Physician shall repay within ten (10) days any amounts not so recovered to Employer.  Upon termination of this Agreement and following a final accounting/reconciliation to be completed within thirty (30) days following the termination date, any amounts owed by either party to the other shall become immediately due and payable within ten (10) days of notice of the results of such accounting/reconciliation.

(c)  Withholdings.  Employer shall deduct from all compensation due Physician hereunder all sums required to be withheld for federal, state, or local taxes, surcharges, or other mandated withholdings with respect to Physician's compensation.

(d)  Proration.  In the event that this Agreement terminates or is terminated during a Contract Year, the amounts stated herein shall be prorated accordingly.

**Section 5. *Compensation Review for Reasonableness.***

(a)  Individual Physician.  The total annual aggregate compensation received by Physician hereunder (including all amounts provided to Physician and reportable as taxable income) shall not exceed one hundred fifty percent (150%) of the ninetieth (90th) percentile for physicians in the Specialty (the "Cap") based on standardized benchmarking (i.e., using the same or similar methodology as was used by Employer

prior to the Start Date of this Agreement) unless Physician's compensation in excess of the Cap is determined to not exceed fair market value as follows:

(i)      In the event that Physician's compensation is projected to exceed the Cap, Employer will conduct an external valuation and review of medical necessity using one or more firms with expertise in physician compensation valuation and the evaluation of the medical necessity of cardiology services, in order to consider Physician's productivity and the medical necessity of services included within such productivity (with such medical necessity review to be based on a sample determined appropriate by the external firm conducting the medical necessity review).  Upon such completion of such medical necessity review, if any services of Physician were disqualified due to lack of medical necessity, the firm conducting the external compensation valuation will determine whether Physician's compensation projected to exceed the Cap will be within fair market value by considering the findings from the medical necessity review.

(ii)      In the event the valuation concludes that Physician's projected compensation in excess of the Cap would not exceed fair market value, the Cap will not apply to Physician's compensation for the particular Contract Year to the extent consistent with the valuation.

(iii)      In the event the valuation concludes that Physician's projected compensation (if in excess of the Cap) would exceed fair market value, the Cap will apply.  In the event that the application of the Cap results in a reduction of compensation which would otherwise be payable to Physician notwithstanding the Cap of more than five percent (5%), Physician may elect to terminate this Agreement in accordance with the time periods specified in Section 7.5, but such termination shall not provide Physician with any separate remedy or right to damages due to termination of the Agreement.

(iii)      If Physician's compensation is project to exceed the Cap based on the first two Contract Year quarters, Employer will use its best efforts to complete the medical necessity review and valuation and inform Physician of the results by the end of the third quarter.

Notwithstanding the foregoing, the parties agree that pursuant to that certain HealthCare Appraisers, Inc., report number 2478-025 for Analysis Cardiology Employment Arrangements for Jack Stephens Heart Institute, LLC (the "Aggregate Compensation Valuation"), the projected compensation to be earned and paid to Physician as of the Start Date is deemed to be within FMV, even if such aggregate amount is projected to be in excess of the Cap.  In addition, so long as the aggregate compensation earned by Physician during each annual period between the Start Date and June 30, 2019 (the last date upon which the Aggregate Compensation Valuation may be relied upon) is less than the aggregate amount set forth for Physician under the Aggregate Compensation Valuation, then such compensation will not be deemed to have exceeded the Cap so as to be subject to the independent valuation requirements of this Section 5(a).  In the event, however, that the aggregate compensation allocated to Physician exceeds the amount set forth in the Aggregate Compensation Valuation, then the provisions of this Section 5(a) shall apply (to include requirements related to external valuation, medical necessity review and potential modification of compensation amounts by Employer).

(b)      <u>Compensation Plan Review</u>.  To ensure ongoing regulatory compliance, after this Agreement has been in force for thirty (30) months, Employer may, at its option, engage a third party valuation firm with expertise in physician compensation for services in the Specialty to assess compensation projected to be paid under this Agreement into the IDP during Contract Years four and five to confirm that such compensation is consistent with fair market value and commercially reasonable.  Any findings from those valuations will be a basis for modifications to such compensation in order to eliminate any identified risk of overpayment.  In the event that such modifications result in a reduction of the allocation to the IDP

<center>C-7</center>

which is projected to reduce compensation payable to the Employed Physicians by more than five percent (5%), such reduction shall require the approval of the Employer and no less than seventy-five percent (75%) of the Employed Physicians, in which case Physician agrees that this Agreement shall be automatically amended without Physician's separate consent or signature. If such approvals are not obtained, such failure to obtain said approvals, Physician may terminate this Agreement without cause as provided in Section 1.15 of Exhibit E.

(c)     Medical Necessity. Employer shall engage, at its sole cost and expense, an independent evaluator to conduct a medical necessity review of Physician as provided in Section 5(a) or in the event that Physician's personal wRVU production exceeds one hundred fifty percent (150%) of the ninetieth (90th) percentile for physicians in the Specialty based on national reports or surveys maintained by national associations with expertise in physician compensation.

**Section 6.        *Compensation Renegotiation.***

(a)     Triggering Event. In the event that, during the Term, external reimbursement from the Centers for Medicare & Medicare Services ("CMS) for cardiology physician professional services decreases by thirty percent (30%) from the level of reimbursement paid for such services in 2016, then the wRVU Conversion Factor for the current Contract Year and each subsequent Contract Year will be renegotiated. The parties agree that this safeguard is meant to cover significant changes in CMS reimbursement rather than volume variances relative to market capture assumptions. An annual evaluation will be completed and in the event that such annual evaluation reveals a thirty percent (30%) decrease, then Employer will provide written notice to Physician and the other Employed Physicians that a triggering event has occurred, and the compensation structure will be renegotiated and amended in accordance with the process described in Section 6(b) below.

(b)     Negotiation Process and Timeline. Upon the occurrence of a triggering event in accordance with Section 8(a) above, the Employed Physicians will name a subcommittee comprised of no less than three (3) and no more than five (5) Employed Physicians. The subcommittee will meet with representatives of Employer's Board of Managers (excluding any board member who is a physician employee of Employer) and their designee (to include appropriate SVHS representatives) in an effort to attempt to agree on a new compensation structure and an amendment to this Agreement. Any such amendment shall require the approval of the Employer and no less than seventy-five percent (75%) of the Employed Physicians, in which case Physician agrees that this Agreement shall be automatically amended without Physician's separate consent or signature. If a mutually acceptable amendment cannot be approved within sixty (60) days, Physician may terminate this Agreement without cause as provided in Section 1.15 of Exhibit E.

**Section 7.        *Disputes.*** In the event there is a dispute between the parties hereto regarding the calculations of amounts due to Physician or Employer, then the parties shall agree on an independent certified public accountant to calculate the amounts due hereunder and such calculation shall be binding on both parties with respect to the mathematical calculations (but not as to the interpretation of this Agreement).

**Section 8.        *Adoption and Changes to IDP.*** The IDP set forth on Exhibit C-1 has been agreed upon and implemented in order to promote certain work allocation, cultural and other objectives related to the organization and operation of the physicians' collective cardiology practices. By becoming a party to this Agreement, Physician agrees to be and remain subject to the IDP, and Physician further consents and agrees to be bound by any amendment to the IDP, as adopted and approved from time to time, by the approval of at least seventy-five percent (75%) of the Employed Physicians, without Physician's separate

C-8

consent or signature on such amendment.  Any amendment to the IDP so approved shall be incorporated into this Agreement without further action of the parties.

C
AR0169 Physician Employment Agreement_Interventionalist_JSHI (Scott 16) v10 den

EXHIBIT E

**EXHIBIT C-1**
*Internal Distribution Plan*

Introduction.  This Exhibit C-1 sets forth the Internal Distribution Plan ("IDP") and methodology under which amounts allocated to the IDP by Employer will be distributed among the Employed Physicians as compensation for their services during each Contract Year.

Section 1.    Distribution of Base Compensation.  Aggregate funds allocated to the IDP by Employer in the form of Base Compensation shall be distributed among the Employed Physicians (other than the New Physician Employees) in the following manner as "Base Compensation":

A.    Calculation of Base Compensation. Subject to reduction as provided in Section 2A below, Employed Physicians will be paid Base Compensation in the amount equal to the greater of:

(i)    The total number of wRVUs generated by such Employed Physician for professional services personally performed plus wRVUs generated by a Non-Physician Individual (excluding any wRVUs for services involving ancillary services and amounts that would trigger the prohibitions under 42 U.S.C. § 1395nn, including "designated health services") assigned to Employed Physician (based on the assignment percentage), multiplied by the Conversion Factor; or

(ii)    The amount of Base Compensation allocated to the IDP for an Employed Physician who is affected by a Reduction Event as described in Section 2(a) of Exhibit C.

B.    Payout of Base Compensation and Reconciliation.  In each Contract Year, each Employed Physician shall be assigned a "Draw" which shall generally be set at eighty percent (80%) of such Employed Physician's projected Base Compensation for such Contract Year, based upon Physician's productivity in the prior Contract Year. Employer will conduct the reconciliation described in Exhibit C, and will concurrently conduct a reconciliation of the amounts due to each Employed Physicians under this IDP and amounts paid to the Employed Physician in the form of a Draw.

i.    If an Employed Physician has earned Base Compensation in excess of such Employed Physician's Draw in accordance Section 1(A) above, then the Employed Physician shall receive the difference between the Base Compensation earned by the Employed Physician and the aggregate Draw payments made to the Employed Physician during such time period, in accordance with the time periods set forth in Exhibit C.

ii.    If such reconciliation shows that the aggregate Draw payments made to the Employed Physician were greater than the Base Compensation earned by such Employed Physician during such time period, including any overcharges or corrections (a "Shortfall"), then Draw payments made to the Employed Physician in the immediately ensuing quarter shall be proportionately reduced in order to recoup the Shortfall; and, in connection therewith, the Employed Physician shall not be entitled to receive payments of Base Compensation in such period unless Base Compensation earned by the Employed Physician in such period exceeds the aggregate amount of unadjusted Draw payments that would have been made to the Employed Physician, absent deductions for the Shortfall.

iii.    In the event the Employed Physician earns Base Compensation in such period which is in excess of the Employed Physician's unadjusted Draw in such period,

C-1-1

then the Employed Physician's Draw in the next succeeding three (3) month period will be reset to the Employed Physician's full, unadjusted Draw amount.

C.     Non-Physician Expenses; Other Expenses.

i.     Notwithstanding anything hereto to the contrary, if the determination of an Employed Physician's Base Compensation includes an allocation of wRVUs that are performed by a Non-Physician Individual assigned to an Employed Physician, then all Non-Physician Direct Expenses attributed to such Non-Physician Individual shall be deducted from Base Compensation payable to the Employed Physicians to whom the Non-Physician Individual is assigned by Employer based on FTE assignment.

ii.     In the event any expenses reimbursed by Employer under the second sentence of Section 3.5 of the Agreement are determined upon audit or other examination to not be allowable for tax purposes then Physician shall repay to Employer the amount of such disallowed compensation or expenses or both.

Section 2.     Call Coverage Pools.

A.     Call Coverage. A separate pool of funds (the "Call Coverage Pool") will be created by multiplying the number of wRVUs which are personally performed by Employed Physicians (other than New Physician Employees) who are excluded from call coverage obligations ("Excluded Physicians") by the per wRVU amount agreed upon by the Board and the Excluded Physician prior to his or her exclusion from call coverage obligations. The funds allocated to the Call Coverage Pool will be allocated on an hourly basis among Employed Physicians who take additional call (to cover call coverage requirements of Excluded Physicians, as determined by Employer) in accordance with Section 2(B) below, with any amounts not distributed from the Call Coverage Pool on such basis, to be distributed through the "Travel Time Pool" described in Section 2(F) below.

B.     Allocation of Compensation. For purposes of this provision the Board of Managers of Employer, with the input of the CV CMO, shall determine what incidents of on-call services will constitute additional on-call services.  Each Employed Physician providing additional on-call services shall receive compensation on an hourly basis at the rate of $71 per hour, or other amount agreed upon by Employed Physician and Employer, based on the respective call schedule of additional on-call services performed (e.g., X hours for evening, Y hours for weekend, etc.). Amounts allocated to the Call Coverage Pool that are not allocated on an hourly basis on the provision of additional on-call services as provided herein will be allocated to the Travel Time Pool. In the event that the amount to be allocated for additional call exceeds the total available in the Call Coverage Pool, then the amount in the Call Coverage Pool will be allocated on a percent to total basis based on the number of hours of additional on-call service provided by each respective Employed Physician.

C.     Travel Time Pool. Amounts allocated to the Call Coverage Pools during each Contract Year that are not allocated in accordance with Section 2(B) above, will be allocated to the Travel Time Pool, and allocated among the Employed Physicians based on a fraction, the numerator of which will equal the "Drive Time Hours" incurred by the respective Employed Physician engaged in travel to outreach ambulatory clinic locations, and the denominator of which will equal the sum of all Drive Time Hours for all Employed Physicians during the respective period.

Section 3.     Distribution of Fees Paid Under a Services Agreement.

C
AR0169 Physician Employment Agreement_Interventionalist_JSHI (Scott 16) v10 den
EXHIBIT E

A.    Base Fee. One or more Employed Physicians may receive a portion of payments allocated by Employer to the IDP as a result of services provided by the Employed Physicians under a Services Agreement. Compensation received for such services will be allocated to and distributed through the IDP as described on the Services Exhibit for the particular Services Agreement. For clarity, not all Employed Physicians may participate in the performance of services (or receive compensation allocated to the IDP for) every Services Agreement. Each Employed Physician must comply with all documentation and other requirements described in the applicable Services Exhibit, to document the types of Management/Professional Services, management duties and tasks, performed by the Employed Physician and the time spent performing such activities.

B.    Incentive Payments. In addition to and not in limitation of the foregoing, in the event that Employer earns incentive payments under a Services Agreement which are allocated to the IDP under the applicable Services Exhibit, the incentive payments will be allocated as provided in the applicable Services Exhibit. For clarity, not all Employed Physicians who participate in a Services Agreement may share in incentive payments under that Services Agreement.

Section 4.    Payments of Certain Pass Through Amounts. Any payments made to Employer in the form of "Pass Through Amounts" shall be distributed to the Employed Physician who have provided services, taken necessary actions or otherwise provided meaningful assistance to Employer in connection with Employer meeting all of requirements necessary to qualify for and receive such Pass Through Amounts. Pass Through Amounts will be distributed:

A.    In the case of Pass Through Amounts that are specifically allocable and earned based on the performance of an Employed Physician, directly to the Employed Physician; and

B.    In the case of Pass Through Amounts that are not specifically allocable and earned based on the performance of an Employed Physician, on a pro-rata basis among all Employed Physicians who qualify for receipt of such Pass Through Amounts by providing services, taking necessary actions or otherwise providing meaningful assistance to Employer in connection with Employer meeting all of requirements necessary to qualify for and receive such Pass Through Amount. For purposes of this provision Employer will be entitled to consult with the Employed Physicians who are Physician Managers on the Employer Board of Managers to determine which Employed Physicians qualify for such Pass Through Amounts by having "provided services, taken necessary actions or otherwise provided meaningful assistance to Employer in connection with Employer meeting all of requirements necessary to qualify for and receive such Pass Through Amounts", and Employer will be entitled to rely on the decision of a majority of such Physician Managers. In the absence of such a majority decision, Employer shall be entitled to assume that each Employed Physician qualified to receive such Pass Through Amounts for purposes of determining each physician's allocated share of Pass Through Amounts within the IDP.

Section 5.    Outreach and Training Services. Any Outreach and Training Credit owed to an Employed Physician for Outreach and Training Services shall be allocated directly to the Employed Physician who provides such Outreach and Training Services for purposes of calculating his or her Base Compensation in any Contract Year. The aggregate amount of Outreach and Training Credit allocated to Employed Physicians shall not exceed Five Thousand (5,000) wRVUs during any Contract Year.

Section 6.    Research Activities.

A.    In connection with a CIRI Research Agreement, Employer will allocate to the IDP the "CIRI Research Agreement Allocation," if any, which equals (i) amounts received in connection with Research Agreements that are not billable to any public or commercial insurer, (ii)

minus any expenses incurred by Employer in connection with the Research Agreement, (iii) minus any amounts payable as Pass Through Amounts.

B.     In connection with a JSHI Research Agreement, Employer will allocate to the IDP in the form of a "JSHI Research Agreement Allocation," amounts which constitute Pass Through Amounts under the definition of Pass Through Amounts in subsection (ii) of Exhibit C hereof from the performance under JSHI Research Agreements. In the event that Physician provides services as the principal investigator under a JSHI  Research Agreement or otherwise is primarily responsible for discharging the obligations that require the services of a physician under such JSHI Research Agreement, then the Physician performing such services shall be allocated a portion of the total JSHI Research Agreement Allocation.  The amount so allocated shall equal the total Research Agreement Allocation during the respective Contract Year, multiplied by a fraction, the numerator of which is the total fees paid under Research Agreements under which Physician is the principal investigator or otherwise is primarily responsible for providing physician services, and the denominator of which is the total of all fees and payments made to Employer under all Research Agreements.  Subject to quarterly reconciliation, the CIRI Research Agreement Allocation will be distributed to Employed Physicians in a pro rata distribution based upon the amount of time each physician performs in connection with CIRI Research Agreements, documented by Time Records as required by Employer.

C.     The "JSHI Research Agreement Allocation" shall mean the total gross revenues received by Employer under all applicable JSHI Research Agreements, minus direct costs incurred by Employer in performing the duties and obligations of Employer under all such JSHI Research Agreement(s) or otherwise in connection with the operations of the Employer Research Department (the "Research Overhead"). For purposes of administering this provision, Employer's Board of Managers will determine reasonable Research Overhead allocations.  The Board will determine which Physicians qualify for such a portion of the JSHI Research Agreement Allocation as a result of the performance of principal investigator or similar services as necessary to qualify for and receive a portion of the JSHI Research Agreement Allocation.

Section 7.     Allocations.  Employer will allocate the funds earned and allocated to the IDP in good faith based on Employer's reasonable interpretation of this IDP.  In the event that the calculations performed hereunder would result in aggregate payments from the IDP during a subject Contract Year which exceed the total amount allocated to the IDP by Employer during the Contract Year, then Employer shall allocate the total funds in the IDP among the Employed Physicians based on the percent to which each individual Employed Physician's calculated compensation bears to the aggregate calculated compensation of all Employed Physicians.

EXHIBIT E

**EXHIBIT D**
*Non-Competition and Non-Solicitation*

    **Introduction.**  The non-competition and non-solicitation provisions set forth in this <u>Exhibit D</u> are intended to protect the integrity of Employer, SVHS, and its Affiliates, the practices of the physicians who remain with Employer, SVHS, and its Affiliates, and the value of physician practices acquired by Employer, SVHS, and its Affiliates.  Capitalized terms not otherwise defined in this <u>Exhibit D</u> will have the meanings set forth in the APLA, the terms of which (but only the defined terms) are incorporated herein by this reference.

    **Section 1.**    **Prohibition.**  As consideration for Physician's employment hereunder, and for other good and valuable consideration, Physician covenants and agrees that during the Term of the Agreement and for two (2) years from the date of termination of this Agreement (the "Non-Competition Period"); provided that employment with Employer or SVHS is terminated for reasons other than a Termination Event described in subparagraph (A)(i) through (iv) of Section 2 below or expiration of the Agreement, the Physician will not, directly or indirectly, within fifty (50) miles of any Primary Location (the "Non-Competition Territory"):

    (A)    Operate, engage in, be employed by, consult with or have any financial interest whatsoever (other than as a less-than-2% owner of a publicly-held corporation in which such Person is not an officer, director, manager, employee or agent) in any cardiology or cardiology patient service related practice or business which is the same as, similar to, related to, or involves any of the same or substantially similar cardiology or cardiology patient service related practice or business operated or engaged in by Employer, SVHS, or any Affiliate of Employer or SVHS; <u>provided</u>, <u>however</u>, that following a termination of Physician's employment with Employer, this Section 1(A) will not prohibit Physician from operating, joining or being employed by a physician-owned medical group practice or Governmental Entity other than the University of Arkansas for Medical Sciences or its affiliates; <u>further provided</u>, that such physician-owned medical group practice may not be one that is a party to, nor may it subsequently enter into, during the Non-Competition Period, a professional services agreement for such group's provision of any cardiology services to any hospital other than the VA hospital, other than services of the type traditionally performed by private practice cardiologists who are not employed or leased by a hospital (collectively, the "Private or Governmental Practice Exception");

    (B)    Influence or attempt to influence any Person to terminate any written or oral agreement with Employer, SVHS or its Affiliates who, as of the Execution Date, or at any time thereafter during the Non-Competition Period, is a contracting party with Employer, SVHS, or any of their Affiliates;

    (C)    (i) initiate contact with or solicit any employee of Employer, SVHS or its Affiliates with the intent of hiring such employee or inducing such employee to leave the employ of Employer, SVHS or its Affiliates; (ii) hire or otherwise engage any such employee; (iii) induce or otherwise counsel, advise, or encourage any such employee to leave the employment of Employer, SVHS, or its Affiliates; or (iv) induce any supplier, vendor, licensor, licensee, business relation, representative, or agent of Employer, SVHS, or its Affiliates to terminate or modify its/their relationship with Employer, SVHS, or its Affiliates, or in any way interfere with such relationship; <u>provided</u>, <u>however</u>, that nothing herein will preclude the re-hiring of the Hired Physicians still active in the Practice during the Non-Competition Period; or

    (D)    Solicit any patients of Employer, SVHS or its Affiliates for the purpose of providing professional medical services.  For purposes of this subsection (D), "Solicit" does not mean advertising in newspapers, TV, radio, and other media that is not specifically targeted to the patients of Employer, SVHS, or its Affiliates.

EXHIBIT E

**Section 2. *Exclusions and Alterations.***

(A)     In General.  The restrictions contained in this Exhibit D shall not apply to Physician after the date of termination of this Agreement if this Agreement is terminated (each of the following, a "Termination Event") (i) by Employer without cause pursuant to Section 1.15 of Exhibit E of this Agreement, (ii) by Employer pursuant to Section 1.5 of Exhibit E, (iii) by Physician for cause pursuant to Section 7.4 of this Agreement, or (iv) by Physician pursuant to Section 7.5 or 7.6 of this Agreement.  Upon the occurrence of any of the aforementioned Termination Events, the restrictions contained in this Exhibit C shall be of no force or effect and Employer shall not attempt to enforce, and shall be barred from enforcing such covenants against Physician.

(B)     Omitted.

(C)     Omitted.

(D)     Conway Regional Medical Center.  The provisions of Section 1 notwithstanding, with respect to physicians (including Physician to the extent applicable) practicing in Conway, Arkansas prior to the Start Date of this Agreement ("Conway Physicians"), the Private or Governmental Practice Exception will be deemed to include, and permit the Conway Physicians (including Physician to the extent applicable) to become employees of, Conway Regional Medical Center at any time following termination of the Physician's employment with Employer or the Hospital.

**Section 3. *Acknowledgment.***  Physician acknowledges and agrees that (A) the provisions of Section 1 above are reasonable and necessary to protect and preserve the interest of the Parties; (B) Employer would be irreparably damaged in the event of a breach of this Exhibit D; and (C) Employer would not enter into this Agreement and the transactions contemplated by this Agreement without these covenants.

**Section 4. *Remedies.***  In addition to any other legal or equitable damages to which Employer may be entitled, Employer will be entitled to obtain injunctive, mandatory, or other equitable relief to restrain any breach or threatened breach or otherwise to specifically enforce the provisions of Section 1 above, it being agreed that money damages alone would be inadequate to compensate Employer and would be an inadequate remedy for such breach.

**EXHIBIT E**
*Additional Provisions*

The following sections are incorporated by reference into the Agreement and are made fully a part thereof. Any ambiguity or conflict shall be resolved in favor of these Additional Provisions.

1.1    Compliance with CHI Standards of Conduct. Physician recognizes that it is essential to the core values of Employer and its Affiliates that all persons and entities employed by or otherwise contracting with Employer at all times conduct themselves in compliance with the highest standards of business ethics and integrity and applicable legal requirements, as reflected in the *Catholic Health Initiatives ("CHI") Standards of Conduct*, as amended from time to time. As of the Effective Date of the Agreement, the *CHI Standards of Conduct* are set forth in *Our Values & Ethics at Work Reference Guide* ("Reference Guide"), which is available at the following website:

http://www.catholichealthinitiatives.org/corporate-responsibility

Physician acknowledges that Physician has electronically accessed, obtained or otherwise received a copy of the Reference Guide and has read and understands the same, and hereby agrees that, so long as the Agreement remains in effect, Physician shall act in a manner consistent with, and shall at all times abide by, such *Standards of Conduct*, to the extent the same are applicable to Physician in the performance of the Agreement.

1.2    *Ethical and Religious Directives*. Physician agrees that his/her performance under the Agreement shall be in accordance with the *Ethical and Religious Directives for Catholic Health Care Services*, as promulgated by the United States Conference of Catholic Bishops, as amended from time to time, and as interpreted by the local bishop (the "*Directives*"). As of the date of the Agreement, the *Directives* are available at the following website:

http://www.usccb.org/

In the event that Employer determines in good faith that Physician has failed to comply with his/her obligations pursuant to Section 1.2 of this Exhibit, Physician shall be considered to be in material breach of the Agreement.

1.3    Excluded Provider and Indemnification. Physician represents and warrants that he/she is not now and at no time has he/she been excluded from participation in any state or federally funded health care program, including Medicare and Medicaid (collectively referred to as "governmental health care program"). Physician further warrants that he/she will not engage in behavior during the Term of this Agreement that leads to his/her exclusion from any governmental health care program.    Physician agrees to immediately notify Employer of any threatened, proposed, or actual exclusion of Physician from participation in any governmental health care program during the Term of the Agreement. Notwithstanding anything to the contrary contained herein, in the event that Physician is excluded from participating in any governmental health care program during the Term of the Agreement or, if at any time after the Effective Date of the Agreement, it is determined that Physician is in breach of this Section, the Agreement shall, as of the effective date of such exclusion or breach, automatically terminate. Physician agrees to indemnify and hold Employer and its Affiliates harmless against all actions, claims, demands, and liabilities, and against all loss, damage, costs, and expenses, including reasonable attorneys' fees, arising directly or indirectly out of any violation of this Section by him/her or due to his/her exclusion from a governmental health care program.

1.4    Insurance. Employer shall, at its sole cost and expense, procure, keep, and maintain throughout the Term of the Agreement, insurance coverage in the minimum amounts of: One Million Dollars ($1,000,000) per occurrence and One Million Dollars ($1,000,000) annual

E-1

aggregate for commercial general liability; One Million Dollars ($1,000,000) per claim and Three Million Dollars ($3,000,000) annual aggregate for professional liability for the primary professional liability coverage required under any state mandated patient compensation fund and with participation in the excess liability fund thereunder; One Million Dollars ($1,000,000) per each and every occurrence for automobile liability; and applicable state statutory limits for workers' compensation. In addition to the coverages specifically listed herein, Employer shall maintain any other usual and customary policies of insurance applicable to the work being performed by Physician pursuant to the Agreement. Said policy(ies) shall cover all of Physician's services hereunder. By requiring insurance herein, Employer does not represent that coverage and limits will necessarily be adequate to protect Physician, and such coverage and limits shall not be deemed as a limitation on Physician's liability under the indemnities granted to Employer in the Agreement, including any exhibits.

1.5    Jeopardy. Notwithstanding anything to the contrary herein contained, in the event the performance by either party of any term, covenant, condition or provision of the Agreement jeopardizes the licensure of Employer or its Affiliates, their participation in or the payment or reimbursement from, Medicare, Medicaid, Blue Cross or other reimbursement or payment programs, Employer or its Affiliates' full accreditation by The Joint Commission or any other state or nationally recognized accreditation organization, or the tax-exempt status of Employer or its Affiliates, any of their respective property or financing (or the interest income thereon, as applicable), or will prevent or prohibit any physician, or any other health care professionals or their patients from utilizing Employer or its Affiliates or any of their respective services, or if for any other reason said performance should be in violation of any statute, ordinance, or be otherwise deemed illegal, or be deemed unethical by any recognized body, agency, or association in the medical or hospital fields, Employer may at its option  (i) terminate

the Agreement immediately; or (ii) initiate negotiations to resolve the matter through amendments to the Agreement and, if the parties are unable to resolve the matter within thirty (30) days thereafter, Employer may, at its option, terminate the Agreement immediately.

1.6    Confidential    and    Proprietary Information. During the Term of this Agreement, Physician shall have access to Employer's confidential and proprietary information as defined below. Physician recognizes and acknowledges that all of Employer's confidential and proprietary information shall remain confidential and shall remain the sole property of Employer. For purposes of this Agreement, the terms "confidential and proprietary information" shall include, without limitation, Employer or its Affiliates' trademarks, service marks, patient lists, patient records (including those generated by Physician for Employer), computer programs, business strategies for developing new patient and new physician relationships, including physician recruitment cost data, utilization review techniques, medical management, quality assurance protocols, patents, trade secrets, know-how and other proprietary processes, and such proprietary information included in manuals or memoranda, as they may now exist or may be developed during the Physician's employment. Physician shall not, during or after the Term of employment by Employer, in whole or in part, disclose such confidential and proprietary information to any person, firm, corporation, association or other entity for any reason or purpose whatsoever, nor shall Physician make use of any such property for Physician's own purposes or for the benefit of any person, firm, corporation or other entity (except Employer) under any circumstances during or after the Term of Physician's employment; provided, however, that after the Term of employment these restrictions shall not apply to secrets, know-how and processes which are then generally known to the public, (provided that the Physician was not responsible, directly or indirectly, for such secrets, know-how or processes entering the public without Employer's consent). However, this paragraph shall not prevent Physician from

E-2

disclosing such confidential and proprietary information as required by court order or process required by law, provided the Physician gives advance written notice of such disclosure.

1.7     Governing Law. The Agreement shall be governed by and construed in accordance with the laws of the State of Arkansas applicable to agreements made and to be performed wholly within that state, irrespective of such state's choice-of-law principles.

1.8     Partial Invalidity. If any provision of the Agreement is found to be invalid or unenforceable by any court or other lawful forum, such provision shall be ineffective only to the extent that it is in contravention of applicable laws without invalidating the remaining provisions of the Agreement, unless such invalidity or unenforceability would defeat an essential business purpose of the Agreement.

1.9     Waiver. No waiver of or failure by either party to enforce any of the provisions, terms, conditions, or obligations herein shall be construed as a waiver of any subsequent breach of such provision, term, condition, or obligation, or of any other provision, term, condition, or obligation hereunder, whether the same or different in nature. No extension of time for performance of any obligations or acts shall be deemed an extension of the time for performance of any other obligations or acts.

1.10     Amendments. The Agreement may be amended at any time by mutual agreement of the parties without additional consideration, provided that, before any amendment shall become effective, it shall be reduced to writing and signed by each of the parties.

1.11     Survival. Except as otherwise expressly provided in the Agreement, all covenants, agreements, representations and warranties, expressed and implied, shall survive the termination of the Agreement, and shall remain in effect and binding upon the parties until they have fulfilled all of their obligations hereunder and the statute of limitations shall not commence to run

until the time such obligations have been fulfilled.

1.12     Compliance with All Laws, Regulations, and Standards. Physician represents and warrants that his/her performance under the Agreement shall fully comply with all applicable federal, state, and local statutes, rules, regulations, accreditation standards, applicable standards of other professional organizations, and Employer's Requirements as defined below, and that it shall be deemed a material breach of the Agreement by Physician if he/she shall fail to comply with this representation and warranty. If such a breach is not cured in accordance with the Agreement, Employer may immediately terminate the Agreement without penalty and without limiting any other rights and remedies set forth in the Agreement.

Specifically, but not by way of limitation, Physician represents and warrants that his/her performance under the Agreement shall comply with all applicable statutes, rules, regulations, accreditation standards, and other applicable standards of: Medicare; Medicaid; the Administrative Simplification requirements of the Health Insurance Portability and Accountability Act of 1996 and regulations promulgated thereunder, including the Standards for Privacy of Individually Identifiable Health Information and Security Standards for the Protection of Electronic Protected Health Information at 45 C.F.R. Parts 160 and 164; the security and privacy provisions of the American Recovery and Reinvestment Act of 2009, and the regulations promulgated thereunder, as all of these may be amended from time to time; other federal or state health programs; The Joint Commission; the National Committee for Quality Assurance; and any national standards applicable in the hospital or medical fields, as well as the Medical Staff bylaws, policies, and procedures, and all other rules and regulations established by SVHS and/or the Medical Staff and applicable to performance under the Agreement (collectively, "Employer's Requirements"); and updates to incorporate any changes to such statutes, rules, regulations, accreditation standards, other

E-3

EXHIBIT E

applicable standards, and Employer's Requirements.

1.13   Nondiscrimination. Physician shall not discriminate in the provision of professional services to patients based on race, color, national origin, ancestry, religion, sex, marital status, disability, sexual orientation, age, or any other legally prohibited basis, except as may be medically indicated.

1.14   PTRC. The parties acknowledge that the Agreement is subject to the review and approval of SVHS's Physician Transaction Review Committee ("PTRC"). In the event that the Agreement has been executed and final approval by the PTRC is not received in a timely manner, the Agreement shall automatically terminate. Such termination shall be considered without harm or damage to either party.

1.15   Termination Without Cause. Notwithstanding any other provision of this Agreement to the contrary, either party may terminate this Agreement upon one hundred eighty (180) days' prior written notice to the other party; provided, however, that the exercise of this clause by Employer shall require both the approval of the Employer's Board of Managers and the affirmative vote of at least 75% of the Employed Physicians then employed by the Employer (excluding the Physician).

1.16   Master Contract List. As required by the Stark law and related regulations, Employer and its Affiliates maintain master lists of contracts between Employer and its physician providers, including Physician. Upon reasonable and legal request, Employer shall provide a copy of such list to Physician, to the extent that it relates to any contracts with Physician, or to government entities permitted to have such lists pursuant to the Stark law and related regulations or other law or regulation.

1.17   Billing. Employer is authorized by the Agreement and this Exhibit to, and shall, submit bills for professional services rendered by Physician in the course of Physician's

employment with Employer and related activities. Employer also is authorized to submit updates, as needed, to Physician's National Provider Identifier (i.e., NPI). Employer shall be entitled to receive all remuneration for such professional services rendered by Physician, whether billed by Employer or not. Physician shall cooperate with and assist Employer (or Employer's designee) in the preparation of any and all financial, billing, and insurance records or reports and/or similar documents. Physician shall not receive or negotiate checks or payments attributable to the services rendered by Physician in the course of Physician's employment by Employer and related activities. Should Physician receive directly any checks or payments which should have been sent to Employer, Physician shall deliver and assign to Employer such checks or payments within not more than five (5) business days of receipt for deposit into an account in the name of Employer.

1.18   General Interpretation; Ambiguities. Ambiguities, if any, in the Agreement shall be reasonably construed in accordance with all relevant circumstances including, without limitation, prevailing practices in the industry of the parties in the place where the contract is to be performed and shall not be construed against either party, irrespective of which party may be deemed to have authored the ambiguous provision.

1.19   Prohibition on Child Labor and Human Trafficking. Each Party warrants and represents that it shall comply with all federal and state labor and employment laws, and executive orders as applicable and specifically those regarding child labor, procuring commercial sex, using forced labor and human trafficking. This includes but is not limited to the Trafficking Victims Protection Reauthorization Act of 2013, Executive Order – *Strengthening Protections Against Trafficking in Persons in Federal Contracts*, Federal Acquisition Regulations (FAR), the provisions of the International Labor Organization's ("ILO") Minimum Age Convention (No. 138), 1973, and any other laws or regulations that prohibit any form of human trafficking, commercial sex,

E-4

EXHIBIT E

forced labor, child labor or other exploitation of children in the manufacturing, delivery or provision of products/devices, items or services and as each may be amended from time to time. In addition, in connection with any International Organization for Standardization ("ISO") certification, the Parties represent and warrant that as applicable each complies with the Social Accountability Guidelines pursuant to which a Party disqualifies any site that uses unacceptable manufacturing practices, such as child labor, forced labor or unsafe or unsanitary working conditions or trafficking of persons as defined by the Trafficking Protocol (United Nations General Assembly, *Protocol to Prevent Suppress and Punish Trafficking in Persons, Especially Women and Children, Supplementing the United Nations Convention Against Transnational Organized Crime,* 15 November 2000, available at http://www.unhcr.org/refworld/docid/4720706c0.html). Physician acknowledges CHI's efforts on human trafficking found at http://www.catholichealthinit.org/human-trafficking-how-you-can-help and represents and warrants to CHI that he or she undertakes periodic inspections of his/her practices and staff regarding services hereunder to ensure compliance with the foregoing. Physician agrees upon request to provide CHI with evidence and/or recordkeeping of his/her compliance with this provision.

E-5

EXHIBIT E

E-1

EXHIBIT E

**IN THE CIRCUIT COURT OF FAULKNER COUNTY, ARKANSAS**
**20TH CIRCUIT DIVISION 1**

DR LENSEY SCOTT V CONWAY REGIONAL MEDICAL CENTER

23CV-21-404

**SUMMONS**

**THE STATE OF ARKANSAS TO DEFENDANT:**

C T Corporation System
124 West Capitol Ave Suite 1900
Little Rock, AR  72201

A lawsuit has been filed against you. The relief demanded is stated in the attached complaint.  Within 30 days after service of this summons on you (not counting the day you received it) - or 60 days if you are incarcerated in any jail, penitentiary, or other correctional facility in Arkansas - you must file with the clerk of this court a written answer to the complaint or a motion under Rule 12 of the Arkansas Rules of Civil Procedure.

The answer or motion must also be served on the plaintiff or plaintiff's attorney, whose name and address are:

Dylan J. Botteicher
8712 Counts Massie Road
North Little Rock, AR  72113

If you fail to respond within the applicable time period, judgment by default may be entered against you for the relief demanded in the complaint.

Additional notices:
•Notice of Right to Consent to Disposition of Case by a State District Court Judge

CLERK OF COURT

Address of Clerks Office

CRYSTAL TAYLOR, CIRCUIT CLERK
CIRCUIT COURT OF FAULKNER COUNTY
724 LOCUST STREET
CONWAY, AR  72034



N Eastham, DC

Date: 06/09/2021

## NOTICE OF RIGHT TO CONSENT
## TO DISPOSITION OF CASE BY A STATE DISTRICT COURT JUDGE

In accordance with Administrative Order Number 18, you are hereby notified that upon the consent of all the parties in a case, a State District Court Judge may be authorized to conduct all proceedings, including trial of the case and entry of a final judgment. Copies of appropriate consent forms are available from the Circuit Clerk.

You should be aware that your decision to consent or not to consent to the disposition of your case before a State District Court Judge is entirely voluntary, and by consenting to the reference of this matter to a State District Court Judge, the parties waive their right to a jury trial, and any appeal in the case shall be taken directly to the Arkansas Supreme Court or Court of Appeals as authorized by law.

You should communicate your consent by completing the Form -- CONSENT TO PROCEED BEFORE A STATE DISTRICT COURT JUDGE -- and return to the Circuit Clerk.

Circuit Clerk
Date: 06/09/2021

No. 23CV-21-404 This summons is for C T Corporation System (name of Defendant).

PROOF OF SERVICE

❏ On _____ [date] I personally delivered the summons and complaint to the individual at _____ [place]; or

❏ After making my purpose to deliver the summons and complaint clear, on _____ [date] I left the summons and complaint in the close proximity of the defendant by _____ [describe how the summons and complaint was left] after he/she refused to receive it when I offered it to him/her; or

❏ On _____ [date] I left the summons and complaint with _____, a member of the defendant's family at least 18 years of age, at _____ [address], a place where the defendant resides; or

❏ On _____ [date] I delivered the summons and complaint to _____ [name of individual], an agent authorized by appointment or by law to receive service of summons on behalf of _____ [name of defendant]; or

❏ On _____ [date] at _____ [address], where the defendant maintains and office or other fixed location for the conduct of business, during normal working hours I left the summons and complaint with _____ [name and job description]; or

❏ I am the plaintiff or an attorney of record for the plaintiff in this lawsuit, and I served the summons and complaint on the defendant by certified mail, return receipt requested, restricted delivery, as shown by the attached signed return receipt.

❏ I am the plaintiff or an attorney of record for the plaintiff in this lawsuit, and I mailed a copy of the summons and complaint by first-class mail to the defendant together with two copies of a notice and acknowledgment and received the attached notice and acknowledgment form within twenty days after the date of mailing.

❏ Other [specify]:
_____

❏ I was unable to execute service because:
_____
_____

My fee is $ _____.

**To be completed if service is by a sheriff or deputy sheriff:**

Date: _____        SHERIFF OF _____ COUNTY, ARKANSAS

By: _____
[Signature of server]

_____
[Printed name, title, and badge number]

**To be completed if service is by a person other than a sheriff or deputy sheriff:**

Date: _____        By: _____
[Signature of server]

_____
[Printed name]

Address: _____

_____

Phone: _____

Subscribed and sworn to before me this date: _____

_____
Notary Public

My commission expires: _____

Additional information regarding service or attempted service:

_____

_____

ELECTRONICALLY FILED
Faulkner County Circuit Court
Crystal Taylor, Circuit Clerk
2021-Jun-10 11:27:02
23CV-21-404
C20D01 : 6 Pages

### IN THE CIRCUIT COURT OF FAULKNER COUNTY, ARKANSAS
### CIVIL DIVISION

**DR. LENSEY SCOTT**                                               **PLAINTIFF**

**VS.**                              **CASE NO. 23CV-21-404**

**CONWAY REGIONAL MEDICAL**
**CENTER, INC.; JACK STEPHENS HEART**
**INSTITUTE, LLC; and ST. VINCENT**
**INFIRMARY MEDICAL CENTER**                                **DEFENDANTS**

### PLAINTIFF'S RESPONSE TO DEFENDANT
### CONWAY REGIONAL MEDICAL CENTER, INC.'S
### MOTION TO DISMISS

COMES NOW, Plaintiff, Dr. Lensey Scott ("Dr. Scott"), by and through his attorneys, Cox, Sterling, McClure & Vandiver, PLLC, and for his Response to Defendant's Motion to Dismiss, states:

#### I.      INTRODUCTION

Conway Regional Medical Center, Inc. ("Conway Regional") filed a motion to dismiss on May 27, 2021. The pleadings regarding the Motion to Dismiss filed on May 27, 2021, have become moot because Dr. Scott filed an Amended Complaint on June 9, 2021.

#### II.      LEGAL STANDARD

Arkansas courts construe pleadings liberally and deem them sufficient if they advise the other party of its obligations and alleges a breach of them. *Bethel Baptist Church v. Church Mut. Ins. Co.*, 54 Ark. App. 262, 265 (1996). All reasonable inferences must be resolved in favor of the complaint when testing the sufficiency of the pleading on a motion to dismiss. *Perry v. Baptist Health*, 358 Ark. 238, 241 (2004). In considering a motion to dismiss under Ark. R. Civ. P. 12(b)(6), Arkansas courts must treat the facts alleged in the complaint as true and viewed in the

light most favorable to the party seeking relief. *Deitsch v. Tillery*, 309 Ark. 401, 405 (1992). Under this standard, the Dr. Scott's pleading is more than sufficiently plead.

### III.   ARGUMENT

The motion to dismiss argues three points: 1) Dr. Scott is not an employee of Conway Regional; 2) Dr. Scott fails to establish a §1981 claim; and 3) Dr. Scott fails to establish a claim under the ACRA. Each of these arguments culminate in erroneous conclusions, and therefore the motion to dismiss should be denied.

A.   <u>Dr. Scott was an employee of Conway Regional</u>.

Conway Regional argues that this Court is bound by the EEOC's determination that there was not an employee-employer relationship. Contrary to Conway Regional's arguments, the law is clear that the EEOC determination should not be given any weight and it is the Court's obligation to provide a judicial forum for the ultimate resolution of the discriminatory employment claim. *Tulloss v. Near N. Montessori Sch., Inc.*, 776 F.2d 150, 154 (7th Cir. 1985) (citing *Alexander v. Gardner-Denver Co*., 415 U.S. at 60 n.2). The nature and extent of an EEOC investigation is in the discretion of that agency and merely serves to provide a notification of the EEOC's findings. *EEOC v. Keco Indus., Inc*., 748 F.2d 1097, 1100 (6th Cir. 1984). The EEOC's determination, especially, when it made the determination in ten (10) days without corresponding with Dr. Scott, is given no credence. Instead, Rule 12 demands that the Court take all facts alleged in the Complaint as true.

An employer is an entity engaged in an industry affecting commerce who has fifteen or more employees. 42 U.S.C.S. § 2000e(b). The Eighth Circuit considers traditional definitions of employer and employee to identify the relationship defined by the statute. *Daggitt v. UFCW, Local 304A*, 245 F.3d 981, 987 (8th Cir. 2001). The definition of employer is to be given liberal

construction to eliminate the "inconvenience, unfairness and humiliation of racial discrimination." *Baker v. Stuart Broad. Co.*, 560 F.2d 389, 391 (8th Cir. 1977).

The Complaint undoubtedly alleges that Dr. Scott was an employee of Conway Regional. See Compl. ¶ 11. It alleges that Conway Regional refused to pay Dr Scott the full amount of services, that it refused to reimburse Dr. Scott for unbilled medical charges, and that it controlled the terms and conditions of Dr. Scott's employment. The Complaint has clearly alleged that Conway Regional was Dr. Scott's employer and Conway Regional cannot point to any law to combat this presumption.

Next, Conway Regional argues that Dr. Scott failed to raise a claim of hostile work environment before the EEOC. Plaintiffs may seek relief for any discrimination that is reasonably related to the substance of the allegations in the administrative charge. *Nichols v. Am. Nat'l Ins. Co.*, 154 F.3d 875, 887 (8th Cir. 1998). These charges are to be interpreted with the "utmost liberality" so as to not frustrate the remedial purpose of Title VII. *Cobb v. Stringer*, 850 F.2d 356, 359 (8th Cir. 1988).

Conway Regional's reliance on *Richter* and *Williams* is unfounded. Both of those cases were narrowly decided when an employee did not check the "retaliation" box. Similarly, the reliance on *Fair* is baseless because that case involved an employee who brought an EEOC charge of race discrimination only to later sue based on gender discrimination as well. In *Fair*, the gender box was not checked. A hostile work environment is a type of race discrimination claim. *Singletary v. Mo. Dep't of Corr.*, 423 F.3d 886, 892 (8th Cir. 2005). A hostile work environment claim involves unwelcomed harassment based on the employee's race. *Moss v. Texarkana Ark. Sch. Dist.*, 240 F. Supp. 3d 966, 979 (W.D. Ark. 2017). There is no "hostile work environment" box to check, and therefore the "race" box was the correct for Dr. Scott to check in order to describe his

3

hostile work environment claims in which he was treated differently than his white colleagues. Dr. Scott's EEOC charge clearly shows that he checked the boxes for both "race" and "retaliation" and that he was terminated after complaining about his treatment due to his race.

B.      Dr. Scott has established a §1981 claim.

Conway Regional has argued that Dr. Scott has failed to meet the burden as set out in *Iqbal*. This is a state court case, but Dr. Scott has met the *Iqbal* standard as well. *Iqbal* states that a complaint proceeds even if the allegations are improbable so long as the allegations do not defy reality as we know it: claims about little green men, or the plaintiff's recent trip to Pluto, or experiences in time travel. *Ashcroft v. Iqbal*, 556 U.S. 662, 696 (2009). Complaints should be dismissed when the allegations are fantastical, such as allegations of the federal government working with a landlord to pipe pharmaceutical gases into an apartment and poison a tenant's animal. *Guthrie v. United States Gov't*, 618 F. App'x 612, 617 (11th Cir. 2015). The allegations in Dr. Scott's Complaint are not fantastical, and therefore it certainly meets the incredibly low bar set forth in *Iqbal*.

Unlike the cases cited by Conway Regional, Dr. Scott has identified several facts that show his treatment was different than similarly situated employees. Dr. Scott has alleged that he was paid less than white physicians and that he was not reimbursed for unbilled hospital charges while white physicians were. Compl. ¶ 14. Dr. Scott was not assigned evening cases, which affect his compensation, while white physicians were regularly assigned evening cases. Compl. ¶ 16. Dr. Scott was punished for complaining about unprofessional behavior when white physicians were never punished for complaining about unprofessional behavior. Compl. ¶ 17. Dr. Scott's and another minority cardiologist's contracts were not renewed while white cardiologists had their contracts renewed.  Compl. ¶ 22. White employees were protected from the consequences of their

improper and unwanted remarks and actions. Compl. ¶ 17. Dr. Scott has plainly alleged the treatment he received based on his race in his Complaint with specific factual allegations. Dr. Scott's Complaint is not fantastical, and it has provided sufficient notice of what Dr. Scott's claims are. Accordingly, the §1981 claim should not be dismissed.

C.      Dr. Scott has established a claim under the ACRA.

Conway Regional is correct that claims under the ACRA are analyzed under the same criteria as Title VII claims. However, Conway Regional incorrectly states that it adopts all of its arguments regarding Title VII claims when it argues that the ACRA claims should be dismissed.

There is not an exhaustion of administrative remedies requirement under the ACRA because the statute does not provide that administrative procedures will be exclusive, and according to the Supreme Court of the United States, "The most common application of the exhaustion doctrine is in cases where the relevant statute provides that certain administrative procedures shall be exclusive." *McKart v. U.S.*, 395 U.S. 185, 193 (1969). The ACRA provides that any party in violation of the Act will be liable in a circuit court for damages. Ark. Code Ann. § 16-123-105(a). Conway Regional has argued that Dr. Scott has failed to exhaust his administrative remedies with regards to the Title VII hostile work environment claim. However, a hostile work environment claim under the ACRA does not require an exhaustion of administrative remedies and therefore Conway Regional's argument regarding the ACRA hostile work environment claim fails. Nevertheless, Dr. Scott did exhaust his administrative remedies for the Title VII hostile work environment claim.

WHEREFORE, Plaintiff, Dr. Scott, prays that the motion to dismiss is denied, for his costs expended in this action, and for reasonable attorneys' fees.

Respectfully Submitted,


By:    /s/ Dylan J. Botteicher

Dylan J. Botteicher (ABN 2017170)
COX, STERLING, MCCLURE &
VANDIVER, PLLC
8712 Counts Massie Rd.
North Little Rock, AR 72113
T: (501) 954-8073
F: (501) 954-7856
E: djbotteicher@csmfirm.com
Attorney for the Plaintiff

## CERTIFICATE OF SERVICE

I certify that on June 10, 2021, a true and correct copy of the above response was forwarded to the counsel via eFLEX at:

Gabriel Mallard
Taylor Pray
1422 Scott Street
Little Rock, AR 72202


By: /s/ Dylan J. Botteicher
Dylan J. Botteicher (ABN 2017170)

ELECTRONICALLY FILED
Faulkner County Circuit Court
Crystal Taylor, Circuit Clerk
2021-Jun-29  15:00:48
23CV-21-404
C20D01 : 3 Pages

**IN THE CIRCUIT COURT OF FAULKNER COUNTY, ARKANSAS**
**CIVIL DIVISION**

**DR. LENSEY SCOTT**                                          **PLAINTIFF**

**VS.**                              **CASE NO. 23CV-21-404**

**CONWAY REGIONAL MEDICAL**
**CENTER, INC.; JACK STEPHENS HEART**
**INSTITUTE, LLC; and ST. VINCENT**
**INFIRMARY MEDICAL CENTER**                      **DEFENDANTS**

## <u>MOTION TO DISMISS AMENDED COMPLAINT</u>

Defendant Conway Regional Medical Center, Inc. (CRMC), by and through its

attorneys, Mallard Gardner PLLC, and for its Motion to Dismiss the Amended

Complaint of Dr. Lensey Scott (Plaintiff), states as follows:

1.      Plaintiff filed his Amended Complaint against Defendants in the above-

referenced matter on or about June 9, 2021, alleging causes of action for Violation of

Title VII of the Civil Rights Act of 1964, Violation of 42 U.S.C. § 1981, and Violation of

the Arkansas Civil Rights Act of 1993 arising from Plaintiff's alleged employment with

CRMC.

2.      For the reasons fully explained in the contemporaneously filed Brief in

Support of the Motion to Dismiss, incorporated herein by reference, Plaintiff has not

asserted facts sufficient to support the elements of the claims he has brought against

CRMC.

3.      CRMC seeks dismissal pursuant to Ark. R. Civ. P. 12(b)(6), as the

Complaint fails to state facts upon which relief can be granted.

WHEREFORE, for the reasons stated herein and the accompanying brief in support, Defendant CRMC moves for an Order dismissing Plaintiff's Amended Complaint with prejudice, for its attorney's fees and costs incurred in connection with this motion, and for all other relief to which it may be entitled.

Respectfully submitted,

**MALLARD GARDNER, PLLC**
1422 Scott Street
Little Rock, AR 72202
T:      (501)850-8501
F:      (844)778-1750
E:      gabriel.mallard@mallardgardner.com;
        taylor.pray@mallardgardner.com


/s/ Gabriel D. Mallard
Gabriel Mallard (2005130)
Taylor Pray (2020127)
*Attorneys for Conway Regional Medical Center, Inc.*

## CERTIFICATE OF SERVICE

I, Gabriel D. Mallard, do hereby certify that on this 29th day of June, 2021 a copy of the foregoing pleading was served upon the named individuals through electronic filing pursuant to Administrative Order No. 21:

Dylan J. Botteicher
COX, STERLING, MCCLURE &
VANDIVER, PLLC
8712 Counts Massie Rd.
North Little Rock, AR 72113
T: (501) 954-8073
F: (501) 954-7856
E: djbotteicher@csmfirm.com

/s/ Gabriel D. Mallard_____

Gabriel D. Mallard

ELECTRONICALLY FILED
Faulkner County Circuit Court
Crystal Taylor, Circuit Clerk
2021-Jun-29 15:03:44
23CV-21-404
C20D01 : 13 Pages

## IN THE CIRCUIT COURT OF FAULKNER COUNTY, ARKANSAS
## CIVIL DIVISION

**DR. LENSEY SCOTT**                                                        **PLAINTIFF**

**VS.**                              **CASE NO. 23CV-21-404**

**CONWAY REGIONAL MEDICAL
CENTER, INC.: JACK STEPHENS HEART
INSTITUTE, LLC; and ST. VINCENT
INFIRMARY MEDICAL CENTER**                              **DEFENDANTS**

## BRIEF IN SUPPORT OF MOTION TO DISMISS AMENDED COMPLAINT

COMES NOW Defendant Conway Regional Medical Center, Inc. ("CRMC"), by and through its attorneys, Mallard Gardner PLLC, and for its Brief in Support of its Motion to Dismiss the Plaintiff's Amended Complaint, states as follows:

### INTRODUCTION

Plaintiff has filed claims of discrimination against CRMC under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 1981 ("§1981"), and the Arkansas Civil Rights Act of 1993 ("ACRA"). Plaintiff's allegations against CRMC rely almost entirely on Plaintiff's assertion that he was an employee of CRMC.  The Equal Employment Opportunity Commission ("EEOC") investigated this matter and determined that no employer/employee relationship existed between Plaintiff and CRMC.  Further, Plaintiff attaches to his Amended Complaint (hereafter, the "Complaint") the Physician Employment Agreement for Cardiology Services between Plaintiff and the Jack Stephens Heart Institute, LLC ("JSHI") which sets forth that Plaintiff was solely an employee of JSHI and not CRMC.  As Plaintiff was not an employee of CRMC and the Complaint lacks factual allegations demonstrating disparate treatment of Plaintiff as compared to similarly situated white individuals, this matter is ripe for dismissal

1

pursuant to Ark. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted.

## STANDARD OF REVIEW

Arkansas is a fact pleading state. *Faulkner v. Ark. Children's Hosp.,* 347 Ark. 941, 69 S.W.3d 393 (2002); see also *Ark. Dep't of Envtl. Quality v. Brighton Corp.,* 352 Ark. 396, 403, 102 S.W.3d 458, 462 (2003). The Arkansas Rules of Civil Procedure require that a complaint contain a "statement in ordinary and concise language of facts showing that the pleader is entitled to relief[.]". Ark. R. Civ. P. 8(a). "Our rules require fact pleading, and a complaint must state facts, not mere conclusions, in order to entitle the pleader to relief." *Faulkner*, 347 Ark. at 951, 69 S.W.3d at 399. In this vein, plaintiffs may not rely on mere conclusions to support claims. *Hollingsworth v. First National Bank & Trust Co. of Rogers,* 311 Ark. 637, 846 S.W.2d 176 (1993). Rather plaintiffs must set forth the facts sufficient to support each element of the cause of action.

A complaint that does not satisfy the Rule 8 pleading standard is subject to dismissal under Ark. R. Civ. P. 12(b)(6). *Wiseman v. Batchelor,* 315 Ark. 85, 864 S.W.2d 248, (1993). In determining whether to grant a motion to dismiss, the trial court only looks to the four corners of the complaint. *Thomas v. Pierce,* 87 Ark. App. 26, 28, 184 S.W.3d 489, 490 (2004). If the complaint either "(1) fail[s] to state general facts upon which relief could be granted, or (2) fail[s] to include specific facts pertaining to the elements of one of its claims after accepting all facts contained in the complaint as true and in the light most favorable to the nonmoving party," then the complaint must be dismissed. *Id.* "[A]ll reasonable inferences must be resolved in favor of the

2

complaint, and the pleadings are to be liberally construed." *Brighton,* 352 Ark. at 403, 102 S.W.3d at 462.

## ARGUMENT

### A.   Plaintiff is not an employee of CRMC and fails to set forth facts to establish a claim for a violation of Title VII.

On January 4, 2021, Plaintiff filed a Charge of Discrimination against CRMC with the EEOC alleging racial discrimination and retaliation.  See Complaint, Ex. A. Specifically, the Charge of Discrimination alleges that "[m]y employer treated me, an African American, differently, than my white colleagues.  I was terminated after I complained about this behavior." *Id.*  There are no other allegations against CRMC in the Charge of Discrimination other than that statement.  On January 14, 2021, the EEOC closed the file as there was no employee/employer relationship between Plaintiff and CRMC.  See Complaint, Ex. B.

At some undetermined time, Plaintiff likewise filed a Charge of Discrimination with the EEOC against JSHI alleging racial discrimination and retaliation.  See Complaint, Ex. C.  Again, Plaintiff alleged that "[m]y employer treated me, an African American, differently, than my White colleagues.  I was terminated after I complained about this behavior." *Id.*

Both Charges of Discrimination are for the periods of July 2020 through September 2020.  See Complaint, Exs. A and C.  During this period of time, Plaintiff and JSHI were parties to a Physician Employment Agreement for Cardiology Services entered into on September 16, 2016 ("JSHI Employment Agreement").  See Complaint, Ex. E.  As part of the JSHI Employment Agreement, Plaintiff agreed that "Physician shall: (i) render professional medical services to patients solely and exclusively on behalf

3

of [JSHI]" and "(iii) not accept employment with any other employer or engage in other professional activities for profit…". Complaint, Ex. E, Section 2.1.  It is notable that Plaintiff attaches no similar agreements between Plaintiff and CRMC.  Even taking the Complaint and Exhibits in the light most favorable to Plaintiff, there is no way to square Plaintiff's argument that he was (i) an employee of CRMC; or (ii) simultaneously an employee of CRMC and JSHI.  As Title VII is only applicable to employment matters, and Plaintiff was not an employee of CRMC, Plaintiff's cause of action for violation of Title VII against CRMC should be dismissed with prejudice.

Title VII covers only employees.  *Glascock v. Linn Cnty, Emergency Med., PC,* 698 F.3d 695, 698 (8th Cir. 2012); *Alexander v. Avera St. Luke's Hosp.,* 868 F.3d 756, 761 (8th Cir. 2014).  Title VII defines "employee" as "an individual employed by an employer."  42 U.S.C. §2000e(f).  The pertinent part of Title VII states that "it shall be an unlawful employment practice for an employer…to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. §2000e-2(a)(1).  A central tenant of a Title VII claim is the existence of an employee and employer relationship.  It does not apply in the absence of such relationship.

In order for Plaintiff to demonstrate a prima facie case of termination due to race, Plaintiff is required to show: (1) that he belongs to a protected group, (2) that he was qualified as an employee, (3) that he was subjected to an adverse employment action, and (4) that the adverse action occurred under circumstances giving rise to an inference of discrimination.  *Tatum v. City of Berkeley,* 408 F.3d 543, 551 (8th Cir. 2005); see

4

also *Wheeler v. Aventis Pharms.,* 360 F.3d 853, 857 (8th Cir. 2004).  Failure to establish even one element of a prima facie case defeats a Title VII discrimination claim. *Tatum,* 408 F.3d at 550-51.

Here, the statements made in the Complaint and those contained in the Exhibits attached to the Complaint directly conflict with one another.  On January 4, 2021, Plaintiff filed a Charge of Discrimination against CRMC with the EEOC.  See Complaint, Ex. A.  Within ten days, the EEOC completed its investigation and issued Plaintiff a notice of dismissal, which clearly states that the EEOC closed the file on Plaintiff's charge because there was "no employee/employer relationship."  See Complaint, Ex. B. As indicated by the EEOC, no "adverse employment action" could occur because there was no employee/employer relationship.  Simultaneous to the Charge of Discrimination against CRMC, Plaintiff filed a Charge of Discrimination against JSHI.  See Complaint, Ex. C.  Taken in conjunction with the JSHI Employment Agreement, it is clear that CRMC did not employ Plaintiff.  Further, the EEOC has already determined that Plaintiff was not an employee of CRMC.   There are no set of facts in which Plaintiff will be able to make a prima facie case that CRMC violated Title VII.

Even if Plaintiff were considered an employee of CRMC, Plaintiff failed to raise a claim of a hostile work environment before the EEOC.  Title VII establishes certain procedural prerequisites that a plaintiff must satisfy before filing an action in court. Under Title VII, a plaintiff must "file a charge of discrimination within 180 days' after the alleged unlawful employment practice occurred'" and must "give notice to the employer of the circumstances of 'the alleged unlawful employment practice.'"  *Richter v. Advance Auto Parts, Inc.*, 686 F.3d 847, 851 (8th Cir. 2012).  The Eighth Circuit

addressed this very issue in *Williams v. Little Rock Municipal Water Works*, 21 F.3d 218, 223 (8th Cir. 1994), where the plaintiff filed an EEOC charge alleging retaliation, but in her complaint also brought a race discrimination claim.  The Eighth Circuit disallowed this type of bootstrapping and stated: "Allowing a complaint to encompass allegations outside the ambit of the predicate EEOC charge would circumscribe the EEOC's investigatory and conciliatory role, as well as deprive the charged party of notice of the charge, as surely as would an initial failure to file a timely EEOC charge."  *Id.* (quoting *Babrocky v. Jewel Food Co. & Retail Meatcutters*,  773 F.2d 857, 863 (7th Cir. 1985)).  "The claims of employment discrimination in the complaint may be as broad as the scope of the EEOC investigation which reasonably could be expected to result from the administrative charge."  *Kirklin v. Joshen Paper & Packaging of Arkansas Co.*, 2018 WL 6625766, at *4 (8th Cir. Dec 19, 2018).

Here, the allegation before the EEOC was narrow.  Plaintiff alleges he was treated different than unidentified white colleagues and that he was terminated after complaining.  "Although an EEOC complaint need not specifically articulate the precise claim…it must nevertheless be sufficient to give the employer notice of the subject matter of the charge and identify generally the basis for a claim."  *Fair v. Norris,* 480 F.3d 865, 867, n. 2 (8th Cir. 2007).  Plaintiff's allegation was limited to an alleged "termination" and did not address a hostile work environment.  Thus, to the extent that Plaintiff is bringing a Title VII claim for a hostile work environment, Plaintiff failed to exhaust his administrative remedies on his claim that CRMC created and/or fostered a hostile work environment.  *See Nat'l R.R. Passenger Corp v. Morgan,* 536 U.S. 101, 114, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002) (explaining that discrete acts such as failure to

hire are "easy to identify," and noting that "[e]ach incident of [alleged] discrimination...

constitutes a separate actionable 'unlawful employment practice'").

As Plaintiff was not an employee of CRMC and failed to properly exhaust his

administrative remedies through the EEOC, Plaintiff's cause of action related to Title

VII should be dismissed with prejudice.

**B.      Plaintiff fails to establish the threshold requirement of 42 U.S.C. §1981 that, but for his race, he suffered the loss of a legally protected right.**

To prevail on a §1981 claim, a plaintiff must show: (1) membership in a protected

class, (2) discriminatory intent on the part of the defendant, (3) engagement in a

protected activity, and (4) interference with that activity by the defendant.  *Combs v.*

*The Cordish Companies, Inc.,* 862 F.3d 671, 681 (8th Cir, 2017) (quoting *Gregory v.*

*Dillard's Inc.,* 565 F.3d 464, 473 (8th Cir. 2009).  More specifically, to prevail on a §1981

claim, "a plaintiff must initially plead and ultimately prove that, but for race, [he] would

not have suffered the loss of a legally protected right."  *Comcast Corp. v. Nat'l Ass'n of*

*African Am.-Owned Media,* 140 S. Ct. 1009, 1019 (2020).

42 U.S.C. §1981 states:

(A)     All persons within the jurisdiction of the United States shall have the same right
in every state and territory to make and enforce contracts, to sue and be parties, give
evidence, to the full and equal benefit of all laws and proceedings for the security of
persons and property as is enjoyed by white citizens, and shall be subject to like
punishment, pains, penalties, taxes, licenses, exactions of every kind and to no other.

(B)     For purposes of this section, the term "make and enforce contracts" includes the
making, performance, modification, and termination of contracts, and the enjoyment of
all benefits, privileges, terms, and conditions of the contractual relationship.

(C)     The rights protected by this section are protected against impairment by non-
governmental discrimination and impairment under color of law.

*Id.*

7

While courts accept *factual* allegations as true at the Motion to Dismiss stage—with only *reasonable* inferences drawn in Plaintiff's favor—the Complaint, at a minimum, "must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Id.* (citing *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 569 (2007)). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.' Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id.* In other words, Rule 8's pleading standard "demands more than an unadorned, the defendant-unlawfully-harmed-me, accusation." *Id.*

Plaintiff's specific "factual allegations" against CRMC appear at Paragraphs 19, 20, 22, 27, and 30.  Paragraphs 19, 20, and 22 complain of actions alleged taken by Mr. Troup against Dr. Scott and asserts the legal conclusion that the actions by Mr. Troup were related to Dr. Scott's race.[1]  Paragraph 27 is related to a physician other that Dr. Scott.[2]  Paragraph 30 is simply a naked assertion that JSHI representatives were in control over CRMC matters.  In reviewing the Complaint as a whole, there are no specific factual allegations against CRMC that rise to a violation of §1981.

The Eighth Circuit has addressed the issue of conclusory assertions in discrimination cases.  In *Ward v. Arkansas Dep't of Finance and Admin.,* the plaintiff alleged that Defendants engaged in "unlawful employment practices involv[ing] subjecting [her] to termination and disparaging treatment different than her co-workers in the form of creating falsified documents in order to terminate the plaintiff and replace

---

[1] CRMC specifically denies the allegations set forth in these Paragraphs, but even if taken as true, the Paragraphs fail to show that any action by Mr. Troup was taken based on Dr. Scott's race.

[2] Again, CRMC specifically denies the allegations set forth in Paragraph 27 of the Complaint.

her with a male employee." *Ward v. Arkansas Dep't of Finance and Admin.,* No. 1:19-cv-1062, 2020 WL 403138, at *3 (W.D. Arkansas, July 16, 2020). The Plaintiff in *Ward* also made the general statement that "[t]he unlawful practices include...disparate treatment because of her gender as a female as reflected by the [sic] replacing her with a less qualified male co-worker." *Id.* The Court found these conclusory allegations unsupported as the plaintiff did not identify any comparators and did not allege facts showing that any similarly situated employees were treated differently. *Id.* This continues a long line of cases where the courts have found that plaintiff's complaints do not state a plausible discrimination claim where they contain only general allegations that other unidentified white employees were given different treatment. *Hager v. Ark. Dep't of Health,* 735 F.3d 1009 (8th Cir. 2013); *Dixon v. Ark. Dep't of Huma Servs.,* No. 4:14-cv-00295 JLH, 2014, WL 5093833, at *2 (Dixon's complaint, which generally concludes that his white co-workers were treated differently than he was, fails to "allege facts such as names, positions or job duties, to support these conclusions"); *Weaver v. Hobbs,* No. 2:13-cv-00048 SWW, 2013, WL 6634005, at *2 (E.D.Ark. Dec 17, 2013) ("Weaver...does not identify alleged comparable employees by name, position, or job duty, does not identify the circumstances under which they were disciplined differently, does not describe the time frame within which the events occurred, and does not anew the decision makers involved.")

Plaintiff must show that he and potential comparators were "similarly situated in all relevant respects." *Bone v. G4S Youth, Servs., LLC,* 686 F.3d 948, 956 (8th Cir. 2012). The comparators "used for comparison must have dealt with the same supervisor, have been subject to the same standards, and engaged in the same conduct

without any mitigating or distinguishing circumstances." *Wierman v. Casey's Gen. Stores,* 638 F.3d 984, 994 (8th Cir. 2011) (quoting *Cherry v. Ritenour Sch. Dist.,* 361 F.3d 474, 479 (8th Cir. 2004)).  Here, the comparators identified by Dr. Scott are Dr. Steely and Dr. Humphrey.[3]  Plaintiff fails to show that Drs. Steely and Humphrey engaged in conduct similar to Plaintiff with a different result for Drs. Steely and Humphrey.  Instead, Plaintiff uses conclusory statements such as "Dr. Scott was regularly not paid the full amount for services rendered for work performed even though white cardiologists, such as Dr. Donald Steely and Dr. Landon Humphrey, were consistently paid the full amount for the same services."  See Complaint, ¶18.  "Dr. Scott submitted unbilled hospital charges, but Defendants refused to reimburse Dr. Scott. Defendants always reimbursed white cardiologists, such as Dr. Steely and Dr. Humphrey, who submitted similar charges."  *Id.*  "Dr. Scott consistently complained that he was unable to be assigned cases in the evening when white physicians, such as Dr. Steely and Dr. Humphrey, regularly were assigned cases."  See Complaint, ¶21.

There are no actual factual allegations that demonstrate that Drs. Steely and Humphrey were paid differently that Dr. Scott.  There are no actual factual allegations that demonstrate there existed a pattern of case assignment, much less one based upon race.  It is not sufficient to simply name drop other physicians and say racial discrimination occurs.

To survive a motion to dismiss, a §1981 complaint must do more than "allege facts plausibly showing that race was a 'motivating factor' in the defendant's decision", rather, the complaint must contain "'sufficient factual matter, accepted as true, to state a

---

3 For purposes only of this Motion to Dismiss, Defendants will assume that Dr. Humphrey is a white cardiologist, although, in fact, Dr. Humphrey is not a cardiologist.

claim to relief that is plausible on its face' under the but-for causation standard."

*Comcast,* 140 S. Ct. at 1019.  A §1981 plaintiff first must show that he was deprived of a protected right and then establish causation.  *Id.* at 1018.  Plaintiff fails to meet this threshold.  The Complaint's general allegations of racial discrimination are conclusory, threadbare and unsupported.  As Plaintiff fails to meet the pleading requirements for a §1981 claim, the cause of action against CRMC for violation of §1981 should be dismissed with prejudice.

    **C.**    **Plaintiff fails to state facts to support his claim of a violation of the Arkansas Civil Rights Act of 1993.**

Under Ark. Code Ann. §16-123-107(a)(1), all otherwise qualified persons have the right to be "free from discrimination because of race, religion, national origin, gender, or the presence of any sensory, mental, or physical disability."  This extends to the "right to obtain and hold employment without discrimination."  *Id.*  Further, Section (c)(1)(A) lays out a cause of action for any employee who is injured by their employer for acts of employment discrimination.  Ark. Code Ann. § 16-123-107(c)(1)(A).

Claims under ACRA are analyzed under the same criteria as the Title VII claims. *See Henderson v. Simmons Foods, Inc.,* 217 F.3d 612, 615 n.3 (8th Cir. 2000).  Thus, a failure to establish even one element of a *prima facie* case under Title VII is fatal to a claim under ACRA.  See *Tatum v. City of Berkeley,* 408 F.3d 543, 550-51 (8th Cir. 2005).  For the reasons Plaintiff's claims against CRMC under Title VII fail, so does his claims against CRMC under ACRA.

WHEREFORE, Defendant, Conway Regional Medical Center, Inc. prays that the Court grant its Motion Dismiss and dismiss Plaintiff's Amended Complaint with prejudice and award costs and attorneys' fees, as well as all other just and property relief to which Defendant may show itself entitled.

Respectfully submitted,

**MALLARD GARDNER, PLLC**
1422 Scott Street
Little Rock, AR 72202
T:    (501)850-8501
F:    (844)778-1750
E:    gabriel.mallard@mallardgardner.com;
      taylor.pray@mallardgardner.com


/s/ Gabriel D. Mallard
Gabriel Mallard (2005130)
Taylor Pray (2020127)
*Attorneys for Conway Regional Medical Center, Inc.*

12

## CERTIFICATE OF SERVICE

I, Gabriel D. Mallard, do hereby certify that on this 29th day of June, 2021 a copy of the foregoing pleading was served upon the named individuals through electronic filing pursuant to Administrative Order No. 21:

Dylan J. Botteicher
COX, STERLING, MCCLURE &
VANDIVER, PLLC
8712 Counts Massie Rd.
North Little Rock, AR 72113
T: (501) 954-8073
F: (501) 954-7856
E: djbotteicher@csmfirm.com

 /s/ Gabriel D. Mallard _____

Gabriel D. Mallard

ELECTRONICALLY FILED
Faulkner County Circuit Court
Crystal Taylor, Circuit Clerk
2021-Jul-08  12:09:36
23CV-21-404
C20D01 : 4 Pages

## IN THE CIRCUIT COURT OF FAULKNER COUNTY, ARKANSAS
## 20TH CIRCUIT DIVISION 1

DR LENSEY SCOTT V CONWAY REGIONAL MEDICAL CENTER

23CV-21-404

**SUMMONS**

**THE STATE OF ARKANSAS TO DEFENDANT:**

C T Corporation System
124 West Capitol Ave Suite 1900
Little Rock, AR  72201

A lawsuit has been filed against you. The relief demanded is stated in the attached complaint.  Within 30 days after service of this summons on you (not counting the day you received it) - or 60 days if you are incarcerated in any jail, penitentiary, or other correctional facility in Arkansas - you must file with the clerk of this court a written answer to the complaint or a motion under Rule 12 of the Arkansas Rules of Civil Procedure.

The answer or motion must also be served on the plaintiff or plaintiff's attorney, whose name and address are:

Dylan J. Botteicher
8712 Counts Massie Road
North Little Rock, AR  72113

If you fail to respond within the applicable time period, judgment by default may be entered against you for the relief demanded in the complaint.

Additional notices:
•Notice of Right to Consent to Disposition of Case by a State District Court Judge

Address of Clerks Office

CRYSTAL TAYLOR, CIRCUIT CLERK
CIRCUIT COURT OF FAULKNER COUNTY
724 LOCUST STREET
CONWAY, AR  72034

CLERK OF COURT

N Eastham, DC

Date: 06/09/2021

## NOTICE OF RIGHT TO CONSENT
## TO DISPOSITION OF CASE BY A STATE DISTRICT COURT JUDGE

In accordance with Administrative Order Number 18, you are hereby notified that upon the consent of all the parties in a case, a State District Court Judge may be authorized to conduct all proceedings, including trial of the case and entry of a final judgment. Copies of appropriate consent forms are available from the Circuit Clerk.

You should be aware that your decision to consent or not to consent to the disposition of your case before a State District Court Judge is entirely voluntary, and by consenting to the reference of this matter to a State District Court Judge, the parties waive their right to a jury trial, and any appeal in the case shall be taken directly to the Arkansas Supreme Court or Court of Appeals as authorized by law.

You should communicate your consent by completing the Form -- CONSENT TO PROCEED BEFORE A STATE DISTRICT COURT JUDGE -- and return to the Circuit Clerk.



Circuit Clerk
Date: 06/09/2021

No. 23CV-21-404 This summons is for C T Corporation System (name of Defendant).

PROOF OF SERVICE

❑ On _____ [date] I personally delivered the summons and complaint to the individual at _____ [place]; or

❑ After making my purpose to deliver the summons and complaint clear, on _____ [date] I left the summons and complaint in the close proximity of the defendant by _____ [describe how the summons and complaint was left] after he/she refused to receive it when I offered it to him/her; or

❑ On _____ [date] I left the summons and complaint with _____, a member of the defendant's family at least 18 years of age, at _____ [address], a place where the defendant resides; or

☒ On 6-29-2021 at 1:37PM [date] I delivered the summons and complaint to CT Corporation System [name of individual], an agent authorized by appointment or by law to receive service of summons on behalf of Jack Stephens Heart Institute [name of defendant]; or

❑ On _____ [date] at _____ [address], where the defendant maintains and office or other fixed location for the conduct of business, during normal working hours I left the summons and complaint with _____ [name and job description]; or

❑ I am the plaintiff or an attorney of record for the plaintiff in this lawsuit, and I served the summons and complaint on the defendant by certified mail, return receipt requested, restricted delivery, as shown by the attached signed return receipt.

❑ I am the plaintiff or an attorney of record for the plaintiff in this lawsuit, and I mailed a copy of the summons and complaint by first-class mail to the defendant together with two copies of a notice and acknowledgment and received the attached notice and acknowledgment form within twenty days after the date of mailing

❑ Other [specify]: _____

❑ I was unable to execute service because: _____
_____
_____

My fee is $ 65.00

**To be completed if service is by a sheriff or deputy sheriff:**

Date: _____     SHERIFF OF _____ COUNTY, ARKANSAS

By: _____
[Signature of server]

_____
[Printed name, title, and badge number]

**To be completed if service is by a person other than a sheriff or deputy sheriff:**

Date: _6-29-2021_     By: _____
[Signature of server]

_John A. Burns_
[Printed name]

Address: _1579 Ellen Court_
_Little Rock, AR 72212_

Phone: _501-960-7414_

Subscribed and sworn to before me this date: _6-29-2021_

_____
Notary Public

My commission expires: _2-9-2028_

JAMES B PIERCE
NOTARY PUBLIC
PULASKI COUNTY, ARKANSAS
COMM. EXP. 2-9-2026
COMMISSION NO. 12703273

Additional information regarding service or attempted service:
_____
_____

ELECTRONICALLY FILED
Faulkner County Circuit Court
Crystal Taylor, Circuit Clerk
2021-Jul-08 12:09:36
23CV-21-404
C20D01 : 4 Pages

## IN THE CIRCUIT COURT OF FAULKNER COUNTY, ARKANSAS
## 20TH CIRCUIT DIVISION 1

### DR LENSEY SCOTT V CONWAY REGIONAL MEDICAL CENTER

23CV-21-404

### SUMMONS

**THE STATE OF ARKANSAS TO DEFENDANT:**

C T Corporation System
124 West Capitol Ave Suite 1900
Little Rock, AR 72201

A lawsuit has been filed against you. The relief demanded is stated in the attached complaint   Within 30 days after service of this summons on you (not counting the day you received it) - or 60 days if you are incarcerated in any jail, penitentiary, or other correctional facility in Arkansas - you must file with the clerk of this court a written answer to the complaint or a motion under Rule 12 of the Arkansas Rules of Civil Procedure.

The answer or motion must also be served on the plaintiff or plaintiff's attorney, whose name and address are:

Dylan J. Botteicher
8712 Counts Massie Road
North Little Rock, AR 72113

If you fail to respond within the applicable time period, judgment by default may be entered against you for the relief demanded in the complaint.

Additional notices:
•Notice of Right to Consent to Disposition of Case by a State District Court Judge

CLERK OF COURT

Address of Clerks Office

CRYSTAL TAYLOR, CIRCUIT CLERK
CIRCUIT COURT OF FAULKNER COUNTY
724 LOCUST STREET
CONWAY, AR 72034

N Eastham, DC

Date: 06/09/2021

## NOTICE OF RIGHT TO CONSENT
## TO DISPOSITION OF CASE BY A STATE DISTRICT COURT JUDGE

In accordance with Administrative Order Number 18, you are hereby notified that upon the consent of all the parties in a case, a State District Court Judge may be authorized to conduct all proceedings, including trial of the case and entry of a final judgment. Copies of appropriate consent forms are available from the Circuit Clerk.

You should be aware that your decision to consent or not to consent to the disposition of your case before a State District Court Judge is entirely voluntary, and by consenting to the reference of this matter to a State District Court Judge, the parties waive their right to a jury trial, and any appeal in the case shall be taken directly to the Arkansas Supreme Court or Court of Appeals as authorized by law.

You should communicate your consent by completing the Form -- CONSENT TO PROCEED BEFORE A STATE DISTRICT COURT JUDGE -- and return to the Circuit Clerk



Circuit Clerk
Date: 06/09/2021



No. 23CV-21-404 This summons is for C T Corporation System (name of Defendant).

## PROOF OF SERVICE

❑ On _____ [date] I personally delivered the summons and complaint to the individual at _____ [place]; or

❑ After making my purpose to deliver the summons and complaint clear, on _____ [date] I left the summons and complaint in the close proximity of the defendant by _____ [describe how the summons and complaint was left] after he/she refused to receive it when I offered it to him/her; or

❑ On _____ [date] I left the summons and complaint with _____, a member of the defendant's family at least 18 years of age, at _____ [address], a place where the defendant resides, or

☒ On *6-29-2021* at *1:37 pm* [date] I delivered the summons and complaint to *CT Corporation System* [name of individual], an agent authorized by appointment or by law to receive service of summons on behalf of *St. Vincent Infirmary Medical Center* [name of defendant]; or

❑ On _____ [date] at _____ [address], where the defendant maintains and office or other fixed location for the conduct of business, during normal working hours I left the summons and complaint with _____ [name and job description]; or

❑ I am the plaintiff or an attorney of record for the plaintiff in this lawsuit, and I served the summons and complaint on the defendant by certified mail, return receipt requested, restricted delivery, as shown by the attached signed return receipt.

❑ I am the plaintiff or an attorney of record for the plaintiff in this lawsuit, and I mailed a copy of the summons and complaint by first-class mail to the defendant together with two copies of a notice and acknowledgment and received the attached notice and acknowledgment form within twenty days after the date of mailing.

❑ Other [specify]:

_____

❑ I was unable to execute service because:

_____
_____

My fee is $ *65.00*

**To be completed if service is by a sheriff or deputy sheriff:**

Date: _____          SHERIFF OF _____ COUNTY, ARKANSAS

By: _____
[Signature of server]

_____
[Printed name, title, and badge number]

**To be completed if service is by a person other than a sheriff or deputy sheriff:**

Date: *6-29-2021*     By: _____
[Signature of server]

*John A. Burns*
[Printed name]

Address: *1519 Ellen Court*
*Little Rock, AR 72212*

Phone: *501-960-7414*

Subscribed and sworn to before me this date: *6-29-2021*

_____
Notary Public

JAME B PIERCE
NOTARY PUBLIC
PULASKI COUNTY, ARKANSAS
COMM. EXP. 2-9-2028
COMMISSION NO. 12703273

My commission expires: *2-9-2028*

Additional information regarding service or attempted service:

_____

_____

ELECTRONICALLY FILED
Faulkner County Circuit Court
Crystal Taylor, Circuit Clerk
2021-Jul-12  14:26:18
23CV-21-404
C20D01 : 8 Pages

## IN THE CIRCUIT COURT OF FAULKNER COUNTY, ARKANSAS
### CIVIL DIVISION

**DR. LENSEY SCOTT**                                                  **PLAINTIFF**

**VS.**                                   **CASE NO. 23CV-21-404**

**CONWAY REGIONAL MEDICAL
CENTER, INC.; JACK STEPHENS HEART
INSTITUTE, LLC; and ST. VINCENT
INFIRMARY MEDICAL CENTER**                              **DEFENDANTS**

### PLAINTIFF'S RESPONSE TO DEFENDANT CONWAY REGIONAL MEDICAL CENTER, INC.'S MOTION TO DISMISS

COMES NOW, Plaintiff, Dr. Lensey Scott ("Dr. Scott"), by and through his attorneys, Cox, Sterling, McClure & Vandiver, PLLC, and for his Response to Conway Regional Medical Center Inc.'s ("Conway Regional") Motion to Dismiss the Amended Complaint, states:

### I.     LEGAL STANDARD

Arkansas courts construe pleadings liberally and deem them sufficient if they advise the other party of its obligations and alleges a breach of them. *Bethel Baptist Church v. Church Mut. Ins. Co*., 54 Ark. App. 262, 265 (1996). All reasonable inferences must be resolved in favor of the complaint when testing the sufficiency of the pleading on a motion to dismiss. *Perry v. Baptist Health*, 358 Ark. 238, 241 (2004). In considering a motion to dismiss under Ark. R. Civ. P. 12(b)(6), Arkansas courts must treat the facts alleged in the complaint as true and viewed in the light most favorable to the party seeking relief. *Deitsch v. Tillery*, 309 Ark. 401, 405 (1992). Under this standard, the Dr. Scott's pleading is more than sufficiently plead.

### II.     ARGUMENT

The motion to dismiss argues three points: 1) Dr. Scott is not an employee of Conway Regional; 2) Dr. Scott fails to establish a §1981 claim; and 3) Dr. Scott fails to establish a claim

under the ACRA. Each of these arguments culminate in erroneous conclusions, and therefore the motion to dismiss should be denied.

A.    <u>Dr. Scott was an employee of Conway Regional</u>.

Conway Regional argues that this Court is bound by the EEOC's determination that there was not an employee-employer relationship. Contrary to Conway Regional's arguments, the law is clear that the EEOC determination should not be given any weight and it is the Court's obligation to provide a judicial forum for the ultimate resolution of the discriminatory employment claim. *Tulloss v. Near N. Montessori Sch., Inc*., 776 F.2d 150, 154 (7th Cir. 1985) (citing *Alexander v. Gardner-Denver Co*., 415 U.S. at 60 n.2). The nature and extent of an EEOC investigation is in the discretion of that agency and merely serves to provide a notification of the EEOC's findings. *EEOC v. Keco Indus., Inc*., 748 F.2d 1097, 1100 (6th Cir. 1984). The EEOC's determination, especially, when it made the determination in ten (10) days without corresponding with Dr. Scott, is given no credence. Instead, Rule 12 demands that the Court take all facts alleged in the Complaint as true.

Conway Regional incorrectly asserts that it was not an "employer" per Title VII. An employer is an entity engaged in an industry affecting commerce who has fifteen or more employees. 42 U.S.C. § 2000e(b). Under this definition, Conway Regional is certainly an employer. The Eighth Circuit considers traditional definitions of employer and employee to identify the relationship defined by the statute. *Daggitt v. UFCW, Local 304A*, 245 F.3d 981, 987 (8th Cir. 2001). Congress intended for the definition of employer is to be given liberal construction to eliminate the "inconvenience, unfairness and humiliation of racial discrimination." *Baker v. Stuart Broad. Co*., 560 F.2d 389, 391 (8th Cir. 1977). Multiple related entities may be liable under Title VII under either a "single employer" or "joint employer theory" for a statutory purpose when

2

the separate entities integrate to accomplish a business purpose. *Pulitzer Pub. Co. v. NLRB*, 618 F.2d 1275, 1278 (8th Cir. 1980). Courts view four factors to determine if there was integration: (1) some functional interrelation of operations, (2) centralized control of labor relations, (3) common management, and (4) common ownership or financial control. *Id.* at 1279.

The Amended Complaint makes allegations that meet all of these factors. The Amended Complaint states that Dr. Scott worked under Conway Regional's management and executives that it shared with the other Defendants, which meets each of the factors. Am. Compl. ¶ 15. It states that Conway Regional and the other Defendants controlled the terms and conditions of Dr. Scott's employment at all times. Am. Compl. ¶ 16. Dr. Scott worked under the control of the Conway Regional CEO, Matt Troup. Am. Compl. ¶ 19. Troup is not only the CEO of Conway Regional, but he is also an employee of St. Vincent, which shows the common management and control between the entities. Furthermore, Dr. Jordan and Ms. Atkinson, both who worked for the other Defendants, informed Dr. Scott that they controlled the operations at Conway Regional. Am. Compl. ¶ 19.

Troup had the ability to control Dr. Scott's treatment of patients and control Dr. Scott's work hours. Am. Compl. ¶¶ 20-22. Troup's role as the Conway Regional CEO and as a St. Vincent employee is a prototypical example of common management and common ownership that indicate two companies are either a joint employer or single employer. *Baker v. Stuart Broad. Co*., 560 F.2d 389, 392 (8th Cir. 1977); *McKenzie v. Davenport-Harris Funeral Home*, 834 F.2d 930, 933 (11th Cir. 1987). The Amended Complaint undoubtedly alleges that Dr. Scott was an employee of Conway Regional. *See* Am. Compl. ¶ 3. Conway Regional relies on the contract to argue against Dr. Scott, but Title VII is broader than a contract and courts must consider the functional relationship between the parties because an employer cannot avoid Title VII simply by affixing a

label in a contract. *Vahid v. Farmers Ins. Exch.*, 985 F. Supp. 2d 1002, 1007 (S.D. Iowa 2013) (citing *Schwieger v. Farm Bureau Ins. Co*., 207 F.3d 480, 483 (8th Cir. 2000). All allegations are to be taken as true and viewed in the light most favorable to Dr. Scott, and therefore Dr. Scott should be considered an employee of Conway Regional under Title VII and the ACRA.

Conway Regional's behavior is precisely why the single employer and joint employer theories exist; otherwise, all companies could create a web of companies and contracts to avoid liability of Title VII. This is precisely why the Title VII analysis ignores the contractual label. Conway Regional is seeking to use a veil of separate corporate entities in order to avoid liability for discriminatory actions. Dr. Scott is not required to plead the entirety of his case "while toeing the starting blocks." *Stepan v. Bloomington Burrito Grp., LLC*, No. 14-3288 ADM/TNL, 2014 U.S. Dist. LEXIS 176084, at *8 (D. Minn. Dec. 22, 2014). Conway Regional's interpretation of Rule 12 would render virtually all plaintiffs unable to sufficiently plead a cause of action. The discovery process, in this case and in all Arkansas cases, is required in order to delve into the interrelations of defendants. Dr. Scott has met the "mere possibility" threshold established by *Iqbal* as to Conway Regional being considered an employer under Title VII.

Next, Conway Regional argues that Dr. Scott failed to raise a claim of hostile work environment before the EEOC. Plaintiffs may seek relief for any discrimination that is reasonably related to the substance of the allegations in the administrative charge. *Nichols v. Am. Nat'l Ins. Co*., 154 F.3d 875, 887 (8th Cir. 1998). These charges are to be interpreted with the "utmost liberality" so as to not frustrate the remedial purpose of Title VII. *Cobb v. Stringer*, 850 F.2d 356, 359 (8th Cir. 1988).

Conway Regional's reliance on *Richter* and *Williams* is unfounded. Both of those cases were narrowly decided when an employee did not check the "retaliation" box. Similarly, the

4

reliance on *Fair* is baseless because that case involved an employee who brought an EEOC charge of race discrimination only to later sue based on gender discrimination as well. In *Fair*, the gender box was not checked. A hostile work environment is a type of race discrimination claim. *Singletary v. Mo. Dep't of Corr.*, 423 F.3d 886, 892 (8th Cir. 2005). A hostile work environment claim involves unwelcomed harassment based on the employee's race. *Moss v. Texarkana Ark. Sch. Dist.*, 240 F. Supp. 3d 966, 979 (W.D. Ark. 2017). There is no "hostile work environment" box to check, and therefore the "race" box was the correct for Dr. Scott to check in order to describe his hostile work environment claims in which he was treated differently than his white colleagues. Dr. Scott's EEOC charge clearly shows that he checked the boxes for both "race" and "retaliation" and that he was terminated after complaining about his treatment due to his race.

B.     Dr. Scott has established a §1981 claim.

Conway Regional has argued that Dr. Scott has failed to meet the burden as set out in *Iqbal*. This is a state court case, but Dr. Scott has met the *Iqbal* standard as well. *Iqbal* states that a complaint proceeds even if the allegations are improbable so long as the allegations do not defy reality as we know it: claims about little green men, or the plaintiff's recent trip to Pluto, or experiences in time travel. *Ashcroft v. Iqbal*, 556 U.S. 662, 696 (2009). Complaints should be dismissed when the allegations are fantastical, such as allegations of the federal government working with a landlord to pipe pharmaceutical gases into an apartment and poison a tenant's animal. *Guthrie v. United States Gov't*, 618 F. App'x 612, 617 (11th Cir. 2015). The allegations in Dr. Scott's Complaint are not fantastical, and therefore it certainly meets the incredibly low bar set forth in *Iqbal*.

Unlike the cases cited by Conway Regional, Dr. Scott has identified several facts that show his treatment was different than similarly situated employees. Dr. Scott has identified comparators

that were similarly situated in all relevant aspects and Dr. Scott has explained the discriminatory behavior in detail. When testing the sufficiency of complaints, all reasonable inferences are resolved in favor of the complaint and pleadings are to be liberally construed. *Perry v. Baptist Health*, 358 Ark. 238, 248, 189 S.W.3d 54, 60 (2004). All of Dr. Scott's allegations have to be taken as true, and therefore his Amended Complaint should not be dismissed.

Dr. Scott has alleged that he was paid less than white physicians and that he was not reimbursed for unbilled hospital charges while white physicians were. Am Compl. ¶ 18. Dr. Scott named white physicians who were similarly situated to Dr. Scott in all relevant aspects. Dr. Scott was not assigned evening cases, which affect his compensation, while white physicians were regularly assigned evening cases. Am. Compl. ¶ 21. Dr. Scott was punished for complaining about unprofessional behavior when white physicians, specifically Dr. Steely and Dr. Humphrey, were never punished for complaining about unprofessional behavior. Am. Compl. ¶ 23. Dr. Scott's and another minority cardiologist's contracts were not renewed while white cardiologists who were similarly situated to Dr. Scott had their contracts renewed.  Am. Compl. ¶ 32. Dr. Scott has plainly alleged the treatment he received based on his race in his Complaint with specific factual allegations. Dr. Scott's Complaint is not fantastical, and it has provided sufficient notice of what Dr. Scott's claims are. Accordingly, the §1981 claim should not be dismissed.

C.      Dr. Scott has established a claim under the ACRA.

Conway Regional is correct that claims under the ACRA are analyzed under the same criteria as Title VII claims. However, Conway Regional incorrectly states that it adopts all of its arguments regarding Title VII claims when it argues that the ACRA claims should be dismissed.

There is not an exhaustion of administrative remedies requirement under the ACRA because the statute does not provide that administrative procedures will be exclusive, and

according to the Supreme Court of the United States, "The most common application of the exhaustion doctrine is in cases where the relevant statute provides that certain administrative procedures shall be exclusive." *McKart v. U.S.*, 395 U.S. 185, 193 (1969).  The ACRA provides that any party in violation of the Act will be liable in a circuit court for damages.  Ark. Code Ann. § 16-123-105(a).  Conway Regional has argued that Dr. Scott has failed to exhaust his administrative remedies with regards to the Title VII hostile work environment claim.  However, a hostile work environment claim under the ACRA does not require an exhaustion of administrative remedies and therefore Conway Regional's argument regarding the ACRA hostile work environment claim fails.  Nevertheless, Dr. Scott did exhaust his administrative remedies for the Title VII hostile work environment claim.

WHEREFORE, Plaintiff, Dr. Scott, prays that the motion to dismiss is denied, for his costs expended in this action, and for reasonable attorneys' fees.

Respectfully Submitted,

By:   */s/ Dylan J. Botteicher*

Dylan J. Botteicher (ABN 2017170)
COX, STERLING, MCCLURE &
VANDIVER, PLLC
8712 Counts Massie Rd.
North Little Rock, AR 72113
T: (501) 954-8073
F: (501) 954-7856
E: djbotteicher@csmfirm.com
Attorney for the Plaintiff

## CERTIFICATE OF SERVICE

I certify that July 12, 2021, a true and correct copy of the above response was forwarded to the counsel via eFLEX and served via U.S. mail:

7

Gabriel Mallard
Taylor Pray
1422 Scott Street
Little Rock, AR 72202

St. Vincent Infirmary Medical Center
124 West Capitol Avenue, Suite 1900
Little Rock, AR 72201

Jack Stephens Heart Institute
124 West Capitol Avenue, Suite 1900
Little Rock, AR 72201

By: */s/ Dylan J. Botteicher*
Dylan J. Botteicher (ABN 2017170)

ELECTRONICALLY FILED
Faulkner County Circuit Court
Crystal Taylor, Circuit Clerk
2021-Jul-16  16:15:53
23CV-21-404
C20D01 : 10 Pages

**IN THE CIRCUIT COURT OF FAULKNER COUNTY, ARKANSAS**
**CIVIL DIVISION**

**DR. LENSEY SCOTT**                                                              **PLAINTIFF**

**VS.**                               **CASE NO. 23CV-21-404**

**CONWAY REGIONAL MEDICAL**
**CENTER, INC.; JACK STEPHENS HEART**
**INSTITUTE, LLC; and ST. VINCENT**
**INFIRMARY MEDICAL CENTER**                                    **DEFENDANTS**

**REPLY IN SUPPORT OF DEFENDANT CONWAY**
**REGIONAL MEDICAL CENTER, INC.'S MOTION TO DISMISS**

Comes Now Defendant Conway Regional Medical Center, Inc. ("CRMC"), by and through its undersigned counsel, Mallard Gardner PLLC, and for its Reply to Plaintiff's Response to CRMC's Motion to Dismiss, states as follows:

**INTRODUCTION**

On July 12, 2021, Plaintiff submitted his Response to Defendant's Motion to Dismiss and supporting Brief. However, Plaintiff has failed to rebut the underlying deficiencies in his claims, as set forth in Defendant's Motion to Dismiss, warranting the dismissal of Plaintiff's Complaint as a Matter of Law.

**I.     As Evidenced by Plaintiff's Own Attachments to the Amended**
**Complaint, Plaintiff Was Not an Employee of CRMC.**

In many hospitals and other healthcare facilities, a physician may not always be an employee of the facility in which he or she is providing patient care. Increasingly, hospitals use professional staffing companies or exclusive provider agreements to find and retain providers. This is the type of arrangement set forth in the Plaintiff's Physician Employment Agreement for Cardiology Services with Jack Stephens Heart Institute, LLC ("JSHI"). Complaint, Ex. E. However, a hospital's use of a staffing company or a

1

service agreement cannot be stretched to create an employer-employee relationship where the hospital has provided little more to the physician than access to patients.

A key element of any prima facie case of termination due to race is a showing that a plaintiff is an employee of the entity he or she brings a complaint against. See *Tatum v. City of Berkeley*, 408 F.3d 543, 551 (8th Cir. 2005); see also *Wheeler v. Aventis Pharms.*, 360 F.3d 853, 857 (8th Cir. 2004). Failure to establish even one element of a prima facie case defeats a discrimination claim brought under Title VII of the Civil Rights Act of 1964 ("Title VII"). *Tatum*, 408 F.3d at 550-51.

Plaintiff has tried to argue that because CRMC is "engaged in an industry affecting commerce" and has more than fifteen employees, it meets the definition of an "employer" under 42 U.S.C. § 2000e(b). While CRMC certainly meets the definition of an employer required to abide by Title VII protections under this definition, this does not change the fact that CRMC was not Plaintiff's employer according the supporting documents Plaintiff attached to his Complaint.

Although not directly addressed in Arkansas or more broadly by the Eighth Circuit, other circuits have ruled that physicians with staff privileges at hospitals are not employees for Title VII purposes simply because the hospital exercises some level of control over patient care and record keeping. *Cilecek v. Inova Health Sys. Servs.*, 115 F.3d 256, 260 (4th Cir. 1997); *Aziz v. Uvalde Cty. Hosp. Auth.*, 990 F.2d 626, 1993 WL 117825, at 2 (5th Cir. 1993).

In his Response to CRMC's Motion to Dismiss, Plaintiff addresses the possibility that his claim against CRMC should survive because they could be deemed a "single employer" or a "joint employer." The Western District of Texas recently addressed both of these theories in *Perry v. Pediatric Inpatient Critical Care Servs., P.A.*, when a

physician, Dr. Perry, sued both Pediatric Inpatient Critical Care Services ("PICCS"), the professional association through which he rendered services, and VHS San Antonio Partners, which ran North Central Baptist Hospital, the hospital with which PICCS had an exclusive services agreement. 2020 WL 1248263, at 1 (W.D. Tex. Mar. 16, 2020). There, the court found that while "the Hospital retained the right to request Plaintiff's removal, and exercised that right, there is simply insufficient evidence for a reasonable factfinder to conclude that the Hospital was 'so involved in the daily employment decisions of [PICCS] as to justify treating the two [entities] as a single employer.'" *Id.* at 14. Further, they found a joint employment theory to be equally untenable because "system-wide or Hospital-wide policies are simply conditions for operating within the System or the Hospital applicable to all physicians" and they are "necessary to the Hospital's attempt to fulfill its duties to patients to provide quality care and abide by federal rules and regulations." *Id.* at 21. While the hospital exerted control over Dr. Perry in the general sense, "it is not the type of control sufficient to create a joint employer relationship." *Id.*

Regardless, the Court has no obligation to delve into a more detailed factual analysis of the "single employer" or "joint employer" theories when there is ample support to grant this Motion to Dismiss based on two exhibits attached to the Complaint: the EEOC Dismissal and Notice of Rights letter and the JSHI Employment Agreement.

  a.  The EEOC Dismissal and Notice of Rights letter states that Plaintiff was not CRMC's employee.

Plaintiff alleges that the Court should not give deference to the EEOC's determination that there was no employer/employee relationship. However, in the past,

federal courts in Arkansas have relied solely on EEOC determinations to grant Motions to Dismiss.

For example, in *Pitchford v. Southland Racing Corp.*, Frederick Lee Pitchford sued Southland Racing Corporation over a potential job furnishing one of Southland's parks. 2008 WL 2954275 at 1 (E.D. Ark. July 29, 2008). Pitchford alleged that Southland violated his Title VII rights and attached the Right to Sue letter, stating that no employer/employee relationship existed, to his complaint. In this case, the Court granted Southland Racing Corp's Motion to Dismiss, plainly stating that "there is nothing in the record to support a conclusion that Plaintiff was ever an employee. Thus, Plaintiff's claims under Title VII and the ADEA cannot succeed." *Id.* at 1.

Similar to the issue presented in *Pitchford*, the current Motion to Dismiss under the Court's consideration offers the same information: a plaintiff has filed a Complaint alleging violations of Title VII, along with documentation from the EEOC that is wholly incompatible with those claims. Plaintiff's Dismissal and Notice of Rights letter from the EEOC states that "the EEOC is closing its file on this charge for the following reason: No employee/employer relationship." Complaint, Ex. B[1]. For these reasons, the Court should give deference to the finding already made by the EEOC and dismiss Plaintiff's claims.

b. <u>The JSHI Employment Agreement clearly establishes that Plaintiff is solely an employee of JSHI.</u>

---

[1] It should be noted that Plaintiff states he is not under an obligation to list "hostile work environment" on the Charging Document, despite decisions in the Eighth Circuit holding otherwise. See *Williams v. Little Rock Mun. Water Works*, 21 F.3d 218 (8th Cir. 1994) (holding that where an EEOC charge did not refer to racial discrimination, racial discrimination claims could not be added after the EEOC investigation had concluded).

4

Under the sole employment agreement attached to the Complaint, Plaintiff agreed to be an employee of JSHI. See Complaint, Ex. E. Section 2.1 of the Agreement states that Plaintiff shall "render professional medical services to patients solely and exclusively on behalf of Employer." Plaintiff argues that "courts must consider the functional relationship between the parties" to deem him an employee of CRMC. However, the details of Plaintiff's Employment Agreement does little to demonstrate any functional employer-employee relationship between Plaintiff and CRMC.

Here, Plaintiff is correct - determining whether or not a Title VII defendant qualifies as an "employer" is a "fact-intensive consideration of all aspects of the working relationship between the parties." *Hunt v. State of Mo., Dep't of Corr.*, 297 F.3d 735, 741 (8th Cir.2002). Both the Eighth Circuit and the United States Supreme Court have looked to twelve factors to evaluate potential employment relationships:

> "the skill required; the source of the instrumentalities and tools; the location of the work; the duration of the relationship between the parties; whether the hiring party has the right to assign additional projects to the hired party; the extent of the hired party's discretion over when and how long to work; the method of payment; the hired party's role in hiring and paying assistants; whether the work is part of the regular business of the hiring party; whether the hiring party is in business; the provision of employee benefits; and the tax treatment of the hired party."

*Schwieger v. Farm Bureau Ins. Co. of N.E.*, 207 F.3d 480, 484 (2000) (quoting *Nationwide Mut. Ins. Co. v. Darden*, 503 U.S. 318, 323–24, 112 S.Ct. 1344, 117 L.Ed.2d 581 (1992)).

After examining these factors in *Alexander v. Rush N. Shore Med. Ctr.*, the Seventh Circuit found that an Egyptian-born Muslim physician could not bring a claim of discrimination against an Illinois hospital, Rush North Shore, after the revocation of his staff privileges. 101 F.3d 487, 490 (7th Cir. 1996). There, the Seventh Circuit held

5

that a Title VII claim against the hospital was untenable, in part, because the physician did not list the hospital as his employer on his tax returns and "he never received any compensation, paid vacation, private office space, or any other paid benefits from Rush North Shore," and because "he had the authority to exercise his own independent discretion concerning the care he delivered to his patients based on his professional judgment as to what was in their best interests" *Id.* at 493.

A review of the Employment Agreement demonstrates that CRMC had no responsibility for Plaintiff's compensation, leave, or benefits, nor does CRMC have any authority over Plaintiff's medical judgment. Further, Section 2.6 of the Agreement states that "Physician shall at all times exercise independent medical judgment and control over all his professional activities and services." See Complaint, Ex. E. Plaintiff has failed to plead any facts to establish de facto employment by CRMC and has attached his exclusive Employment Agreement with JHSI. Thus, the Court should dismiss Plaintiff's Complaint because the Complaint clearly demonstrates Plaintiff was not employed by CRMC.

## II. The facts included in Plaintiff's Complaint fail to support that any loss experienced was but for Plaintiff's race.

As Plaintiff has stated in his Response to Defendant's Motion to Dismiss, the Court must treat all well pled factual allegations in a Complaint as true. However, this standard is not without its limits. Arkansas is a fact pleading state, mirroring the pleading standards set for federal pleadings in *Iqbal*. See *Hutchinson v. McArty*, 2020 Ark. 190, 4, 600 S.W.3d 549, 552 (2020); See also *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009). In Arkansas, "the rules of civil procedure require fact pleading, and a complaint must state facts, not mere conclusions,

6

in order to entitle the pleader to relief." *Clowers v. Lassiter*, 2005, 213 S.W.3d 6, 363 Ark. 241; *Perry v. Baptist Health*, 2004, 189 S.W.3d 54, 358 Ark. 238.

Beyond this, the Court has further discretion to evaluate a complaint on a Motion to Dismiss. The Arkansas Supreme Court has held that they "treat only the *facts* alleged in a complaint as true for purposes of a motion to dismiss but not a party's theories, speculation, or statutory interpretation." *Sanford v. Walther*, 2015 Ark. 285, 3, 467 S.W.3d 139, 142 (2015).

As stated in CRMC's Motion to Dismiss, prevailing on a 42 U.S.C. § 1981 ("§1981") claim for racial discrimination requires a Plaintiff to "initially plead and ultimately prove that, but for race, [he] would not have suffered the loss of a legally protected right." *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 140 S. Ct. 1009, 1019 (2020). Thus, to survive a motion to dismiss, a §1981 claim must "provide 'enough fact to raise a reasonable expectation that discovery will reveal evidence' that, but for the plaintiff's race, the loss of or interference with the contractual right would not have occurred." *Swinton v. 10 Fitness Inc. Rodney Parham*, 2020 WL 7495535 at 3 (E.D. Ark. Dec. 21, 2020) (quoting *Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 140 S. Ct. 1009, 1019 (2020)).

In December 2020, a similar complaint was dismissed in *Swinton v. 10 Fitness Inc. Rodney Parham* when an African American patron member of a 10 Fitness facility, Reggie Swinton, was asked to leave the facility after a female patron made a complaint about him. Mr. Swinton brought a §1981 against 10 fitness, alleging that the "action being taken against him, i.e., being kicked out of the club, was racially motivated" *Id.* The Court found Mr. Swinton's allegations to be "conclusory, threadbare, and unsupported" - "even taking [the allegations] as true, they fall well short of raising a

reasonable inference of intentional discrimination by 10 Fitness Inc. or its employees. At bottom, Mr. Swinton's claim is based on nothing more than the racial identities of the people involved." *Id.* Ultimately, the Court dismissed Mr. Swinton's claim because the facts he raised were "not enough to raise the specter of intentional racial discrimination." *Id.*

Plaintiff's Complaint includes various allegations against CRMC, including an allegation that Plaintiff was not paid in full for his services, an allegation that Matt Troup reported Plaintiff for "bogus unprofessional behavior," an allegation that he received an unfavorable call schedule, and allegation that an unnamed CRMC employee cursed and screamed at Plaintiff. Amended Complaint ¶ 18 – 23.

Plaintiff repeatedly states that all of these events were "because of his race" Amended Complaint ¶ 17, 21, 23. However, Plaintiff fails to plead, with any specificity, how these alleged events were related to his race or retaliatory due to complaints he made, rather than common workplace disputes. Similar to the complaint in *Swinton*, Plaintiff has alleged that that he experienced negative treatment at CRMC and he has alleged that this treatment is based on the racial identities of the parties involved. He has failed to allege any facts describing how this treatment was racially motivated. The Court has no obligation to give any deference to theories or speculation that these events were motivated by race, when no fact included in the Complaint would indicate such.

## CONCLUSION

Plaintiff's Complaint fails to set forth sufficient facts entitling him to any relief from Defendants based on his claims of violations of Title VII, §1981, and the Arkansas Civil Rights Act. Accordingly, Defendants respectfully request that the Court enter an order granting their Motion to Dismiss, dismissing Plaintiff's Verified Second Amended

Complaint in its entirety, awarding Defendants' attorneys' fees and costs incurred in filling this motion, and for such other and further relief as the Court deems just and proper.

Respectfully submitted,

**MALLARD GARDNER, PLLC**
1422 Scott Street
Little Rock, AR 72202
(501)850-8501
gabriel.mallard@mallardgardner.com
taylor.pray@mallardgardner.com


___/s/ Taylor S. Pray_____
Gabriel Mallard (2005130)
Taylor S. Pray (2020127)
*Attorneys for Conway Regional Medical Center, Inc.*

9

## CERTIFICATE OF SERVICE

I, Taylor S. Pray, do hereby certify that on this 16th day of July, 2021 a copy of the foregoing pleading was served upon the named individuals through electronic filing pursuant to Administrative Order No. 21:

Dylan J. Botteicher
COX, STERLING, MCCLURE &
VANDIVER, PLLC
8712 Counts Massie Rd.
North Little Rock, AR 72113
T: (501) 954-8073
F: (501) 954-7856
E: djbotteicher@csmfirm.com

*ATTORNEY FOR PLAINTIFF*

    /s/ Taylor S. Pray
Taylor S. Pray, AR BAR #2020127

**IN THE CIRCUIT COURT OF FAULKNER COUNTY, ARKANSAS**
**20TH CIRCUIT DIVISION 1**

DR LENSEY SCOTT V CONWAY REGIONAL MEDICAL CENTER

23CV-21-404

**SUMMONS**

**THE STATE OF ARKANSAS TO DEFENDANT:**

  JACK STEPHENS HEART INSTITUTE, LLC
124 West Capitol Ave Suite 1900
Little Rock, AR  72201

A lawsuit has been filed against you. The relief demanded is stated in the attached complaint.  Within 30 days after service of this summons on you (not counting the day you received it) - or 60 days if you are incarcerated in any jail, penitentiary, or other correctional facility in Arkansas - you must file with the clerk of this court a written answer to the complaint or a motion under Rule 12 of the Arkansas Rules of Civil Procedure.

The answer or motion must also be served on the plaintiff or plaintiff's attorney, whose name and address are:

Dylan J. Botteicher
8712 Counts Massie Road
North Little Rock, AR  72113

If you fail to respond within the applicable time period, judgment by default may be entered against you for the relief demanded in the complaint.

Additional notices:
•Notice of Right to Consent to Disposition of Case by a State District Court Judge


CLERK OF COURT

Address of Clerks Office

CRYSTAL TAYLOR, CIRCUIT CLERK
CIRCUIT COURT OF FAULKNER COUNTY
724 LOCUST STREET
CONWAY, AR  72034

BDonahue

B Donohue, DC

Date: 07/19/2021

## NOTICE OF RIGHT TO CONSENT
## TO DISPOSITION OF CASE BY A STATE DISTRICT COURT JUDGE

In accordance with Administrative Order Number 18, you are hereby notified that upon the consent of all the parties in a case, a State District Court Judge may be authorized to conduct all proceedings, including trial of the case and entry of a final judgment. Copies of appropriate consent forms are available from the Circuit Clerk.

You should be aware that your decision to consent or not to consent to the disposition of your case before a State District Court Judge is entirely voluntary, and by consenting to the reference of this matter to a State District Court Judge, the parties waive their right to a jury trial, and any appeal in the case shall be taken directly to the Arkansas Supreme Court or Court of Appeals as authorized by law.

You should communicate your consent by completing the Form -- CONSENT TO PROCEED BEFORE A STATE DISTRICT COURT JUDGE -- and return to the Circuit Clerk.

Circuit Clerk
Date: 07/19/2021

No. 23CV-21-404 This summons is for   JACK STEPHENS HEART INSTITUTE, LLC (name of Defendant).


PROOF OF SERVICE

❑ On _____ [date] I personally delivered the summons and complaint to the individual at _____ [place]; or

❑ After making my purpose to deliver the summons and complaint clear, on _____ [date] I left the summons and complaint in the close proximity of the defendant by _____ [describe how the summons and complaint was left] after he/she refused to receive it when I offered it to him/her; or

❑ On _____ [date] I left the summons and complaint with _____, a member of the defendant's family at least 18 years of age, at _____ [address], a place where the defendant resides; or

❑ On _____ [date] I delivered the summons and complaint to _____ [name of individual], an agent authorized by appointment or by law to receive service of summons on behalf of _____ [name of defendant]; or

❑ On _____ [date] at _____ [address], where the defendant maintains and office or other fixed location for the conduct of business, during normal working hours I left the summons and complaint with _____ [name and job description]; or

❑ I am the plaintiff or an attorney of record for the plaintiff in this lawsuit, and I served the summons and complaint on the defendant by certified mail, return receipt requested, restricted delivery, as shown by the attached signed return receipt.

❑ I am the plaintiff or an attorney of record for the plaintiff in this lawsuit, and I mailed a copy of the summons and complaint by first-class mail to the defendant together with two copies of a notice and acknowledgment and received the attached notice and acknowledgment form within twenty days after the date of mailing.

❑ Other [specify]:

_____

❑ I was unable to execute service because:

_____
_____

My fee is $ _____.

**To be completed if service is by a sheriff or deputy sheriff:**

Date: _____          SHERIFF OF _____ COUNTY, ARKANSAS

By: _____
[Signature of server]


_____
[Printed name, title, and badge number]

**To be completed if service is by a person other than a sheriff or deputy sheriff:**

Date: _____     By: _____
[Signature of server]


_____
[Printed name]

Address: _____

_____

Phone: _____

Subscribed and sworn to before me this date: _____


_____
Notary Public

My commission expires: _____

Additional information regarding service or attempted service:

_____

_____

**IN THE CIRCUIT COURT OF FAULKNER COUNTY, ARKANSAS**
**20TH CIRCUIT DIVISION 1**

DR LENSEY SCOTT V CONWAY REGIONAL MEDICAL CENTER

23CV-21-404

**SUMMONS**

**THE STATE OF ARKANSAS TO DEFENDANT:**

ST. VINCENT INFIRMARY MEDICAL CENTER
124 West Capitol Ave Suite 1900
Little Rock, AR  72201

A lawsuit has been filed against you. The relief demanded is stated in the attached complaint.  Within 30 days after service of this summons on you (not counting the day you received it) - or 60 days if you are incarcerated in any jail, penitentiary, or other correctional facility in Arkansas - you must file with the clerk of this court a written answer to the complaint or a motion under Rule 12 of the Arkansas Rules of Civil Procedure.

The answer or motion must also be served on the plaintiff or plaintiff's attorney, whose name and address are:

Dylan J. Botteicher
8712 Counts Massie Road
North Little Rock, AR  72113

If you fail to respond within the applicable time period, judgment by default may be entered against you for the relief demanded in the complaint.

Additional notices:
•Notice of Right to Consent to Disposition of Case by a State District Court Judge

CLERK OF COURT

Address of Clerks Office

CRYSTAL TAYLOR, CIRCUIT CLERK
CIRCUIT COURT OF FAULKNER COUNTY
724 LOCUST STREET
CONWAY, AR  72034

*BDonohue*

B Donohue, DC

Date: 07/19/2021

## NOTICE OF RIGHT TO CONSENT
## TO DISPOSITION OF CASE BY A STATE DISTRICT COURT JUDGE

In accordance with Administrative Order Number 18, you are hereby notified that upon the consent of all the parties in a case, a State District Court Judge may be authorized to conduct all proceedings, including trial of the case and entry of a final judgment. Copies of appropriate consent forms are available from the Circuit Clerk.

You should be aware that your decision to consent or not to consent to the disposition of your case before a State District Court Judge is entirely voluntary, and by consenting to the reference of this matter to a State District Court Judge, the parties waive their right to a jury trial, and any appeal in the case shall be taken directly to the Arkansas Supreme Court or Court of Appeals as authorized by law.

You should communicate your consent by completing the Form -- CONSENT TO PROCEED BEFORE A STATE DISTRICT COURT JUDGE -- and return to the Circuit Clerk.

Circuit Clerk
Date: 07/19/2021

No. 23CV-21-404 This summons is for  ST. VINCENT INFIRMARY MEDICAL CENTER (name of Defendant).

PROOF OF SERVICE

❑ On _____ [date] I personally delivered the summons and complaint to the individual at _____ [place]; or

❑ After making my purpose to deliver the summons and complaint clear, on _____ [date] I left the summons and complaint in the close proximity of the defendant by _____ [describe how the summons and complaint was left] after he/she refused to receive it when I offered it to him/her; or

❑ On _____ [date] I left the summons and complaint with _____, a member of the defendant's family at least 18 years of age, at _____ [address], a place where the defendant resides; or

❑ On _____ [date] I delivered the summons and complaint to _____ [name of individual], an agent authorized by appointment or by law to receive service of summons on behalf of _____ [name of defendant]; or

❑ On _____ [date] at _____ [address], where the defendant maintains and office or other fixed location for the conduct of business, during normal working hours I left the summons and complaint with _____ [name and job description]; or

❑ I am the plaintiff or an attorney of record for the plaintiff in this lawsuit, and I served the summons and complaint on the defendant by certified mail, return receipt requested, restricted delivery, as shown by the attached signed return receipt.

❑ I am the plaintiff or an attorney of record for the plaintiff in this lawsuit, and I mailed a copy of the summons and complaint by first-class mail to the defendant together with two copies of a notice and acknowledgment and received the attached notice and acknowledgment form within twenty days after the date of mailing.

❑ Other [specify]:

_____

❑ I was unable to execute service because:

_____

_____

My fee is $ _____.

**To be completed if service is by a sheriff or deputy sheriff:**

Date: _____          SHERIFF OF _____ COUNTY, ARKANSAS

By: _____
[Signature of server]


_____
[Printed name, title, and badge number]

**To be completed if service is by a person other than a sheriff or deputy sheriff:**

Date: _____     By: _____
[Signature of server]


_____
[Printed name]

Address: _____

_____

Phone: _____

Subscribed and sworn to before me this date: _____


_____
Notary Public

My commission expires: _____

Additional information regarding service or attempted service:

_____

_____

# EXHIBIT B

**IN THE UNITED STATES DISTRICT COURT FOR THE**
**EASTERN DISTRICT OF ARKANSAS**
**CENTRAL DIVISION**

**DR. LENSEY SCOTT**                                                                           **PLAINTIFF**

**V.**                                                        **CASE NO.**

**CONWAY REGIONAL MEDICAL CENTER, INC.;**                   **DEFENDANTS**
**JACK STEPHENS HEART INSTITUTE, LLC; and**
**ST. VINCENT INFIRMARY MEDICAL CENTER**

## <u>NOTICE OF CONSENT TO REMOVAL</u>

Defendant Conway Regional Medical Center, Inc. ("**Conway Regional**"), through counsel,

files this consent to removal under 28 U.S.C. §1446(b).

      1.      On April 13, 2021, Plaintiff Lensey Scott filed a Complaint against Conway

Regional in the 20th Judicial Circuit Court, Division 1, Faulkner County, Arkansas, Case No.

23CV-21-404.

      2.      On June 9, 2021, Plaintiff filed an Amended Complaint adding St. Vincent

Infirmary Medical Center ("**St. Vincent**") and Jack Stephens Heart Institute, LLC ("**JSHI**") as

parties in addition to Conway Regional.

      3.      Plaintiff served St. Vincent and JSHI on June 29, 2021 with a Summons and the

Amended Complaint.

      4.      St. Vincent and JSHI have filed or will file a notice of removal to federal court.

      5.      Conway Regional consents to removal of this action to federal court.

78940391.1

Dated: _July 26_, 2021.

Respectfully submitted,

**MALLARD GARDNER, PLLC**
1422 Scott Street
Little Rock, AR 72202
T:      (501)850-8501
F:      (844)778-1750
E:      gabriel.mallard@mallardgardner.com
        taylor.pray@mallardgardner.com

By:
Gabriel Mallard (2005130)
Taylor Pray (202127)

*Attorneys for Conway Regional Medical Center, Inc.*

78940391.1